**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **IN RE MUTUAL FUNDS INVESTMENT LITIGATION** _____ **In Re EXCELSIOR, FEDERATED and SCUDDER** **This Document Relates To:** **IN RE FEDERATED MUTUAL FUNDS DERIVATIVE LITIGATION** **Feder v. Federated Investors, Inc. et al.** | : : : : : : : : : : : : : : : | **MDL DOCKET 1586** **Case No. 04-md-15861 (CCB)** **Case No. 04-md-00933** |

**CONSOLIDATED AMENDED FUND DERIVATIVE COMPLAINT**

Plaintiffs, derivatively on behalf of the mutual funds comprising the Federated Family of mutual funds (the "Funds"), hereby complain against the defendants as follows:

## I. SUMMARY OF THE ACTION

1.      This derivative action seeks to recover damages for the Funds for harm inflicted upon them by their own fiduciaries, who breached their fiduciary duties to the Funds, including those arising under Sections 36(b) and 36(a) of the Investment Company Act of 1940 (the "ICA") and Sections 206 and 215 of the Investment Advisers Act of 1940 (the "IAA"), and by those who participated in a manipulative scheme to enrich themselves at the expense of the Funds through rapid in-and-out trading in the Funds, a practice commonly called "market timing" or "timing," and trading in shares of the Funds after the close of the financial markets each day, a practice commonly called "late trading."

2.     This Complaint seeks redress for harm caused by the managers and investment advisers of mutual funds who, in order to share in the substantial profits that market timing and late trading generate, combined with the market timers and others and allowed them to prey upon the Funds to which they owed the highest fiduciary duties of loyalty, candor, and due care.  This Complaint also seeks redress for the harm caused by the Trustees of the Funds who failed or refused to perform their fiduciary duties to manage and supervise the Funds and enforce the manager's duties in the best interests of the Funds.

3.     Market timing and late trading have been extremely harmful to the Funds. Market timing and late trading have caused hundreds of millions of dollars of harm to the Funds, primarily by inflating transaction costs and administrative costs, and adding unnecessary marketing and distribution costs, all of which are paid by the Funds. Market timing also causes serious, known disruptions to mutual funds and their operations. It forces portfolio managers to keep excess quantities of cash available in the funds to edeem market timers' shres when they sell out a position — cash that otherwise should be invested. Trading protocols are upset as capital available for investment fluctuates unpredictably, preventing portfolio managers from implementing their investment strtegies for the Fund. The effect of all this is to reduce  the returns earned by the Funds.

4.     Market timing and late trading have harmed each and every Fund in the Federated family of mutual funds, whether or not the particular Fund was the direct victim of market timing or late trading. This is so because some expenses, such service agent fees, statement costs, transaction costs, and interest charges on borrowing that increase as a result

2

of market timing and late trading and may be shared among all Funds in the Federated family, including timed-funds and non-timed funds alike. This is also so because investors have fled all the funds in the Federated family, not just the timed funds, following the public disclosure of the market timing and late trading scandal.

5.     Because of these and other problems caused by market timers, fund managers for years have had in place policies and practices designed to monitor and deter timing, including redemption penalties.

6.     Conversely, market timing and late trading have been extremely profitable for market timers, and impose little risk. Because the price movement of the underlying securities will almost certainly be followed, sometimes within a matter of hours, by a corresponding movement in the price of the funds' shares, the realization of profit on the pricing inefficiency is almost a sure bet. Market timers exploit price  inefficiencies inherent in the forward pricing structure of mutual funds.

7.     Moreover, timed or late trades cost little or nothing to execute because most timed mutual funds do not charge commissions, or "loads," for trades, thus shifting the transaction costs for market timing from the market timers to the funds themselves. Thus, for example, a one day tade can yield a net gain in excess of 100 percent, while the costs of timing are pushed off onto the Funds as the timers move in and out of no-load funds, parking their winnings in liquid cash funds between trades.

8.     Market timers and late traders could not reap these profits simply by investing in the securities held in the Funds' portfolios, because (a) the timers would bear significant

transaction costs and tax consequences if they bought and sold individual securities, which are foisted upon the Funds under the market timing and late trading scheme, and (b) the underlying securities trade in the open market and are efficiently priced, as opposed to the inefficient prices of mutual fund shares, which would deny market timers the opportunity to execute trades at unfair prices.

9.     In addition to the market timers themselves, who reaped quick and easy profits at the expense of the Funds, the advisers to the Funds and their affiliates also reaped hundreds of millions of dollars in unearned advisory, management, administrative, marketing, and distribution fees from the Funds without disclosing that they had permitted, facilitated, encouraged or even participated in the improper activities. At a minimum, the advisors failed to detect and/or prevent market timing and late trading in the Funds — the types of abusive transactions they were obligated to prevent. Simply put, the advisers abandoned their fiduciary duties to the Funds in order to inflate the already huge fees they received from the Funds.

10.     Market timing and late trading results from the wholesale abdication of the fiduciary obligations the defendants owed to the Funds. As William H. Donaldson, Chairman of the SEC, recently observed in commenting upon the scandal that has engulfed the entire mutual fund industry:

> The relationship between an investment adviser and its clients is supposed to rest on a bedrock foundation of fiduciary principles. It is extremely troubling that so much of the conduct that led to the scandals in the mutual fund industry was, at its core, a breach of the fiduciary relationship between investment

4

> advisers and their advised funds.  As fiduciaries, advisers owe
> their clients more than mere honesty and good faith.  Recent
> experience suggests that all too many advisers were delivering
> much less.[1]

11.     The market timing and late trading scandal results from the substantial and

unresolved conflicts of interest between mutual funds and the investment advisers who create

and manage the funds.  Those conflicts of interest have manifested themselves in widespread

instances of improper market timing and late trading in the mutual funds, all to the detriment

of the Funds.

12.     The "independent" directors of the Funds recklessly ignored the  nature and

extent of those conflicts of interest, the market timing they led to, and the adverse impact

they had on the Funds, and the Fund advisers therefore had little trouble deceiving them

about what was going on. In their willful ignorance, these directors approved or ratified the

fund adviser's management agreements each year, despite the harm the adviser caused or

permitted to the Funds, and approved or ratified plans permitting the adviser or its affiliates

to charge and collect marketing and distribution fees under Rule 12b-1 of the SEC

promulgated under the ICA. By approving these agreements without making any good faith

effort to inform themselves of these critical facts, the directors egregiously violated their own

statutory and fiduciary duties to the Funds.

13.     This action is brought by shareholders of the Funds on behalf of the Funds to

recover damages for the Funds from those who are responsible for the wrongdoing and from

---

[1]     Opening Statement at an open Commission meeting on May 26, 2004 (available at http://www.sec.gov/news/speech/spch052604.htm).

those who profited, directly or indirectly, from the wrongdoing.  These damages include, but are not limited to:

(a)     forfeiture and return of the management, administration, distribution, and marketing fees and all other compensation paid to the investment adviser and its affiliates during the period of market timing and late trading;

(b)     damages to the Funds for profits earned by the Fund Adviser and its affiliates (including officers and employees of the Fund Adviser) from market timing or late trading arrangements;

(c)     damages to the Funds for direct and indirect injury, including increased transaction costs, liquidity costs, tax expenses, and lost investment opportunities, caused by market timing or late trading; and

(d)     damages to the Funds for 12b-1 fees paid to the Fund Adviser and its affiliates (including third-parties) in excess of the corresponding economic benefit to the Funds.

14.     This action is also brought by shareholders on behalf of the Funds to obtain injunctive relief for the Funds, including but not limited to:

(a)     rescission of the adviser's management and other agreements with the Funds;

(b)     rescission of the 12b-1  Plans adopted by the Funds;

(c)     removal of the Fund adviser and its affiliates that manage and perform other services for the Funds; and

(d)     removal of each of the Trustees of the Funds named in this Complaint and replacing them with independent Trustees.

## II.  JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Section 44 of the ICA, 15 U.S.C. § 80a-43,  Section 214 of the IAA, 15 U.S.C. § 80b-14, and 28 U.S.C. § 1331(a).

16.     This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims asserted herein, because they arise out of and are part of the same case or controversy as plaintiffs' federal claims.

17.     Venue is proper in the transferor district(s), because some or all of the defendants are incorporated or conduct business in, and/or some of the wrongful acts alleged herein took place or originated in those judicial districts. Venue is also proper in this District of Maryland because some of the wrongful acts alleged herein took place or originated in this district.

18.     In connection with the acts and practices alleged herein, defendants directly or indirectly used the instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets and national securities exchanges.

19.     This is a consolidated amended complaint filed pursuant to an Order of the Judicial Panel on Multidistrict Litigation, captioned *In re Mutual Fund Investment Litigation*, MDL Docket No. 1586, centralizing pretrial proceedings in these actions in this Court.  To preserve the filing dates of the original complaints for purposes of any applicable statutes of

limitation and all other defenses based upon the passage of time, the plaintiffs herein expressly reserve the right to seek transfer of these actions back to the transferor courts at the conclusion of pretrial proceedings.

### III. **PARTIES**

**A.**   **Plaintiffs**

20.   The plaintiffs are all currently investors in the Federated Funds specified below, and maintained their investments during the transactions complained of herein.

(a)   Plaintiff Dolores Banas invested in the Federated Fund for U.S. Government Securities, the Federated High Income Bond Fund, the Federated Government Income Securities Fund and the Federated Strategic Income Fund.

(b)   Plaintiff Howard Bertram invested in the Federated American Leaders Fund.

(c)   Plaintiffs Edward Casey and Tina Casey invested in the Federated International Small Company Fund.

(d)   Plaintiff Brian Clark invested in the Federated American Leaders Fund, the Federated Bond Fund, the Federated Capital Income Fund, the Federated Fund for U.S. Government Securities, the Federated International Value Fund, the Federated Kaufmann Fund, the Federated Large Cap Growth Fund, the Federated Global Value Fund, the Federated International Small Company Fund, the Federated Mid Cap Strategies Fund and the Federated Government Income Securities Fund and the Federated Technology Fund.

(e)   Plaintiff Michael Feder invested in the Federated Kaufmann Small Cap

8

Fund.

(f)     Plaintiff Howard W. Mathews invested in the Federated Fund for U.S. Government Securities.

(g)     Plaintiffs Michael J. Meehan and Teresa M. Meehan invested in the Federated Capital Income Fund and the Federated Strategic Income Fund.

(h)     Plaintiff Dina Rozenbaum invested in the Federated International Small Company Fund.

(i)     Plaintiff Risa B. Schneps invested in the Federated Kaufmann Fund.

(j)     Plaintiff Elizabeth Shuhany invested in the Federated Capital Appreciation Fund and the Federated Kaufmann Fund.

(k)     Plaintiff Stanley Soto invested in the Federated Kaufmann Small Cap Fund.

(l)     Plaintiff Virginia Wilcox invested in the Federated  American Leaders Fund, the Federated Bond Fund, the Federated Capital Income Fund, the Federated Fund for U.S. Government Securities, the Federated Global Value Fund, the Federated International Value Fund, the Federated Government Income Securities Fund and the Federated Kaufmann Fund.

(m)     Plaintiff Lu Chang invested in the Federated International Capital Appreciation Fund.

**B.     Defendants**

**1.     The Federated Defendants**

9

21.    **The Adviser Defendants.**  Defendant Federated Investment Management Company ("Federated Management") is an investment adviser registered   under the Investment Advisers Act (the "IAA"), and at all relevant times was the investment adviser to the Funds.  As of January 1, 2004, the advisory function was switched to another affiliate of Federated Management.

22.    Federated Management delegated daily management of some of the Funds to defendant Federated Global Investment Management Corporation ("Global"), as Sub-Adviser. Global is also a registered investment adviser under the IAA and Global continues as sub-adviser to the present time.  The Funds pay substantial Sub-Advisory fees directly to the Sub-Adviser.

23.    **The Distributor Defendant.**  At all relevant times, shares of the Funds were distributed by Federated Securities Corporation ("Federated Securities"). Federated Securities enters into separate distribution agreements with each of the Funds, which are governed by §12(b) of the ICA, which provides for fees to be paid based on a percentage of assets under management in each fund (the "12b-1 Fees").

24.    **The Administrator.**  Defendant Federated Services Co. ("Federated Services") provides transfer agency, administrative, accounting and record keeping services to the Funds, also pursuant to separate fee agreements with the Funds.

25.    **The Parent Company Defendant.**  Federated Management, Federated Global, Federated Services and Federated Securities are all wholly owned subsidiaries of Federated Investors, Inc. ("Federated Investors"), a Pennsylvania public corporation that is the

"controlling person" of the entire Federated Mutual Fund Complex.

26.     Federated Investors sponsors over 135 nominally separate investment companies, all registered with the SEC under the ICA. The individual "portfolios" comprising the individual mutual funds managed by Federated's subsidiaries have been referred to collectively in its regulatory filings as "The Fund Complex" or "The Federated Complex of Funds."

27.     **The Director Defendants.**  The Funds are governed by Boards of Trustees which are charged with selecting and overseeing the Advisers.  With minimal exceptions not relevant here, the Boards of all the Federated Funds were, at all relevant times, essentially identical. Moreover, unlike the directors of most companies, all of these board members serve for an indefinite term, and most of them have no other employment. As a result, they function as de facto employees or consultants rather than as typical directors, who are subject to periodic re-election. The members of the Boards of the Funds are, and were at all relevant times:

(a)     John D. Donahue (Chairman).   According to Fund Statements of Additional Information ("SAI's"), John Donahue was at all relevant times Chief Executive Officer and Director of the Federated Fund Complex; Chairman and Director, Federated Investors, Inc.; and Chairman, Federated Investment Management Company, Federated Global Investment Management Corp. and Passport Research, Ltd., another affiliated company.  He is conceded to be an "interested" Trustee.  He was born on July 28, 1924 and has been a director since April 1984.

11

(b)     J. Christopher Donahue (President).    According to Fund SAI's, J. Christopher Donohue was at all relevant times Principal Executive Officer of the Federated Fund Complex; Trustee of the Funds in the Federated Fund Complex,  Chief Executive Officer and Director, Federated Investors; President, Chief Executive Officer and Trustee, Federated Management;  Trustee, Federated Investment Counseling; President, Chief Executive Officer and Director, Federated Global; Trustee, Federated Shareholder Services Company; and Director, Federated Services Company.  He is conceded to be an "interested" Trustee.

(c)     Lawrence D. Ellis, M.D.  According to Fund SAI's, Dr. Ellis is Trustee of the Federated Fund Complex; Professor of Medicine, University of Pittsburgh; Medical Director, University of Pittsburgh Medical Center Downtown; and Hematologist, Oncologist and Internist, University of Pittsburgh Medical Center.  Federated designates him as an "interested" Trustee because his son-in-law is employed by the funds' distributor, Federated Securities.  He was born on October 11, 1932 and has been a Director since August 1987. He also resides in Pittsburgh.

(d)     Thomas G. Bigley.  According to Fund SAI's, Mr. Bigley's only "Principal Occupation" is  Director of the Federated Fund Complex. He was born on February 3, 1934 and has been a Director since October 1995.  He resides in Pittsburgh, where Federated is located.

(e)     John T. Conroy, Jr.   According to Fund SAI's, the "Principal Occupation" of Mr. Conroy is Director of the Federated Fund Complex.  He is also Chairman

of the Board, Investment Properties Corporation; Partner or Trustee in real estate ventures in Southwest Florida. He was born on June 23, 1937 and has been a director since November 1991.

(f)     Nicholas P. Constantakis.  According to Fund SAI's, Mr. Constantakis' only "Principal Occupation" is Director of the Federated Fund Complex. He was born on September 3, 1939 and has been a director since February 1998.  He also resides in Pittsburgh.

(g)     John F Cunningham.  According to Fund SAI's, the only "Principal Occupation" of Mr. Cunningham is Director of the Federated Fund Complex.  He was born on March 5, 1943 and has been a director since January 1999.

(h)     Peter E. Madden.  According to Fund SAI's, the "Principal Occupation" of Mr. Madden is Director of the Federated Fund Complex.  He is also a Management Consultant. He was born on March 16, 1942 and has been a Director since November 1991.

(i)     Charles F. Mansfield, Jr.  According to Fund SAI's, the "Principal Occupation" of Mr. Mansfield is Director of the Federated Fund Complex.  He is also a Management Consultant.  He was born on April 10, 1945 and has been a Director since January 1999.

(j)     John E. Murray, Jr.  According to Fund  SAI's, the "Principal Occupation" of Mr. Murray is Director of the Federated Fund Complex.  He is also Chancellor and Law Professor, Duquesne University; and Consulting Partner, Mollica and Murray.  He  was born on December 20, 1932 and has been a Director since February 1995.

He also resides in Pittsburgh.

(k)     Marjorie P. Smuts.   According to Fund SAI's, the "Principal Occupation" of Ms. Smuts is Director of the Federated Fund Complex.  She is also a Public Relations/Marketing Consultant/Conference Coordinator.  She was born on June 21, 1935 and has been a Director since April 1984.  She also resides in Pittsburgh.

(l)     John S. Walsh.  According to Fund SAI's, the "Principal Occupation" of Mr. Walsh was, at all relevant times, Director, Federated Fund Complex.  He is also President and Director, Heat Wagon, Inc. (a manufacturer of construction temporary heaters); President and Director, Manufacturers Products, Inc. (a distributor of portable construction heaters); and President, Portable Heater Parts, a division of Manufacturers Products, Inc.  He was born on November 28, 1957 and has been a Director since January 1999.

28-30.     [Intentionally Omitted]

**2.     <u>Additional Defendants</u>**

31.     Various financial institutions, which are not affiliates of Federated Investors, were active participants in late trading and market timing schemes that injured the Funds. These "Additional Defendants" are:

(a)     **Defendant Bank of America Corp. ("BOA")** is a Delaware corporation with its headquarters at Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina.[2]  BOA is a bank holding company and a financial holding

---

[2]  Effective April 1, 2004, FleetBoston Financial Corporation ("Fleet"), a Rhode Island corporation, merged with and into BOA pursuant to an Agreement and Plan of Merger, dated as of October 27, 2003.

company that provides a diversified range of banking and non-banking financial services and products.  BOA is the indirect parent of Banc of America Securities LLC.

(b)     **Defendant Banc of America Securities LLC ("BAS")**, a Delaware limited liability company, is a wholly-owned subsidiary of NationsBanc Montgomery Holdings Corporation, which is itself a wholly owned subsidiary of NB Holdings Corporation. NB Holdings Corporation is wholly owned by BOA. BAS, a registered broker-dealer, is a full-service United States investment bank and brokerage firm with principal offices in San Francisco, California; New York, New York; and Charlotte, North Carolina. BAS is also registered as an investment adviser pursuant to the Investment Advisers Act of 1940.  In its capacity as broker-dealer, BAS accepts, executes and clears orders for hundreds of mutual funds, including the Funds.

(c)     **Defendant Bank of America, N.A. ("BOA N.A.")** is a wholly-owned subsidiary of defendant BOA and is headquartered at 100 North Tryou Street, Charlotte, North Carolina.

(d)     **Defendant Aurum Securities Corp. ("Aurum")**, a California corporation, is a registered investment advisor and Broker-Dealer, with offices at 120 Montgomery Street, San Francisco, California.

(e)     **Defendant Aurum Capital Management Corp. ("Aurum Capital")**, a California corporation, is a registered investment advisory firm headquartered at 84 West Santa Clara Street, Suite 690, San Jose, California.  Aurum Capital is an affiliate of Aurum.

(f)     **Defendant Trautman Wasserman & Company, Inc. ("Trautman")**,

15

a Delaware corporation, is a registered investment advisor and Broker-Dealer headquartered at 500 Fifth Avenue, Suite 1440, New York, New York.

(g)     **Defendant Pritchard Capital Partners LLC ("Pritchard")**, a Louisiana limited liability company, is a registered investment advisor and Broker-Dealer headquartered at 2001 Lakeshore Drive, Mandeville, Louisiana.

(h)     **Defendant Lehman Brothers Holdings, Inc.**, a Delaware Corporation, is an investment banking firm headquartered at 745 Seventh Avenue, New York, New York.

(i)     **Defendant Lehman Brothers, Inc. ("Lehman")**, a Delaware Corporation, is a financial institution headquartered at 399 Park Avenue, New York, New York. Lehman is a wholly-owned subsidiary of defendant Lehman Brothers Holdings, Inc. Among other things, Lehman is a retailer of mutual funds and variable life insurance or annuities. Lehman introduced timers, including Canary, to various mutual fund complexes, including the Funds, for the purpose of establishing market timing arrangements, including those that permitted Canary's market timing activity in the Funds. Lehman further engaged in the market timing scheme by executing timed trades on behalf of Canary and other timers.

(j)     **The Canary Defendants:**

(i)     **Defendant Canary Capital Partners, LLC ("Canary")**, is a New Jersey limited liability company with its principal offices in Secaucus, New Jersey. At all relevant times, Canary was a hedge fund engaged in the business of late trading and timing mutual funds. **Canary Capital Partners, Ltd. ("CCP Ltd.")** is a Bermuda limited liability company. At all relevant times, CCP Ltd. was also a hedge fund engaged in the

business of timing mutual funds.  **Defendant Canary Investment Management, LLC ("CIM")**, is a New Jersey limited liability company with its principal offices in Secaucus, New Jersey.  At all relevant times, CIM managed the assets of CCP and CCP Ltd. in exchange for a fee equal to 1.5 percent of the assets of Canary plus 25 percent of the profits above a certain threshold.  As of July 2003, CIM had received approximately $40 million in Canary management and incentive fees. The size of these fees reflects the phenomenal success Canary enjoyed both in terms of its trading results and the amount of capital it was able to gather in the fund.

(ii)    **Defendant Edward J. Stern ("Stern")** is a resident of New York County, New York and at all relevant times was the Managing Principal of Canary, CCP Ltd. and CIM.  **Defendant Noah Lerner ("Lerner")** was at all relevant times an employee of Canary.  **Defendant Andrew Goodwin ("Goodwin")** was at all relevant times up to 2001 an employee of Canary.

(iii)   Canary, CCP Ltd., CIM, and Stern are collectively referred to herein sometimes as "Canary."  In September 2003, Canary reached a settlement of charges filed against it by the Attorney General of the State of New York.

### 3.    The Nominal Defendant Federated Funds

32.    Plaintiffs bring this action on behalf of the entire family of Federated Funds, as well as on behalf of the specific funds in which they invested, which are organized under Massachusetts and Maryland law.

(a)    Each of the Federated Funds was created and sponsored by Federated

17

Investors, and is managed under the supervision of a common board of Trustees. The Trustees of all the Funds, who are designated by the adviser and serve indefinite terms, not only are essentially the same for all Funds, they have been the same throughout the period covered by this complaint; and the Trustee meetings for the Funds occur en masse. Each of the Funds also has the same adviser, the same distributor, the same custodian, the same transfer agent, and the same shareholder service provider. The agreements between the Funds and each of these entities are identical form agreements, with differences only in the fee percentages; and in many instances the funds share costs among themselves. In substance, then, all the Federated Funds are, de facto, operated as a single entity. Plaintiffs therefore bring this action on behalf of this unified entity, the entire Federated Fund Complex.

(b)     Plaintiffs also bring this action on behalf of the particular funds in which they invested. In some instances, explained below, plaintiffs invested in funds that were actually "portfolios" of investments issued by a single master trust, in which case plaintiffs sue on behalf of the entire master trust. The funds in the Federated Fund family are listed in the attached Appemdix..

## IV. STATEMENT OF FACTS

A.     **General Factual Allegations**

1.     **Introduction**

33.     Mutual funds enable small investors to invest long-term capital in the stock and bond markets. Specifically, mutual funds were intended to enable small investors to (a) accumulate diversified stock portfolios for retirement or other long-term investing with

smaller amounts of capital than otherwise would be required for such investing, (b) avoid the transaction costs that ordinarily accompany stock and bond trades, and (c) utilize the services of professional investment advisers whose services otherwise would not be available at affordable prices.

34.     Investors contribute cash, buying shares in the mutual fund, the number of which is directly proportionate to the amount of the investment.  Mutual fund shares are issued pursuant to prospectuses that must comply with The Securities Act of 1933 and the Investment Company Act.  The investor's cash is then used by the Fund to purchase such securities as are consistent with the investment goals and objectives of the mutual fund stated in the Prospectus.

35.     Mutual funds typically hold no assets other than cash and the securities purchased for the benefit of their shareholders and engage in no investment activities of their own.

36.     Mutual Funds typically have no employees.  Although funds may have officers, the portfolio managers and all of the officers are employees of the investment adviser.  The adviser "sponsors" the funds and as a practical matter is responsible for the initial creation of the funds and creating new funds in existing series.

37.     Whether a Fund is constituted as a corporation or trust, typically all of the trustees are the same individuals and have the same responsibilities, the only difference between trustees being the form of entity they serve.  Trustees have ultimate responsibility for the management of the funds.

38.     Each of the funds is created and sponsored by the adviser and is managed unde

rhte supervision of its trustees or directors.  The same trustees or directors have supervised

all the Funds at all times relevant hereto, and their meetings for all the Funds occur at or

about the same time.  Each of the Funds has the same adviser, who in turn appoints the same

trustees or directors, the same distributor, the same custodian, and the same transfer agent for

all the Funds, all fo whom serve indefinite terms.  The agreements between the Funds and

each of these entities are substantially identical form agreements, with only minor differences

only in fee percentages.  In many instances, the funds share costs among themselves.  In

substance, all the Funds are operated as a single *de facto* entity.  Plaintiffs therefore bring this

action as a derivative action on behalf of the entire Federated Family of Funds, as well as on

behalf of the particular Funds in which they invested.

39.     The trust or corporation contracts with an Adviser or Manager to handle the

day-to-day operations of the Funds, including making investment decisions, although the

Trustees retain ultimate responsibility for the fund.  The adviser or the trust will enter into

contracts with other entities which in almost all instances are affiliates of the adviser for

investment advisory servicing (adviser, sub-adviser), selling or underwriting (distributors),

shareholder relations and other back-office services (administrator).  Each of these affiliates

will typically be paid either a percentage of the adviser's fee, or a transaction fee from the

net asset value of the Fund.

40.     Mutual fund advisers charge and collect substantial management,

administration, marketing and distribution, and other fees and compensation from the funds

as a percentage of assets under management.  Mutual fund advisers have a direct economic incentive to increase the amount of assets in the funds, and thus their own fees and compensation.

### 2.   NAV Pricing

41.      Mutual fund shares are priced once each day, usually following the close of financial markets in New York at 4:00 p.m. Eastern Time.  The price, known as the Net Asset Value ("NAV"), reflects the closing prices of the securities in a particular fund's portfolio, plus the value of any uninvested cash that the fund manager maintains for the fund and minus any expenses accrued that day.  Although mutual fund shares are bought and sold all day long, the price at which the shares trade does not change during the course of the day.  Orders placed any time up to 4:00 p.m. are priced at that day's NAV, and orders placed after 4:00 p.m. are priced at the next day's NAV.  This practice is known as "forward pricing" and has been required by law since 1968.

42.      Because NAV is set just once at 4:00 p.m. every day under the forward pricing rules, each day's NAV is inefficient.  This is because the NAV has not incorporated the material information affecting the prices at which the underlying securities will trade by 4:00 p.m.  Thus, the prices at which mutual funds trade are often "stale."  In addition, mutual fund prices do not always reflect the true value of the stocks or bonds, especially thinly-traded securities or securities with high price volatility, but low trading volume, such as especially mid-cap, small-cap, and sector stocks, or high-yield and municipal bonds.

43.      Forward pricing gives rise to a number of manipulative practices, all of which

21

may be characterized as "market timing."   These manipulative practices exploit the inefficiency of forward pricing in a number of ways involving short-term "in-and-out" purchases and redemptions of mutual fund shares that are "timed" to precede small movements in the market prices of the securities in which a fund invests before the NAV reacts to the price changes.

### 3.      Market Timing Transactions

44.      Market timing transactions are frequently referred to as "round trips," because market timing involves a purchase made in anticipation of a near-term price increase that will trigger a quick sale.  For example, in the case of international funds that are inefficiently priced because, as a result of domestic and foreign markets operating at different times, the last-trade prices in the freign markets have not yet incorporated movements in the United States markets, the round trips will occur within a short time frame, often within one or two days.  In other cases, such as bond funds — where the price inefficiency lasts longer because the information that causes the security to be re-valued takes longer to be disseminated by the financial markets – the duration of the round trip will be slightly longer.

45.      Market timing frequently includes or consists of "late trading," in which market timers are permitted to purchase or sell mutual fund shares after the close of trading but at the same prices as other investors who must trade the shares during the day to get that day's NAV.

46.      Market timers employ a variety of trading strategies to profit from small increases in the market prices for stocks and bonds in which the mutual funds invest by

purchasing mutual fund shares before increases in the underlying securities affect the fund's NAV and redeeming fund shares after the NAV has risen.

47.    Many market timers purchase mutual funds when trading models analyzing performance trends indicate that prices of the underlying securities (and consequently the fund's NAV) will rise in the short-term.  For example, when a market timer's trading model indicates that the stocks of companies with small market capitalization will rise in the short term, the trader acquires small cap mutual fund shares in order to capture the benefit of the price rise.  The market timer who purchases small cap fund shares then redeems those shares once the predicted rise occurs.

48.    By purchasing and selling mutual fund shares, rather than the underlying small cap stocks, market timers avoid transaction costs such as commissions on each purchase and sale of stock, which costs are borne by the fund itself.

49.    Another market timing scheme is designed to take advantage of the fact that some NAVs are calculated using "stale" prices for the securities in the Fund's portfolio. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated.

50.    One type of stale price market timing is "time zone arbitrage," which takes advantage of the fact that funds consisting primarily of foreign securities may calculate NAV based on stale prices.  A typical example is a U.S. mutual fund that invests in Japanese securities.  Because of the time zone difference, the Japanese market closes at 2:00 a.m. New York time.  When the NAV is calculated at 4:00 p.m. in New York, it is based upon market

information that is fourteen hours old.  If there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it opens later, the stale Japanese prices will not reflect the price change and the fund's NAV will be artificially low.  A trader who buys the Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling those same shares once the NAV is adjusted to reflect the price increase.

51.     Predictable next-day price changes in foreign securities are not exploitable by trading in the securities themselves because those shares tend to re-price as soon as trading resumes the next day.  By the time a trader can buy the securities, the market price has risen to reflect the new information.  However, market timers can exploit the pricing of mutual fund shares because the funds are not re-priced in response to information that becomes available while the foreign market is closed until the following day, effectively allowing market timers to buy stock at yesterday's prices.

52.     Another market timing scheme seeks to take advantage of inefficiency in the pricing of certain municipal, corporate, and mortgage bonds.  These bonds are not efficiently priced by the market, and consequently their prices tend to lag the prices at which more efficiently priced bond futures trade.  Market timers exploit this phenomenon by purchasing (or selling) shares of a municipal bond fund that invests in such bonds on days when the prices for bond futures rise (or fall), and do so at "stale" prices.  Market timers employing this trading scheme sell (or purchase) these mutual fund shares a day or two later once the prices of the bonds have "caught up" to the prices of the bond futures, thus earning huge

24

profits with little or no corresponding risk.

53.     Yet another market timing scheme is "liquidity arbitrage." Under this scheme, a trader seeks to take advantage of stale prices in certain infrequently traded investments, such as high-yield bonds or the stock of small capitalization companies. The fact that such securities may not have traded for hours before the 4:00 p.m. closing time can render the fund's NAV stale, and thus open it to being timed.

### 4.     **Late Trading**

54.     Because of forward pricing, mutual funds are also susceptible to a manipulative practice known as "late trading." Late trading, either in conjunction with market timing or as a separate manipulative trading scheme, is the unlawful practice of allowing some investors to purchase or redeem mutual fund shares *after* 4:00 p.m. at that day's NAV, even though such after-hours trades should be priced at the next day's NAV.

55.     Late traders seek to take advantage of events that occur after the close of trading, such as earnings announcements, by purchasing shares of mutual funds on good news or redeeming shares on bad news at prices that do not reflect those events and are therefore under- or over-valued, respectively. "Late trading can be analogized to betting today on yesterday's horse races."[3] The manipulative device virtually eliminates investment risk.

56.     The late trader's arbitrage profit comes dollar-for-dollar out of the mutual fund

---

[3] *State of New York v. Canary Capital Partners et al.*, Supr. Ct. of N.Y., ¶ 10 ("NYAG Complaint").

that the late trader buys or redeems.  When the late trader redeems his shares and claims his

profit, the mutual fund manager has to either sell stock or use cash on hand – stock and cash

that belong to the fund and its shareholders and would otherwise remain invested – to give

the late trader his gain.  The late trader's profit is revenue withheld from the  mutual fund.

The forward pricing rule was enacted to prevent precisely this kind of abuse.  *See* 17 C.F.R.

§270.22c-1(a).

57.     Late trading can be accomplished in at least two different ways.  The first way

market timers are able to trade late is by making arrangements with a mutual fund adviser

or a third-party intermediary who has made arrangements with a mutual fund adviser to have

access to a trading terminal after the close of trading at 4:00 p.m. each day.  Defendant BAS

provided trading terminals to at least three broker-dealers that engaged in market timing and

Canary– in effect, making them branch offices of BAS, but unencumbered by BAS's

obligation to adhere to the forward pricing rule — giving them the ability to place orders for

mutual fund shares as late as 6:30 p.m. Pacific Time, more than five hours after the financial

markets closed in New York each day.

58.     Market timers are also able to trade late by making arrangements with

intermediaries, such as broker-dealers, trust companies, and other clearing agents, to combine

the market timers' trades with other mutual fund purchases or redemptions each day, which

are processed as batch orders.  These intermediaries net purchases against redemptions, and

submit the net orders to a mutual fund's transfer agent through the Mutual Fund Settlement,

Entry and Verification Service ("FundSERV"), an automated system operated by the

National Securities Clearing Corporation ("NSCC"), the only registered clearing agency that operates an automated system for processing mutual fund orders.

59.     Although orders must be submitted to the intermediary broker-dealers, banks, and retirement plans before 4:00 p.m. eastern time, SEC rules permit those intermediaries to forward the order information to FundSERV or transfers agents at a later time.   Often intermediaries process orders in the early evening.  The entire process, ending in processing of orders by the transfer agent, is typically completed in the middle of the night.

60.     Late traders have found numerous ways to exploit the forward-pricing regime to their advantage.  For example, some intermediaries allowed certain preferred investors to place orders after the 4:00 p.m. cutoff, but before orders were submitted to transfer agents. These intermediaries sometimes blended late trades with legitimate trades in the net order information submitted to FundSERV in order to conceal the late trading.  In other cases, late traders placed orders before the 4:00 p.m. cutoff, but were permitted to cancel or retract the orders after 4:00 p.m. Similarly, some intermediaries have permitted late traders to alter orders after 4:00 p.m.  Finally, some late traders were given trading platforms, integrated hardware-software systems, that allowed them to trade mutual fund shares directly without using an intermediary to submit orders to FundSERV.   In some cases fund managers themselves permitted and aided late trading by fund investors.

61.     Late traders were not necessarily restricted to trading in any single fund family through these schemes. Often intermediary broker-dealers sell shares of many different fund families through "Supermarkets."   It is not unusual for a single Supermarket to offer

thousands of mutual funds.  By gaining access to the trading platform of a fund Supermarket, a market timer could late trade all of the funds in that Supermarket.  Likewise, a market timer could late trade many different mutual funds through agreements with broker-dealers who operate a fund Supermarket.

62.    Market timing was not limited to third parties who acted either alone or in complicity with intermediaries to time mutual funds.  Fund insiders, like advisers, managers, and portfolio managers, sometimes unfairly availed themselves of the opportunity that market timing provided for quick profits at the expense of the mutual funds.

### 5.    Mutual Fund "Short Selling" Strategy

63.    A corollary to market timing used by some investors pursuing market timing strategies involved shorting the underlying securities that make up a fund portfolio.  Using this technique timers were able to profit in both rising and falling markets.  Generally, fund managers do not disclose the portfolio holding information of the funds they manage.  Although this information is disclosed in semi-annual and annual reports, the information is not current when it becomes publicly available.  In fact, portfolio managers are generally protective of this information and will not disclose it to individual investors and fund trackers like Morningstar.  However, some fund insiders provided detailed information regarding the portfolio holdings of funds to market timers.  The market timers could then buy the fund and simultaneously sell short[4]  a basket of stocks that mirrored the fund's holdings, leaving the

---

[4]  Short selling involves selling a security that the seller borrows on the assumption that the value of the security will drop and the short seller will be able to replace the borrowed security at a lower price than the price the short seller sold it for.

timer overall market neutral.  If the value of the underlying securities increased, the timer would sell the shares of the fund earning a quick profit.  When the value of the underlying securities decreased the timer would close out the short position, again earning a quick profit. By working with derivative dealers to create "equity baskets" of short positions that mimicked the effect of shorting every stock in the mutual fund, a timer can reduce transaction costs associated with this strategy.  Often the derivative dealers who assisted timer in creating short baskets were affiliate of banks that were loaning money to timers for timing purposes.

### 6.    Market Timing Is Easy to Detect and Has Been Well-Known Since 1997

64.    Market timing in mutual funds has occurred at least since the late 1970s. During the 1980s and 1990s, a number of papers and reports were published by the media, by scholars, and by market timers themselves that described various market timing schemes and discussed the adverse impact of market timing on mutual funds.  The mutual fund industry became aware of potential problems from stale prices as early as 1981 by virtue of the *Putnam International Equities Fund No Action Letter*,  Fed.Sec.L.Rep. ¶ 76,816, 1981 WL 25522 (Feb. 23, 1981), which explicitly discussed the question of whether pricing methods used by United States international funds properly could reflect the "fair value" of underlying assets given that different nations' markets close at different times.

65.    Prior to September 3, 2003, market timing and late trading had become common, if not unlawful, practice.  For example, a website called www.hedgefund.net listed hedge funds whose trading strategy was mutual fund market timing.

66.    In 2000, the Society of Asset Allocators and Fund Timers, Inc. ("SAAFTI")

held a conference in Chicago that was attended by brokers and capacity consultants whosecured and offered negotiated timing capacity in mutual funds and in annuities that held mutual funds.  The meeting was attended by the investment advisers of many mutual fund families who were there for the specific purpose of soliciting timing business from the brokers and consultants.

67.    Mutual fund managers, including investment advisers and portfolio managers, were at all relevant times aware of market timing (including late trading) and the deleterious impact of market timing (including late trading) on mutual funds and fund performance. Some mutual fund managers adopted measures ostensibly to prevent or deter market timing and late trading, such as redemption penalties.

68.    Fund managers were able to detect timing transactions in their funds through well-developed mechanisms, such as tracking the number of buy-sell orders, or "round trips," in a single account or monitoring the size of transactions to determine if a trader was a timer. The fund manager could then exercise discretion to refuse to execute trades on that account, forcing the timer to resort to the subterfuge of multiple accounts or multiple brokers.  These subterfuges frequently required the assistance of third party intermediaries to execute trades for the timer in such a fashion that the timing might go undetected.

69.    However, mutual fund managers, including investment advisers and portfolio managers, permitted or encouraged market timing and late trading, notwithstanding the deleterious impact of market timing and late trading on mutual funds and fund performance, and despite the measures they adopted ostensibly to prevent or deter market timing and late

trading, including redemption penalties, because they profited handsomely from market timing and late trading and the arrangements they made with market timers and late traders.

70.    Market timing is easy to detect through shareholder turnover data.  A ratio of the number of shares redeemed to the number of shares outstanding is a useful means of detecting and identifying market timing in mutual funds.  Because timers make frequent "round trips",  when timers are active in a fund, the number of shares redeemed greatly exceeds the number of shares that ordinarily would be redeemed in the absence of market timing.

71.    A fund that has not been timed will have a low ratio of redemptions-to-shares outstanding, whereas a fund that has been timed will have a much higher ratio of redemptions-to-shares outstanding.  Timed funds have redemption ratios as many as five, ten, or even 100 or more times higher than the redemption ratios for funds that are not timed.

72.    Mutual fund managers, including advisers and portfolio managers, routinely monitored mutual fund redemption rates using a variety of mechanisms of detection that were well-developed, and thus were aware of, or recklessly disregarded indications of, market timing in the form of higher than normal redemption rates.

73.    By 1997, market timing in mutual funds was well-known and well-documented. During October, 1997, Asian markets were experiencing severe volatility.  On Tuesday October 28, 1997, the Hong Kong market index declined approximately fourteen percent, following the previous day's decline on the New York stock market.  Later on Tuesday the 28th, the New York markets rallied.  Knowing that the Hong Kong market would

rebound the next day, U.S. mutual funds invested in Hong Kong securities were faced with the dilemma whether to calculate NAV based on Tuesday's depressed closing prices in Hong Kong, or whether to calculate their NAV based on another method.  Several mutual fund companies determined that the closing prices in Hong Kong did not represent "fair value" and used an alternative method to calculate NAV.  Some investors (presumably market timers) who had expected to profit from the large price swings went so far as to complain to the SEC when Fidelity used fair value pricing.

74.     On November 5, 1997 the Wall Street Journal published an article by Vanessa O'Connell describing some of the responses by mutual funds to the October market turmoil. *See Mutual Funds Fight the 'Market Timers,'* Wall St. J., 11/5/97, C1.  For example, the article described a "stock-market correction trading activity" policy announced by the Dreyfus mutual funds immediately following the drop and subsequent rebound of stock prices on October 28, 1997, which permitted Dreyfus to take an additional day to complete exchanges placed by telephone during a "severe market correction" in order to prevent harm to those funds from market timing.

75.     The SEC's investigation of fund companies' responses to the October, 1997, turmoil revealed that funds that used fair value pricing experienced less dilution than those that used market quotations.  Further, the number of investors who attempted to take advantage of the arbitrage opportunity was "fairly large."  *See* Barry P. Barbash, *Remembering the Past: Mutual Funds and the Lesson of the Wonder Years,* 1997 ICI SECURITIES LAW PROCEDURES CONFERENCE (Dec. 4, 1997).

76.     By 2001, academic research estimated that between February 1998 and March 2000 market timing caused dilution damages exceeding $420 million in a sample of only approximately 20 percent of the international funds then available to U.S. investors. *See* Jason T. Greene & Charles W. Hodges, *The Dilution Impact of Daily Fund Flows on Open-End Mutual Funds*, Journal of Financial Economics 131 (July 2002).

77.     One recent study estimated that U.S. mutual funds lose over $4 billion per year to timers. *See* Eric Zitzewitz, *Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds,* Journal of Law, Economics & Organization 19:2 (Fall 2003), 245-280.78.   By 2002 specialty firms began marketing fair value pricing programs to assist mutual fund companies in reducing arbitrage opportunity in international funds.  These firms provide programs to mutual funds that eliminate arbitrage opportunity by bringing stale prices in international securities up to date as of the time when NAV is calculated.  One firm, ITG, now offers a Fair Value Model providing "fair value adjustment factors for over 34,000 stocks in 43 markets outside the U.S."  *See* http://www.itginc.com/research/fvm.html.

**7.     Market Timing Arrangements**

79.     Most market timing (including substantially all late trading) in mutual funds took place through negotiated written or oral agreements giving market timers authority to trade certain amounts within a given mutual fund family or a number of fund families.  The authority to time mutual funds is known as "capacity."  Market timing became so widespread that many mutual fund advisers operated "timing desks" to service market timers.

80.     Timers, the intermediaries and the Funds' managers and advisers entered into

*specific negotiated agreements* to permit timing of certain funds in a fund family, often with prominent financial institutions lending money to timers to effect the trading and monitoring the trades.  Through the misuse of sophisticated computer equipment used for clearing mutual fund trades, market timing soon morphed into late trading, a practice which *guarantees* profits.

81.    Mutual fund advisers, distributors, and their affiliates, whose fees are a percentage of fund assets, profited from capacity arrangements that encouraged market timing, as well as from timing "under the radar," by charging and collecting fees on the money deposited by market timers in the mutual funds.

82.    Market timers frequently offered mutual advisers, distributors, and their affiliates static, non-trading assets, called "sticky assets," in exchange for the right to time. In other cases, timers simply moved their money between timed mutual funds and money market funds in the same fund family, thereby earning additional fees for the mutual advisers, distributors, and their affiliates.

83.    As Stephen M. Cutler, the Director of the SEC's Division of Enforcement, testified on November 3, 2003, before the Senate Subcommittee on Financial Management, the Budget and International Security Committee on Government Affairs:

> **About half of the fund groups appear to have some kind of agreement or arrangement with frequent traders**: 50% of responding fund groups appear to have one or more arrangements with certain shareholders that allow these shareholders to engage in market timing --*i.e.* these shareholders have been given "market timing capacity." The market timing of persons with these arrangements appears to be inconsistent with

the groups' policies and, in some cases, the fund groups' prospectus disclosures and/or fiduciary obligations. We are aggressively following up on these arrangements.

**Quid pro quo arrangements**: Although the information provided in this area is limited it appears that many of the persons proposing a special arrangement to get market timing space offered to invest so-called "sticky" or long-term assets in one or more funds in the complex. In most of the situations where sticky assets were discussed, the funds in which these assets were to be invested were not the same funds to be market timed by the person involved in the arrangement.

84.    Market timers obtained capacity either directly through mutual fund advisers, distributors, and their affiliates, or indirectly through broker-dealers or other timers.  Many fund families had "Anchor Brokers" or "Anchor Timers," who were designated broker-dealers or timers who had timing capacity agreements with a fund's adviser or its affiliates, and who doled out market timing "capacity" to timers.

85.    Negotiated market timing arrangements often involved other financial institutions as participants in the timing schemes, and those financial institutions (such as banks and brokerage firms) had other business relationships with the mutual funds that encouraged the funds to accommodate the other financial institutions as well as the market timers.

86.    Banks who financed market timing negotiated loans and swaps that provided market timers with leverage at exorbitant rates to time and late trade mutual fund shares as well as short equity baskets.  The banks entered these financing arrangements knowing that the loans would be used for market timing, late trading, and short baskets.  The financing

35

consisted of loans for market timing and late trading, and swaps for shorting.  The collateral

for the loans were mutual fund shares, so the banks followed trading closely to ensure that

their loans were fully secured.  Under swap arrangements, the swaps are in the bank's name

as account holder, in which event the market timer manages the money, pays interest to the

bank, and keeps the profit.

87.     Broker-dealers and other intermediaries who offered timing capacity received

remuneration from both the mutual funds themselves and the market timers to whom they

allocated capacity.

88.     Distributors and other service agents who permitted timing also benefited by

receiving increased fees based on the money deposited into the mutual funds for market

timing purposes.  Distributors often receive fees based on assets under management and may

earn commissions on sales of fund shares.  Such fees, known as "12b-1 Fees," are paid

pursuant to a plan adopted by mutual funds under Rule 12b-1 promulgated by the SEC under

the ICA for marketing and distributing mutual fund shares.  Rule 12b-1 permits a mutual

fund to pay distribution-related costs out of fund assets, provided that the fund adopts "a

written plan describing all material aspects of the proposed financing of distribution," which

must include an express finding that the fees paid will result in a net economic benefit to the

funds.  17 C.F.R. ¶ 240.12b-1.

89.     Intermediaries who facilitated market timing also received "wrap fees" from

market timers.  Wrap fees are customarily charged to investors as a single fee for a variety

of investment services, such as commission trading costs and fees of an outside money

manager. Wrap fees are charged as a flat percentage of assets rather than on a transaction-by-transaction basis. The name refers to the fact that these charges usually "wrap" a variety of investment services into a single fee — usually from 1 to 3 percent of assets. Broker-dealers who offered timing capacity to market timers often charged a percentage of assets that they termed a "wrap fee," even though the brokers did not generally give investment advice.

90.    Typically, 12b-1 Fees are deducted from fund assets and paid to the fund's primary distributor, usually an affiliate of the adviser. Distributors usually pay a portion of those 12b-1 Fees to the broker-dealers who sell fund shares. The broker-dealers continue to receive 12b-1 fees for as long as their client's money is invested in the funds. However, broker-dealers who offered timing capacity often received 12b-1 fees directly from the funds themselves, which were paid in addition to the 12b-1 fees paid to the mutual fund distributors.

91.    Negotiated capacity arrangements by market timers also facilitated late trading through a variety of manipulative schemes. For example, market timers frequently traded through third parties, *i.e.*, broker-dealers or other intermediaries who processed large numbers of mutual fund trades every day through omnibus accounts where net trades are submitted to mutual fund companies *en masse*. By trading this way, market timers evaded detection of their activity amid the other trades in the omnibus accounts. This is one example of market timing "under the radar."

92.    Timing under the radar is intended to avoid the "market timing police," a

colloquial term used by market participants to describe persons employed by mutual funds ostensibly to detect and prevent market timing.  Market timing police often ignored or did not prohibit negotiated market timing, or were instructed by their superiors that certain favored investors wee exempt from the restrictions

93.     Brokers who assisted in timing under the radar employed a number of tactics to avoid detection and to continue their illicit activities if a fund took steps to prevent their timing activity.  These tactics included:  (a) using multiple account numbers, registered representative numbers, and branch numbers to conduct market timing trades; (b) creating and using two or more affiliated broker dealers; (c) using different clearing firms to clear trades; and (d) switching between mutual fund families.  Some market timers employed these tactics directly, without relying on an intermediary broker.

### a.  Banc of America Securities LLC

94.     Some time prior to late 1999, in order to facilitate late trading and timing of mutual funds by brokers and timers through BAS, BAS, in conjunction with ADP, which operates its "back office," created a special electronic trading system called "RJE" ("Remote Job Entry"), and colloquially referred to as "the box," which it provided to certain market timers and broker-dealers who acted as intermediaries for a large number of market timers.

95.     RJE is an electronic mutual fund entry order system that could be installed in different locations and was directly hooked up to ADP through a modem.  In effect, those who had the box became branches of BAS.

96.     Those market timers and broker-dealers who received the box could enter

mutual fund orders at 5:30 p.m., 7:00 p.m., or 7:30 p.m. Eastern Time directly into ADP's clearing system, and therefore had the capability to buy and sell mutual fund shares at the 4:00 p.m. closing price up to 3-1/2 hours later.  BAS's standard system, called "MFRS," allowed trades to be entered as late as 5:30 p.m., but only if trade tickets were time stamped prior to 4:00 p.m.

97.    The box allowed broker-dealers and others to circumvent BAS's standard system and the 4:00 p.m. deadline for buying and selling mutual fund shares at that day's prices, in violation of the forward pricing rule.  17 C.F.R. § 270.22c-1(a).

98.    In addition, broker-dealers and others who had the box could "batch" mutual fund trades instead of executing them one at a time, which is the standard method of entering mutual fund orders through BAS.  The "batching" capability allowed brokers and timers who had the box to enter mutual fund trades *en masse* after the 4:00 p.m. deadline at that day's prices.

99.    Initially, the box was developed for use by the Broker-Dealer Services ("BDS") group of BAS and defendant Aurum, a broker-dealer who was known to be extensively involved in late trading and timing mutual funds.  At the time the box was developed, BDS was not very profitable, and it hoped to increase its margins by charging a per trade fee to brokers that had access to the box.

100.    BAS installed the box in the offices of three broker-dealers who routinely late-traded and timed mutual funds on behalf of their clients and themselves.  BAS gave the box to defendant Aurum in around late 1999 or early 2000, to defendant Trautman in or about

early 2001, and to defendant Pritchard in early 2003. Each of these broker-dealers was charged $10 for each trade that was entered through the box.

101.   BAS entered into clearing agreements with these brokers that, among other things, obligated them to comply with the securities laws. By virtue of these agreements, BAS sought to shift liability for its knowing violation of the forward pricing rule onto the broker-dealers.

102.   BAS also installed the box in Canary's offices in or around the summer 2001, but did not charge any fee to Canary for orders placed through the box. Rather, the Private Client Services ("PCS") group of BAS provided the box free of charge to Canary, which was not a broker-dealer, as part of a special arrangement negotiated between Stern and Theodore Siphol III ("Siphol") of PCS, under which Canary was charged a wrap fee of 100 basis points (one percent) for late trading and timing funds offered by BOA and 50 basis points (0.5 percent) for late trading and timing funds offered by other mutual fund families.

103.   On September 16, 2003, the SEC instituted an administrative proceeding against Siphol charging him with violations of the Securities Act of 1933, the Securities Exchange Act of 1934, the ICA, and the IAA for his role in enabling Canary to engage in late trading shares of mutual funds offered by BOA and other mutual fund companies. The SEC charged Siphol[5] for his facilitation of Canary's late trading "manually" and through the box. As set forth in the SEC's order:

---

[5] Siphol was also indicted on 40 counts in connection with late trading at BOA, including a scheme to defraud in the first degree, grand larceny in the first degree, violation of the Martin Act, and falsifying business records in the first degree.

"Manual" Late Trading at BAS

15.   In or around May 2001, Canary began to late trade the
Nations Funds.   At first, Canary conducted its late trading
"manually."   In the manual stage, Canary was able to engage in
late trading primarily because Sihpol and his team falsified
BAS' books and records.   Prior to 4:00 p.m. ET, a Canary trader
would send Sihpol or a member of his team a series of
"proposed" mutual fund trades by e-mail or facsimile.   Upon
receipt, Sihpol, or a member of his team acting upon his
instructions, would fill out an order ticket, time stamp it, and set
it to one side until that evening.   Thus, Sihpol created false order
tickets that made it appear as if the orders had been received
prior to 4:00 p.m. ET.

16.   Sometime after 4:00 p.m. ET, a Canary trader would
telephone Sihpol or a member of his team, and would either
confirm or cancel the "proposed" trades.   If confirmed, Sihpol's
team would fax the order (with its pre-4:00 p.m. time stamp and
no post-4:00 p.m. time stamp) to the clearing department for
processing.   As a result, Canary would receive that day's NAV.
If Canary cancelled the "order," Sihpol or a member of his team
would discard the ticket.

*Late Trading Through BAS' Electronic System*

17.  In the summer of 2001, BAS technicians installed the direct
access system in Canary's offices.   Through this system, Canary
was able to enter its trades directly into BAS' clearing function
until 6:30 p.m. ET.

18.   After a Canary trader entered the trades directly into the
system, the trader would print out a document confirming the
trades and the time (after 4 p.m.) that the trades had been
entered.   The trader then faxed the document to Sihpol or a
member of his team.   The following day, Sihpol or a member of
his team would use this document to reconcile Canary's trades.
Once the trades were reconciled, Sihpol or a member of his team
discarded the document.

19.  From the summer of 2001 until the summer of 2003, Canary

used the electronic system to late trade.  Canary also late traded "manually" whenever there were technical problems with the electronic system.  BAS technicians also installed a second direct access system in the residence of a Canary trader.

20.  The electronic system enabled Canary to late trade with Nations Funds and in the many other mutual fund families with which BAS had clearing agreements.  By using the electronic system, Canary was able to send orders directly to BAS' clearing function, circumventing the normal trading process in which each brokerage order must be properly documented, including the time the order was received.

21.  Canary paid BAS a so-called "wrap fee" of one percent of the Canary assets in Nations Funds and one-half of one percent of the assets in other funds traded through the electronic link. Sihpol received a portion of this wrap fee.  In addition, Canary agreed to leave millions of dollars invested in BAC proprietary mutual funds on a long-term basis.  Canary also paid interest and other charges to BAS and its affiliates.  Canary also paid fees for the installation and maintenance of the electronic system.

104.  By March 2004, BOA admitted that, by allowing Canary and others to time and late trade mutual funds through its clearing platform, it caused harm not only to the Nations Funds, but to other mutual fund families as well:

> The Corporation has announced it will establish a restitution fund for shareholders of the Nations Funds who were harmed by Canary's late trading and market timing practices.  In addition, the Corporation announced that it will provide restitution for shareholders of ***third party mutual funds who were harmed by any late trading activities by Canary that are found to have occurred through the Corporation*** in the event restitution is not otherwise available from Canary, its affiliates, its investors or from any other third parties.

BOA Form 10-K for Fiscal year 2003, filed March 1, 2004 (emphasis added).

105.   On March 15, 2004, the SEC and the New York Attorney General announced a $675 million joint settlement in principle with BOA and Fleet in connection with their involvement in late trading and market timing.   BOA's monetary settlement was $375 million, comprised of restitution of $250 million and penalties of $125 million (and a fee reduction of $80 million over 5 years).

106.   The SEC Press Release announcing the settlement in principle states that the $375 million "will be distributed to the mutual funds and their shareholders that were harmed as a result of market timing in Nations Funds and *other mutual funds through Bank of America*."   (Emphasis added).   In the same release quoted Mark Schonfeld of the SEC as saying:

> This settlement is a new benchmark in mutual fund market timing and late trading.  Bank of America not only permitted timing in its own funds, *it provided the instruments for timing and late trading of numerous other funds through its broker-dealer.  This settlement will ensure compensation for all victims of the harm that resulted and prevent this misconduct from happening again*.

107.   BOA's Press Release announcing the settlement states that, "subject to further discussions with the Nations Board of Trustees," approximately $25 million "would go to Nations Funds shareholders" and the remainder to shareholders of other funds that were harmed by BAS' clearing of timing trades.   Thus, *BOA itself attributed $350 million of its $375 million monetary settlement to harm caused to other mutual fund families as a result of BAS' facilitation of late trading and market in other mutual fund families*.

108.   In further recognition of BAS's misconduct in facilitating late trading through

43

the box or otherwise, the BOA's settlement with the SEC and NYAG provides that BOA will exit the securities clearing business by the end of 2004.

109.   Between late 1999 through 2003, BAS, either manually or by providing the box,  allowed Aurum to late trade approximately $5.6 billion in third-party mutual funds, Trautman to late trade approximately $8.6 billion in third-party mutual funds, Canary to late trade $21.2 billion in third party mutual funds, and Pritchard to late trade approximately $4.9 billion in third party mutual funds.

110.   Defendant BAS, by providing the box to the Aurum Defendants, Trautman and Pritchard, facilitated late trading and timing in the Federated Funds, as follows:

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Amer Leaders A | 1,143,394 | $28,085,775 | $28,245,205 | $159,430 |
| International Equity A | 1,439,319 | 20,081,321 | 20,101,333 | 20,012 |
| Kaufmann A | 6,079,202 | 23,536,472 | 23,553,138 | 16,666 |
| International Sm Co A | 330,010 | 6,409,605 | 6,420,027 | 10,422 |
| Bond A | 493,675 | 4,308,000 | 4,313,432 | 5,432 |
| Global Equity A | 28,689 | 245,000 | 248,730 | 3,730 |
| Ld Tm A | 777,583 | 7,041,216 | 7,043,558 | 2,341 |
| Government Income Sec A | 97,355 | 75,000 | 874,998 | -2 |
| Growth Strategy A | 7 | 249 | 242 | -7 |
| Aggressive Growth A | 10 | 236 | 206 | -30 |
| European Growth A | 194,752 | 1,660,823 | 1,660,725 | -98 |
| International Growth A | 286,912 | 2,136,797 | 2,124,735 | -12,063 |
| **TOTAL:** | **10,870,909** | **$94,380,495** | **$94,586,326** | **$208,832** |

111.   Defendant BAS, by providing the box to Canary, facilitated Canary's late trading and timing in the Federated Funds, as follows:

44

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Federated MaxCap Index IS | 9,904,122 | $173,875,292 | $177,761,414 | $3,886,122 |
| Federated Amer Leaders A | 11,670,423 | 219,741,483 | 220,845,633 | 1,104,150 |
| Federated Kaufman A | 27,909,282 | 131,730,140 | 132,605,127 | 874,987 |
| Federated Equity Index A | 4,804,130 | 60,730,140 | 61,452,954 | 593,680 |
| Federated Cap Apprec A | 8,893,363 | 181,813,319 | 181,144,257 | -669,062 |
| Federated Stock | 4,468,605 | 120,370,859 | 119,428,192 | -942,667 |
| **TOTAL** | **77,649,925** | **$888,290,367** | **$893,237,578** | **$4,947,210** |

## b. **Canary**

112.    In or about the summer of 2001, as part of a package deal with BAS that included late trading and timing capacity in the Nations Funds, financing for late trading and timing trades in Nations Funds and other mutual fujds, and unliminated capacity to late trade and time hundreds of other mutual funds, defendant BAS installed the "box", free of charge, at Canary's offices in Secaucus, New Jersey. The deal is memorialized in a letter dated May 1, 2001 by Stern to Siphol of BAS, in which, among other things, Stern writes:

> We plan on transacting our trades manually at first (via Fax), at a time of day that is a little bit earlier than  Matt [Augliero, a mutual fund clearing specialist at BAS] specified in our first meeting. As soon as we can work out our lending arrangement with the bank and begin transacting electronically via ADP [i.e. the box] we will draw down leverage against the capital we have deployed in the Nations funds, effectively increasing our trading capital with your firm to $32 million. If all goes well, this capital should grow larger as we get a sense of what trades can and cannot be done via the Banc of American Securities Platform. We really would like to get going with ADP and begin trading electronically as soon as possible.

113.    Canary executed a total of $888,290,367 in late trading and timing trades in the Funds through its own BAS box and a BAS box provided to Trautman.

### c. **Aurum Defendants, Trautman, and Prichard**

114.    The Aurum Defendants, Trautman, and Pritchard were broker-dealers or market timers who entered into express agreements with BAS enabling them to time and late trade mutual funds through the BAS box.  These defendants timed and late traded mutual funds both for their clients, who bought and sold hundreds of millions dollars worth of mutual funds, and for their own accounts.

115.    The Aurum Defendants, which had the box since about late 1999 or early 2000, late traded and timed the Federated Funds, as follows:

| Fund Name in the Federated Family of Funds | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Amer Leaders A | 1,143,394 | $28,085,775 | $28,245,205 | $159,430 |
| Intl Equity A | 2 | 40 | 34 | -6 |
| Growth Strat A | 7 | 249 | 242 | -7 |
| Aggressive Growth-A | 10 | 236 | 206 | -30 |
| **TOTAL:** | **1,143,412** | **$28,086,300** | **$28,245,687** | **$159,387** |

116.    Trautman, which had the box since about early 2001, late traded and timed the Federated Funds, including on behalf of Canary, as follows:

| Fund Name in the Federated Family of Funds | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Bond A | 153,492 | 1,357,000 | 1,355,445 | -1,555 |
| Intl Sm Co A | 231,147 | 4,875,324 | 4,863,003 | -12,321 |
| Intl Equity A | 581,047 | 10,448,574 | 10,417,698 | -30,876 |
| **TOTAL:** | **965,686** | **$16,680,899** | **$16,636,147** | **$-44,752** |

117.    Trautman also late traded and timed the Funds on behalf of Canary, as follows:

47

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Federated Intl Sm Co A | 261,728 | 4,171,785 | 3,882,135 | 58,192 |
| Federated Intl Equity A | 390,831 | 4,596,113 | 3,966,831 | 28,580 |
| **TOTAL** | **652,559** | **8,767,898** | **7,848,966** | **866,773** |

118.    Pritchard, which had the box since about early 2003, late traded and timed the Federated Funds, as follows:

| Fund Name in the Federated Family of Funds | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Intl Equity A | 858,271 | $ 9,632,706 | $ 9,683,601 | $50,894 |
| Intl Sm Co A | 98,863 | 1,534,281 | 1,557,023 | 22,742 |
| Kaufmann A | 6,079,202 | 23,536,472 | 23,553,138 | 16,666 |
| Bond A | 340,183 | 2,951,000 | 2,957,986 | 6,986 |
| Global Eq A | 28,689 | 245,000 | 248,730 | 3,730 |
| Ltd Tm A | 777,583 | 7,041,216 | 7,043,558 | 2,341 |
| Govt Inc Sec A | 97,355 | 875,000 | 874,998 | -2 |
| European Gr A | 194,752 | 1,660,823 | 1,660,725 | -98 |
| Intl Growth A | 286,912 | 2,136,797 | 2,124,735 | -12,063 |
| **TOTAL:** | **8,761,811** | **$49,613,296** | **$49,704,493** | **$91,197** |

119.    The late trading and timing orders that were processed through the box consisted of both "under the radar" late trading and timing, and late trading and timing arrangements between the Aurum Defendants, Trautman, and Pritchard, or their intermediaries, on the one hand, and mutual fund advisers, on the other hand. These defendants, or their intermediaries, received wrap fees for providing under the radar or negotiated late trading/timing capacity in mutual funds.

120.    Even where late trading and timing was "under the radar," mutual fund advisers knew that funds were being timed by the sheer volume of asset turnover in the funds. One

advantage to the brokers and timers that late traded and/or timed "under the radar" — as the Aurum Defendants, Trautman and Pritchard sometimes did — was that they avoided paying wrap fees to the mutual fund families. Where there was a negotiated timing arrangement with a mutual fund family, the defendants often shared their wrap fees with the mutual fund family advisers.

121-250.  [Intentionally omitted]

**(8)**    **Impact of Market Timing and Late Trading**

251.    Market timing and late trading are inconsistent with and inimical to the primary purpose of mutual funds as long-term investments. Mutual funds are marketed towards buy-and-hold investors, and are therefore the preferred investment instruments for many retirement and savings accounts. Nonetheless, certain market timers have been allowed to make frequent in-and-out trades to exploit the inefficiency of forward pricing and the cost structure of the mutual funds.

252.    Market timing and late trading harm mutual funds, directly and indirectly, in a variety of ways. The types of adverse impact caused to mutual funds from market timing generally can be grouped into three categories: (a) Dead Weight, (b) Dilution, and (c) Concentration.

253.    Dead Weight losses result from frequent transactions in mutual fund shares by market timers. Dead Weight harms not just the funds targeted and traded by market timers, but also affects other funds in the same fund family that are not market timed.

254.    Dead Weight losses include, but are not limited to, the following:

(a)     increased service agent fees, such as transfer agent, compliance administrator, custodian, portfolio accounting, shareholder servicing agent, adviser, auditor, and fund accounting fees, and other agency fees, all of which increase based on the frequency of transactions and thus increase with market timing;

(b)     statement costs (including costs of printing and postage for statements of account activity) for account statements relating to market timers' trades;

(c)     higher capital gains tax liability resulting from the sale of underlying securities to raise cash for redemption, including redemptions caused by investors who fleee the fund after learning of the late trading and timing scandal;

(d)     lost investment opportunity on cash that portfolio managers must hold in reserve to redeem market timers' shares that cannot be invested in furtherance of the funds' investment strategies and objectives;

(e)     inefficient trading in the Funds' underlying portfolio securities when investment advisers must buy or sell securities at inopportune times (*e.g.*, buying shares of stock in a rising market or selling them in a declining market) to cover market timers' trades (as well as to cover the redemption of fund shares for those innocent fund investors who have withdrawn their investments from mutual fund families implicated in the scandal);

(f)     transaction costs for transactions in the Funds' underlying portfolio securities that result from market timing (as well from as the redemption of fund shares for those innocent fund investors who have withdrawn their investments from mutual fund families implicated in the scandal), which include bid-ask spreads and brokerage fees;

50

(g)     interest on borrowing to maintain the mutual funds' position in the underlying portfolio securities; and

(h)     increased expenses for fixed costs (including trustee or director expenses) resulting from shareholder redemptions from mutual fund families implicated in the scandal.

255.   Market timing lowers the expected returns of mutual funds by restricting the amounts the fund portfolio managers are able to invest in furtherance of their investment strategies.  Because the money deposited into mutual funds by market timers is not expected to remain in the funds for long periods of time but is deposited and redeemed frequently, portfolio managers must keep greater uninvested cash balances in the funds than would be required to meet ordinary redemption demand in the absence of market timing.  With less cash available to invest, the net return on all fund assets (including the transient cash deposited by market timers) is lower than it would be otherwise if the managers were able to fully invest the money deposited by market timers.

256.   Dead Weight harms not only the funds that are timed, but can also harm non-timed funds.   Non-timed funds are harmed by market timing when timing increases costs that are shared by timed and non-timed funds within the same fund family.  Certain costs, for example custodian fees, are shared by all funds in a mutual fund family.  Market timing in one fund can cause an increase in these costs, which is then spread across all funds in the fund family.  This is true regardless of whether those fees are calculated on a transactional basis or as a percentage of assets in the funds.  If fees are calculated on a transactional basis,

the costs are increased directly.  If fees are calculated as a percentage of assets, the relevant service agent must charge a higher percentage of assets when the agreement is renegotiated in a subsequent year in order to compensate for predicted future transactions.  Any service agent fees, statement costs, transaction costs, and interest charges on borrowing that increase as a result of market timing and are shared among multiple funds cause damage to timed-funds and non-timed funds alike.

257.   Non-timed funds were also harmed by market timing when large numbers of innocent investors redeemed their shares in the wake of the scandal.  Fixed costs, such as director's fees, are shared among funds and are accrued daily.  When large numbers of investors redeemed their shares after discovering that the funds were implicated in the market timing scandal, the assets of the funds shrank and the fixed costs became a greater burden.

258.   Dead Weight is exacerbated when timing occurs in international and small capitalization funds because the underlying securities tend to be the most expensive to trade due to high bid-ask spreads.

259.   In addition to exposing mutual funds to Dead Weight, market timers who purchase mutual fund shares on the expectation of a short-term price rise and redeem those shares at a profit also dilute the fund's assets.  When a timer purchases based on an anticipated rise in the prices of the underlying securities, the portfolio manager cannot invest the timer's cash before the price of those securities rises. The timer therefore pays less  than the true value of the fund share.  When the underlying securities increase in price (as anticipated), the fund's NAV increases and the timer participates in thes "unearned

appreciation". The timer's unearned appreciation results in dilution of the fund's NAV dollar for dollar.

260.    Dilution occurs when a market timer buys a mutual fund that has a stale price incorporated into its NAV, such as a fund invested in Japanese securities that calculates NAV based on information that is fourteen hours old.  Dilution is compounded because the market timer repeatedly purchases mutual fund shares at a NAV that does not accurately reflect the value of the underlying securities.

261.    Late trading in particular dilutes the assets of a mutual fund.  When a market timer places an order to purchase mutual fund shares after the 4:00 p.m. close of the financial markets, the price at which the order should be executed is the following day's higher NAV. However, late traders are able to purchase the fund shares at the current day's lower NAV, thus reducing the purchase price for the shares and depriving the funds of the  NAV appreciation between the two days.  Late traders recapture this saving in the form of increased profits when they subsequently redeem their mutual fund shares.

262.    Dilution occurs because the fund manager cannot invest the timer's cash at the stale price on which the NAV was calculated.  In order to do so, in the example of Japanese securities, the fund manager would have to invest the timer's cash fourteen hours prior to knowing what trade is needed.  The timer's cash is either invested in the underlying securities at the next day's non-stale price, or else held in cash, but in both cases the timer receives a proportionate share of the increase in NAV that results from the rising value of the underlying securities even though the timer's money was not invested when the value of the

underlying securities increased.  Since the timer's money is either invested at a non-stale price or held in cash, it causes a dilution of NAV across all of the fund's shares.

263.    Concentration occurs when a market timer sells shares of the fund just prior to a negative price movement in the underlying securities.  The exploitation of the down turn in the market is the reversal of the exploitation of the up turn in the market in dilution.  The fund manager cannot liquidate the underlying securities prior to the next-day drop in prices, and instead must sell those securities at the reduced prices.  Therefore, the market timer is able to redeem shares based on a stale, inflated NAV, which concentrates the negative returns to the existing fund shares the next day.

**B.**      **Fund Family Specific Facts**

**1.**      **The Federated Family Fund Organization**

**a.**      **The Funds**

264.    The Federated Funds are nominally separate and distinct open-ended management investment companies with an unlimited number of authorized shares of beneficial interest. Such investment companies are commonly referred to as mutual funds. Their affairs are government by the Investment Company Act of 1940 ("the ICA"). These Funds are all sponsored and managed by the Federated corporate defendants and, as noted above, are managed and operated as a single entity (the "Federated Fund Complex").

265.    Some of these Funds are stand-alone business entities organized under the laws of Massachuisetts and Maryland. Others are not entities at all, but are portfolios of investments offered by other Federated entities ("Master Trusts"). Thus:

(a)     The Federated Income Securities Trust, an investment company, issues

the following investment portfolios:

> Fund for U.S. Government Securities
> Capital Income Fund
> Intermediate Corporate Bond Fund
> Muni and Stock Advantage Fund.

(b)     The Federated Investment Series Fund, an investment company, issues,

as a portfolio, the Federated Bond Fund.

(c)     The Federated Fixed Income Securities Series, an investment company,

issues the following portfolios:

> Federated Strategic Income Fund
> Limited Term Municipal Fund
> Limited Term Fund
> Municipal Ultrashort Fund.

(d)     The Federated World Investment Series, an investment company, issues

the following portfolios:

> Federated International Value Fund
> European Equity Fund
> Global Equity Fund
> Global Value Fund
> International Capital Appreciation Fund
>  International High Income Fund
> International Small Company Fund.

(e)     The Federated Equity Funds, an investment company, issues the

following investment portfolios:

> The Kaufmann Fund
> The Kaufman Fund II
> The Technology Fund

> The Market Opportunity Fund;
> The Kaufman Small Cap Fund
> The Capital Appreciation Fund
> The Capital Appreciation Fund II

(f)     The Federated Investment Series Fund, an investment company, issues, as a portfolio, the Federated Bond Fund.

(g)     The Federated Fixed Income Securities Series, an investment company, issues the following investment portfolios:

> The Federated Strategic Income Fund
> Limited Term Municipal Fund
> Limited Term Fund
> Municipal Ultrashort Fund

(h)     The Federated World Investment Series, an investment company, issues the following investment portfolios:

> European Equity Fund
> Global Equity Fund
> Global Value Fund
> International Capital Appreciation Fund
> International High Income Fund
> International Small Company Fund
> The Federated International Value Fund

266.     Thus, investors in the various Federated portfolios in fact hold equity interests in the master trust that issues these portfolios. The portfolios themselves are not separate business entities.

267.     Some of the Federated funds sell a single class of shares (or investment units), while others sell multiple classes, which are invested in a common portfolio of securities but differ in the sales charges and operating expenses they impose.

268.   The Federated funds are not required to hold annual meetings and, upon information and belief, do not regularly hold annual meetings.

### b.   Management of the Funds

269.   The adviser to all the Federated Funds during the relevant period was Federated Management.  As of January 1, 2004, the advisory function was switched to Federated Equity Management Company of Pennsylvania ("Equity Management"), an affiliate of Federated Management.

270.   Federated Management delegated daily management of some of the Funds to Global, as Sub-Adviser. Global remains as sub-adviser to this day. The Funds pay substantial Sub-Advisory fees directly to the Sub-Adviser.

271.   At all relevant times, shares of the Funds were distributed by Federated Securities, which enters into separate distribution agreements with each of the Funds. Pursuant to those agreements Federated Securities serves as principal underwriter of fund shares and is paid distribution fees, 12b-1 fees, contingent deferred sales charges and/or front-end sales charges, depending on the class of Fund shares in question. The 12b-1 fees are governed by §12(b) of the ICA, which provides for fees to be paid based on a percentage of assets under management in each fund (the "12b-1 Fees").

272.   At all relevant times, administrative services were provided to the Funds by Federated Services, which also receives a fee from each Fund.

273.   The agreements between the Funds and the Adviser, the Sub-Adviser, the Distributor and the Administrator are essentially identical form agreements, which require

57

the payment of fees based, in large part, on a percentage of the total assets under management by each fund. These funds have been very substantial:

| | MANAGEMENT | ADMINISTRATIVE | 12-(b)(1) |
|---|---|---|---|
| 2004 (partial year) | 39,061,780 | 6,027,673 | 32,998,870 |
| 2003 | 248,562,502 | 27,020,874 | 170,683,857 |
| 2002 | 233,046,638 | 24,818,891 | 167,889,860 |

274.   Federated Management, Federated Global, Federated Securities and Federated Services are all wholly owned subsidiaries of Federated Investors, the "controlling person" of the entire Federated Mutual Fund Complex.  In its most recent 10-K, Federated Investors described itself (including its subsidiaries) as "one of the largest mutual fund companies in the United States with $197.9 billion in assets under management at December 31, 2003." The 10-K describes Federated Investors and its subsidiaries as follows:

> Federated's principal source of revenue is investment advisory fee income earned by various subsidiaries of Federated pursuant to investment advisory contracts with the investment products. These subsidiaries are registered as investment advisers under the Investment Advisers Act of 1940.  Investment advisers are compensated for their services in the form of investment advisory fees based upon the net assets of the fund or the separately managed account.  Federated provided investment advisory services to 136 Federated-sponsored funds as of December 31, 2003.

> Certain funds sponsored by Federated have adopted distribution plans that, subject to applicable law, provide for payment to Federated for marketing expenses, including sales commissions paid to broker/dealers.   These distribution plans are implemented through a distribution agreement between

Federated and each respective fund . . . .

Federated also provides a broad range of services to support the operation, administration and distribution of Federated-sponsored funds.  These services, for which Federated receives fees pursuant to agreements with the Federated Funds, include administrative services, transfer agency services, shareholder servicing, accounting and general support.

c.      **The Directors of the Funds**

275.    The 11 "non-interested" director defendants all sit on the boards of all the Funds in the Federated Complex. Because of the structure of the Complex, most "funds" do not have a board of directors. The directors direct the master trusts that, in turn, issue the "fund" portfolios.

276.    Three of the 11 directors are acknowledged to be "interested," as defined by the ICA. Most of the other 8 directors are 65 years of age or older, and list their "principal occupation" as director of the Federated Fund Complex. They serve for an indefinite term, and receive very substantial remuneration in exchange for very little work.

277.    The directors are, in theory, responsible for the overall direction and operation of the Federated Funds, for selecting the advisers, distributor, administrator and other service providers to the funds, and for negotiating agreements with those providers.  They therefore have a fiduciary duty to those Funds to maintain the safety of the assets of the Funds.

278.    In reality, however, these directors have chosen not to play a significant role in the operation of the Funds. They have rubber-stamped the selection of all the service providers, each of which is the Federated entity created by Federated Investments for that

purpose. They have not put any of these agreements out for competitive bidding; nor have they ever considered hiring anyone else to perform any of these services. Moreover, the Funds' agreements with each of these entities are, and have been throughout the relevant time period, essentially identical, boilerplate form contracts of adhesion, dictated by the Federated Corporate Defendants. There is no arm's length bargaining concerning the terms of any of these agreements, which vary only with respect to the fee percentages designed for each of the various Funds.

279.   For performing the largely pro forma functions of approving whatever the Federated Corporate Defendants put in front of them, the Directors have paid themselves substantial fees and other benefits. The Federated Fund Complex paid each of these directors (other than the Donohues) between $115,368.16 and $128,847.72 in total compensation in 2002, and between $148,150 and $178,200 in total compensation in 2003, as set forth in the following chart:

|  | **COMPENSATION** | | | | |
| --- | --- | --- | --- | --- | --- |
| **DIRECTOR** | **FY 1999** | **FY 2000** | **FY 2001** | **FY 2002** | **FY 2003** |
| Thomas G. Bigley | 113,860 | 116,760 | 128,847 | 128,847 | 163,350 |
| John T. Conroy, Jr. | 125,264 | 128,455 | 128,847 | 128,847 | 163,350 |
| Nicholas Constantakis | 47,958 | 73,191 | 126,923 | 126,923 | 163,350 |
| Thomas G. Bigley | 113,860 | 116,760 | 128,847 | 128,847 | 163,350 |
| John F. Cunningham | 0 | 93,190 | 115,368 | 115,368 | 148,500 |
| Lawrence D. Ellis | 113,860 | 116,760 | 117,117 | 117,117 | 148,500 |
| Peter E. Madden | 113,860 | 109,153 | 117,117 | 117,117 | 148,500 |
| Charles F. Mansfield, Jr. | 0 | 102,573 | 128,847 | 128,847 | 163,350 |
| John E. Murray, Jr. | 113,860 | 128,455 | 117,117 | 117,117 | 178,500 |
| Marjorie P. Smuts | 113,860 | 116,760 | 117,117 | 117,117 | 148,500 |

| DIRECTOR | COMPENSATION | | | | |
|---|---|---|---|---|---|
| | FY 1999 | FY 2000 | FY 2001 | FY 2002 | FY 2003 |
| John S. Walsh | 0 | 94,536 | 117,117 | 117,117 | 148,500 |

280.    These directors are not elected for a fixed term. Rather, each of them is appointed for an "indefinite term," which extends forever unless they are removed by the board or through a "special meeting of shareholders."  Moreover, none of the Federated Funds has a director nominating committee. Instead, the adviser, Federated Management, selects all board members.

281.    Because of the very lucrative salaries and benefits paid to "non-interested" Directors, and the fact that most of these directors consider their positions to be their primary, if not sole employment, these directors are not in a position analogous to an outside corporate director. Rather, they are de facto employees of the Federated Fund Complex.

**2.    Market Timing and Late Trading in Federated Funds**

**a.    Federated's Stated Policies Prohibit Market Timing**

282.    Defendants were well aware of the evils of late trading and market timing and made public efforts to combat it.  Federated Funds prospectuses contain the following language under the heading "Exchange Privilege":

> An exchange is treated as a redemption and a subsequent purchase, and is a taxable transaction.

> The Fund may modify or terminate the exchange privilege at any time.  The Fund's management or investment adviser may determine from the amount, frequency and pattern of exchanges that a shareholder is engaged in excessive trading that is detrimental to the Fund and other shareholders.  If this occurs,

the Fund may terminate the availability of exchanges to that shareholder and may bar that shareholder from purchasing other Federated Funds.

283.   Certain Federated Fund prospectuses contain the following additional language:

> In an effort to deter shareholders from using repeated exchanges to take advantage of short-term market movements (also known as "market timing"), after July 31, 2001, Shares acquired through an exchange may not be exchanged again (a "Subsequent Exchange") for a period of 15 days. The Fund will not process any request for a Subsequent Exchange made during the 15-day period . . . .

> A shareholder who needs to effect a Subsequent Exchange to avoid unreasonable hardship during the 15-day period should contact the Fund's Distributor.  The Distributor may, in its sole discretion, permit the Subsequent Exchange if the Distributor finds that the Subsequent Exchange will not harm the Fund or its shareholders and that the requesting shareholder has not engaged in what the Distributor considers to be a pattern of excessive trading.

### b.    Federated Investors Reveals Misconduct in its Funds

284.    On October 22, 2003, Federated Investors issued a press release stating:

> Like many other mutual fund companies, Federated Investors has received detailed requests for information on shareholder trading activities from the Securities Exchange Commission, the New York State Attorney General and the National Association of Securities Dealers.  The company has retained the law firm of Reed Smith LLP to conduct an internal investigation, which is ongoing . . . .

> The internal investigation is examining, among other things, circumstances in which it appears that a few investors in Federated funds were granted exceptions to the company's internal procedures for limiting frequent transactions, and that

> some of these investors made additional investments in other
> Federated funds. The investigation has also identified instances
> in which it appears that orders for Federated variable net asset
> value funds were placed and accepted after the funds' closing
> time at 4:00 p.m . . . .

The release also stated that these allegations were being reviewed by a special committee

appointed by the board of the Funds.

### The November 25th Update

285.    On November 25, 2003 Federated Investors issued another press release, to

which it attached a letter from J. Christopher Donohue and a document labeled "Update on

Frequent Trading" (the "Update"), which disclosed the results of its internal investigation.

286.    Attached to the press release was a recitation of the number of Canary market

timing trades in each month between January and June of 2003:

| | |
|---|---|
| Federated Stock Trust | 4 |
| Federated Kaufmann Fund | 4 |
| Federated Max-Cap Index Fund | 7 |
| Federated American Leaders Fund | 15 |
| Federated Equity Income Fund | none |
| Federated Capital Appreciation Fund | 13 |

287.    The Update discussed the Canary transactions in some detail. It disclosed that

the Canary defendants had arranged with certain sales representatives of Federated

permission to execute market timing transactions in certain Federated funds, in exchange for

which Canary agreed to park $10 million in another Federated short-term Euro-denominated

fund, which was not used for frequent trading. Because the advisory fees paid to Federated

Management were a percentage of the assets in that fund, by parking these "sticky assets"

63

in this fund Canary increased significantly the fees Federated Management earned for advising that fund.

288.   In exchange for this parking arrangement, the Federated sales representatives agreed that Canary could market time the Federated American Leaders Fund, Federated Capital Appreciation Fund, Federated Equity Income Fund, Federated Kaufmann Fund, Federated Max-Cap Index Fund, and the Federated Stock Trust. Working through the Bank of America, the Canary defendants had initially invested $30 million in a Federated money market fund, to be used for market timing activity, and that later the amount had been increased to $80 million and then to $125 million. This money was then shuffled back and forth in a series of "round trip" market timing transactions. From January 22 to July 2, 2003, Canary made forty-six "round trip" transactions between the money market fund and the six domestic equity funds, earning millions of dollars in profits.

289.   The Update also revealed that other investors had been allowed to market time two Federated bond funds, Federated High Income Bond Fund and Federated High Yield Trust:

### Trading by Two Investment Advisers

The first arrangement, which occurred in the summer of 2002, permitted investments of not more than $20 million and resulted in a total of six "round trip" investments over approximately one year, with total net gains of approximately $1.7 million. The second arrangement occurred in April 2002 and permitted investment of approximately $10 million, for not less than 15 days, and not more than four times per year.

290.   Federated Investors then confessed that for a lengthy period it and its

64

subsidiaries had failed to monitor late trading:

### Unreviewed Frequent Trading Reports

Federated has also identified certain internal frequent trading reports that were not  reviewed during the period from May to September 2003 when responsibility for reviewing such reports was being centralized within Federated.

These errors enabled eleven clients and two omnibus accounts for which we do not have underlying client information — whose trading activities would ordinarily have been reviewed — to engage in frequent trading in Federated funds during that period.

291.    Among the clients that got away with market timing because of this lapse of monitoring was Veras Partners, which was able to invest $12 million in a variety of Federated funds, realizing a net gain of about $175,000 through a series of market timing transactions.[6]

292.    The Update also revealed late trading by Veras Partners on fifteen separate occasions and approximately 100 instances of late trading by other investors, whose trades were as large as $400,000  and averaged approximately $28,000. The Update also disclosed that certain e-mails relevant to the investigation had been deleted, and that it had fired several of its officers as a result of this investigation.

### The February 3 Update

293.    On February 3, 2004, Federated Investors issued another press release, providing additional information about the status of its internal investigation. It disclosed that

---

[6]  Veras Partners is now defunct.

its review of the unreviewed internal trading reports had turned up one additional market timing transaction, involving an investment of $125,000, that might have been prevented if the internal reports been reviewed on a timely basis; that it had "sanctioned" two executives who had permitted market timing by Canary; and that it had discovered "additional instances" in which employees had permitted late trading to occur. The press release concluded that "it appears that orders received after 4:00 p.m. were inadequately monitored and there was insufficient oversight to correct these errors."[7]

294.   The press release also revealed that one unnamed employee of Federated had been regularly making late trades for his own personal account between January 1999 and March 2002. The Company terminated the individual's employment. This review also found that another employee had accepted orders for approximately $52,000 from a Company officer after the applicable funds' closing times. That officer was forced to reimburse the funds involved for the difference between the correct share prices and the prices used in processing the orders and was "sanctioned" by the Company.[8]

295.   Significantly, the Update also disclosed that its code of ethics for personal trading, which applies to the company's senior officers, portfolio managers, investment

---

[7] The review of late acceptance of trades was "limited to orders processed directly by employees of the Company," even though "most trades in Federated mutual funds are handled by intermediaries."

[8] The review also concluded that two portfolio managers who had personal trades in the Company 401(k) plan in funds that they managed. One portfolio manager had two offsetting trades over a five-month period, with durations of 35 and 76 days in amounts of approximately $600,000. The other manager had seven offsetting trades in a 21-month period, with durations from nine to 62 days in amounts of up to $160,000. Both of these individuals were "sanctioned."

analysts and portfolio traders, *did not specifically address trading in mutual funds*.  The

Company reported that it had belatedly modified its Code of Ethics to require review of

Federated mutual fund trading and establish minimum holding periods.

296.    The press release also announce that a $7.6 million dollar "restoration fund"

had been established:

### $7.6 Million Restoration Fund

As previously reported, the Independent Trustees of the
Federated mutual funds retained an independent expert,
Cornerstone Research, a provider of financial and economic
analysis, to determine the impact on the funds from trading
activities identified in the review conducted by the Company's
special investigative committee and by counsel to the
Independent Trustees.  Cornerstone provided its findings to the
Independent Trustees, who shared the findings with the
Company's Board of Directors.

Based on Cornerstone's findings, the Independent Trustees of
the Federated mutual funds and the Company's Board
announced the establishment by Federated Investors of a
restoration fund of approximately $7.6 million.    The
Independent Trustees have not yet determined how to distribute
the restoration funds and no government agency has passed on
the establishment or amount of the restoration fund.

The $7.6 million figure, as determined by Cornerstone, includes:
(1) approximately $4.8 million related to the detrimental impact
of the funds from frequent trading activity, (2) approximately $2
million related to the possible detrimental impact on the funds
that may have resulted from orders incorrectly accepted by
Federated employees after the funds' closing times, (3) fees of
approximately $420,000 received by the Company from assets
invested as a result of frequent trading arrangements, and (4)
approximately $355,000 of interest on these amounts . . . .

### 3.    Additional Defendants Made Improper Trades in Federated Funds

### a.   **Lehman Brothers**

297.   Canary had two negotiated timing arrangements with Federated, both negotiated through Lehman brokers, as described below.  Lehman and Federated have a very close relationship, and Lehman routinely offered timing capacity negotiated with, and approved by, Federated to market timers.  Indeed, all of the negotiated timing capacity that Canary had in Federated was arranged by Lehman.  Timing in Federated was always contingent on a timer parking sticky assets in other Federated funds. Canary had $85 million in timing assets, which was later reduced by Canary to $50 million, and $10 million in sticky assets at Federated.

298.   Sometime in 2000, Canary received a cold call from Richard Kirsch ("Kirsch"), a broker in Lehman's Chicago office, who offered Canary negotiated timing capacity in several mutual fund families, including Federated. Canary accepted Kirsch's offer and opened accounts at Lehman to time the offered Federated funds.

299.   Canary began timing the funds, which included an international fund, in October 2000. In an October 24, 2000 e-mail, Noah Lerner of Canary, in discussing when timing in the Federated international funds was to begin, wrote that "Lehman should be good to go on Thursday."

300.   In early 2001, Canary received a request from Lehman not to trade some Federated funds. In a January 5, 2001 e-mail from Christopher L. Grover ("Grover") of Lehman, Canary was informed that Lehman had been asked by Federated to halt trading in the Federated European Equity A and Federated International Equity A funds.  In another

e-mail, dated January 8, 2001, Grover explained that "we had just pushed the envelope this past month in this particular account [with too many trades] and that "Federated would like us to keep our trades at around three trips in and out of the funds per month."

301.    Lehman was in regular communications with Federated in connection with Canary's timing of the Federated funds arranged by Kirsch from 2000 until spring 2001.

302.    In or about early spring of 2001, as a result of a trading error, Canary closed its account at Lehman and stopped timing the Federated funds through Kirsch. Lehman later fixed the trading error.

303.    In the fall of 2002, Canary was approached by Ryan Goldberg ("Goldberg"), a Brean Murray broker, who stated that he had a contact at Lehman who could obtain significant negotiated capacity for Canary in six Federated funds: Federated Kaufman Fund, Federated Equity Income Fund, Federated Capital Appreciation Fund, Federated American Leaders Fund, Federated Growth and Income Fund, and Federated Max-Cap Index Fund. Goldberg mentioned that the timing capacity from Federated could be up to $300 million.

304.    In early December, 2002, Canary representatives met at Lehman's offices in New York with Ron Basu ("Basu"), the Lehman broker, and Tom Pilan ("Pilan"), a senior Federated salesperson. Pilan and Basu offered Canary a timing deal under which Canary would be permitted to make two round trips per month in each of the six Federated funds. A requirement of the deal was that Canary park sticky assets in Federated's Euro Money Market Fund in an amount equaling 20% of its timing assets.  Stern believed the deal would not necessarily be profitable for Canary, but expressed interest in doing the deal on a smaller

scale, because he wanted to maintain a good relationship with Federated in the hopes of getting more advantageous timing deals with Federated in the future.   Stern therefore accepted the timing arrangement brokered by the Lehman broker, despite the high percentage of sticky assets demanded by Federated.

305.   A December 13, 2002 e-mail from Lehman informed Canary that Lehman had opened an account in the name of Nichols Point LLC, an entity which Canary intended to be a new counter-party for its timing and contemplated lending relationship with Lehman.  Basu wanted to establish a lending relationship with Canary to finance both Canary's timing and its short trading strategy in the Federated funds.

306.   Because Lehman could not be competitive on financing terms, Stern decided that Canary would get financing for the Federated timing through BOA.   It closed the account at Federated, and, instead, timed the Federated funds through its BOA accounts in the name of Cockatiel and Syren, for which it had financing through BOA. Canary initially funded the Federated timing deal with $85 million in timing capital.

307.   Lehman and Canary negotiated a fee agreement in connection with Lehman's handling of Canary's timing in Federated funds, which required Canary to pay quarterly fees to Lehman in advance.

308.   The sticky assets for the Federated Euro Money Market Account were deposited in a Federated account in the name of McCaw Capital Ltd., an entity created by Canary. Eventually, Canary moved the timing assets in this account to BOA in order to carry out a swap transaction financed by BOA.

309.    Lehman kept Federated fully informed about Canary's timing of the Federated funds. Basu wrote to Noah Lerner of Canary, in an e-mail dated January 21, 2003, with a copy to Mark Miehl of Federated, that "if you [Lerner] need any help with the Federated Euro money market fund please email Mark Miehl at the attached address. As you start doing trades with Federated at Lehman and Bank America please email him [Miehl] so he knows."

310.    In April 2003, Canary reduced its timing capital in Federated from $85 million to $50 million, because Stern felt the sticky asset requirement was too high and because he was returning money to his investors.

311.    Lehman charged Canary a wrap fee for brokering these timing agreements between Canary and Federated, which Canary paid.  Lehman shared the wrap fee for this deal with Goldberg of Brean Murray.

312.    Lehman offered negotiated timing arrangements in the Federated to other timers, including, upon information and belief, Trautman.

### b.    Bank of America's Financing of Canary's Timing

313.    BOA, as part of the package of late-trading and timing services BOA and BAS agreed to provide to Canary, financed Canary's late trading and market timing in the Funds. BOA also provided financing for Canary's "swap" transactions, which were arranged through BOA's "swaps desk."

314.    Canary created a limited liability company, "Cockatiel," which had four subsidiaries, and opened accounts at BOA under their names to effectuate the timing and short selling transactions funded by BOA.

315.    On July 26, 2001, BOA and Canary executed a "Credit Agreement," which gave Canary a revolving credit facility of $70 million.  Canary used a portion of this financing for his timing of the Federated funds.

316.    In an August 21, 2001 e-mail from Ted Sihpol to Rob Gordon of BOA's credit department, Sihpol provides an "update" on the financing for Canary timing transactions including "[c]los[ing] a $75MM credit facility [for Canary] with Frank Drury and the Private Bank," and "[d]raw[ing] down $20MM on the credit facility."

317.    In an October 26, 2001 e-mail from Andrew Goodwin of Canary to Ian Reisner of BOA, Goodwin, discussing certain swap transactions between Canary and BOA, writes that "[h]opefully, Noah [Lerner of Canary], can work with Frank Drury [BOA Private Banking] to get an ISDA [swap agreement] executed and discuss the need for additional capital to support a line for me to trade these products with Cockatiel [Canary]."

318.    On February 21, 2002, BOA and Canary amended the Credit Agreement to increase Canary's revolving credit facility to $75 million.

319.    A BOA document dated June 13, 2002, entitled "Cockatiel Capital Associates, LLC et al, CAR Comments" states that a loan agreement between Canary and BOA "renew[s] for an additional year the existing $125MM revolving line of credit" extended by BOA to Canary for the purpose of "invest[ing] in open-ended mutual funds and if availability allows, cover interest payments."  A second loan facility, "to renew the existing equity derivative facility," would "remain unchanged at $166.7MM."

320.    BOA charged Canary LIBOR + 150 bps interest for providing 2:1 leverage on

straight late trading and timing transactions. Swap transactions required higher leverage. With swap transactions, BOA generally was the account holder, with a security interest in the assets of the account, which, until the closing of the swap transaction, would consist of Canary's mutual fund shares. BOA would lend Canary funds and, at the appropriate time, Canary would use the funds to execute the swap transaction, and deposit the proceeds in BOA's account. Canary would pay BOA a set commission for the necessary purchases and sales, and BOA would return to Canary the profit on the transaction minus a 2% fee for providing the financing.

321.   Canary's timing assets in the Funds were used as collateral for the BOA financings.

322.   As set forth above, BOA provided Canary with financing, including swap financing, to time the Federated funds. Jim Sweeney of BOA's derivatives desk helped arrange financing, in connection with which he had frequent contact with Mike Mehta ("Mehta") at Federated. Stern also had conversations with Mehta in connection with the BOA swap transactions involving the Federated funds.

323.   BOA's financing of Canary's wrongful late trading and timing not only dramatically increased Canary's ability to late trade and time the Funds, and thereby caused greater harm to the Funds, but resulted in handsome profits for BOA for its known wrongful conduct.

324-500  [Intentionally Omitted]

## V. <u>DEMAND FUTILITY ALLEGATIONS</u>

501.    The allegations concerning demand futility do not apply to claims asserted by the plaintiffs under Section 36(b) of the ICA, which does not confer a direct right upon the Funds or the Trusts to bring such claims.

502.    Plaintiffs have not made a demand upon the Directors of the Funds to bring action against the Adviser, the Distributor, the officers of the Funds, or any other culpable parties because doing so is excused or would be futile for the reasons set forth below.

a.    No demand is required with respect to plaintiffs' claims under Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), for breach of fiduciary duty in connection with compensation and other payments of a material nature to the Adviser Defendants or their affiliates.

b.    The Directors are put into office by officers of the Adviser, and are not required to stand for election or reelection by shareholders of the Funds except on rare occasions, and thus are not accountable to the shareholders of the Funds.  Rather, the Directors effectively serve at the pleasure of the Adviser.  Additionally, the Trustees serve on the boards of virtually all of the Funds of the Fund Family, and are paid for this service with substantial Directors' fees and lucrative retirement benefits, in magnitudes that are sufficient to influence them to act in the interest of the Adviser when the interests of the Adviser may conflict with the interests of the Funds.

c.    Moreover, most of the eight allegedly "non-interested" Directors derive all, or substantially all, of their employment income to their Director positions. They concede, in Fund proxy statements, that their Director position represents their sole or

principal occupation; and many of them, as noted above, are past retirement age. As a result, these Directors are far more reliant on their remuneration as Trustees than is a typical "outside" director of a corporation.

d.      The Directors have been well aware, for a very long period of time, of the existence of the types of activity complained of in this action, and of the potential that such activity might have been taking place in the Fund.  Until Federated was subpoenaed they failed to investigate or to prevent or do anything to recover for damages caused to the Fund by such activities.

e.      Market timing is a phenomenon that has been common knowledge in the mutual fund industry at least since the 1980s.  As early as 1989, the high-profile mutual fund company Fidelity Investments began to impose and enforce heavy redemption fees on short term trades in its mutual fund shares.  In 1992, a widely-publicized book, entitled "The New Market Wizards," focused attention on market timing.

f.      Since at least as early as November 5, 1997, when an article appeared in THE WALL STREET JOURNAL entitled *Mutual Funds Fight the 'Market Timers,'*" the unlawful practices complained of have been well-known to persons in the mutual fund industry, including the Directors of the Funds.  That article detailed the prevalence of market timing in major mutual funds, the types of harm that such activity visited upon the mutual funds, and the types of measures that some mutual funds had taken and were taking in order to discourage or prevent such market timing altogether.

g.      As stated in an article printed in FORTUNE on April 19, 2004, "Clearly,

75

by 2001 everyone connected with the fund industry had to know how crooked the business had become." *See The Secrets of Eddie Stern*, FORTUNE (April 14, 2004).  The article also noted that after the current mutual fund scandal broke, the SEC surveyed 88 of the largest fund companies and discovered that half admitted to allowing market timing, and 25 percent allowed late trading.  *See* ¶ 83 above.

h.      Even though the Directors knew or should have known of the existence and extensiveness of unlawful market timing taking place in the industry, and of the harm that results to mutual funds and fund shareholders, the Trustees either have failed to take action, despite their knowledge, with respect to such practices in connection with the Funds or they have failed to put in place the proper supervision and control mechanisms that would have brought the existence of such unlawful practices in the Funds to their attention.

i.      In fact, had the Directors chosen to do so they could easily have detected market timing by requesting shareholder turnover rates in the various Funds.  Those Funds that are being timed will show turnover ratios many times greater than normal.

j.      Under Section 15(c) of the ICA, 15 U.S.C. § 15(c), the Directors have and had an express duty "to request and evaluate … such information as may reasonably be necessary to evaluate the terms" of any investment advisory contract with respect to the Fund.  In this case, the Trustees have and had a duty to obtain all information regarding all arrangements of the Adviser that related to the Adviser's management agreement, including all terms and conditions applicable to the Adviser's performance of its duties.  Any terms, conditions, or arrangements whereby the Adviser facilitated, encouraged, permitted, and

76

participated in, or failed to detect and prevent, market timing or late trading are and were, in fact, part of the Adviser's contract.

k.      Alternatively, any such arrangements are and were, at minimum, among the information "reasonably necessary to evaluate the terms of" the Investment Adviser's contract, within the meaning of Section 15(c) of the Investment Company Act. Consequently, the Directors either failed to request all of the "reasonably necessary" information they needed to evaluate the Adviser's contract or they knew about or approved such arrangements with respect to the Fund.

l.      Indeed, given the Directors' knowledge of the prevalence and commonplace nature of late trading and market timing in the mutual fund industry, it was incumbent upon the Trustees to take the obvious, prudent measure of implementing some kind of audit system or program that would enable them to discover all aspects and all components of the advisory contract with respect to the Funds.  Had the Directors done this, they would have become aware of the existence of the specific late trading and market timing arrangements in place with respect to such funds.  However, the Trustees failed to put any such necessary system or program in place, thus subjecting themselves to a substantial risk of personal liability for breach of their fiduciary duty because of their gross negligence, and rendering themselves incapable of impartially considering a shareholder demand, thereby compromising their independence.

m.      The Trustees' duties required them independently to act without a demand from a shareholder under the circumstance of this action. Their duties did not and

77

do not come into play only when "kick-started" by a shareholder demand. The Trustees' fiduciary duties apply and applied at all times to require them to act in the best interest of the Funds, to protect the Funds from harm, and to recover damages for the Funds when the Funds have been harmed.

n.     On September 3, 2003, the NYAG commenced the NYAG Complaint, thus bringing the market timing and late trading scandal to the attention of the world.  Before and after the commencement of the NYAG Complaint, state and federal regulators notified mutual funds of an investigation into market timing and late trading.  Since the NYAG Complaint was filed, state and federal regulators have entered into consent enforcement actions with at least six different mutual fund families, representing recoveries of civil penalties and recoveries in excess of $2 billion. The regulators' investigation, the filing of the NYAG Complaint, and the subsequent enforcement actions have highlighted the existence of market timing and late trading as well as the magnitude and severity of the scandal throughout the mutual fund industry.  No Director could claim to be ignorant of the market timing and late trading scandal since September 3, 2003.  Despite that, however, the Trustees have failed to take any action against the Advisers, the Distributor, or other persons responsible for causing harm to the Funds by market timing or late trading.

o.     The purpose of a demand requirement is to bring matters to the attention of the Trustees so that they can determine what action, if any, to take regarding the matter about which the demand is made.  Here, the Trustees *already are aware* of the matters about which they should take action to recover damages for harm to the Funds caused by market

timing and late trading.  Since the Directors are already aware of the matters requiring their action, and of their duty to act, any demand under these circumstances would be nothing but redundant surplusage and would serve as nothing but an unnecessary formality that would elevate form over substance.

p.      Because the Directors have failed for a lengthy time period to take action to recover for the Fund the damages it has suffered because of market timing and late trading, doing so at this point would be tantamount, from their perspective, to an admission that earlier action on their part was required but not forthcoming, thereby subjecting themselves to a substantial likelihood of personal liability for breach of their duty of care.

q.      Given the Directors' awareness of the foregoing facts, and their demonstrated failure to act in the face of their knowledge of those facts, there is, at minimum, a reasonable doubt as to whether they would be independent and disinterested in responding to a demand.  Moreover, given the egregiousness of the Directors' failure of oversight as outlined above, there is, at minimum, a substantial likelihood that they will be subject to personal liability for inadequate oversight of the officers and employees of the Funds. This exposure to a substantial likelihood of personal liability prevents the Directors from being able to consider a demand impartially, if one had been made.

r.      The likelihood of personal liability is even more pronounced in the case of those Directors who served on the Audit Committee of the Funds, Thomas G. Bigley, John T.Conroy, Jr., Nicholas P. Constantakis and Charles F. Mansfield, Jr. since those members had easy access to the internal documents that revealed the market timing and late trading

that harmed the Funds yet they took no steps to prevent such activity or to recover damages that the Funds suffered on account of such activity.

503.    For those Investment Companies that are organized under Massachusetts law, demand on the shareholders is excused because it would be unduly burdensome.

504-600.  [Intentionally Omitted].

## COUNT I

## VIOLATION OF SECTION 36(b) OF THE INVESTMENT COMPANY ACT

## (Against The Advisers, And Distributor Defendant And Federated Services)

601.    Plaintiffs incorporate by reference the preceding paragraphs, except for paragraph 502.

602.    The Federated Fund Complex consists of registered investment companies within the meaning of Section 2 of the ICA.

603.    Federated Management and Global are  investment advisers for the Funds as that term is defined in Section 2 of the ICA.

604.    Federated Services is an affiliate of the Adviser Defendants for purposes of Section 36(b) of the ICA.

605.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment adviser of a mutual fund owes to the mutual fund the fiduciary duties of loyalty, candor, and due care with respect to the receipt of compensation for services or payments of a material nature paid by the mutual fund to such investment adviser or any affiliated person. Those fiduciary duties apply not only to the terms of the advisory fee agreements, but also to the

80

manner in which advisers seek approval of such agreements.

606.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. §80a-35(b), the Adviser owes and owed to the Funds the fiduciary duties of loyalty, candor, and due care with respect to its receipt of compensation for services or payments of any material nature paid by the Funds or its shareholders to the Adviser or any affiliated person.  Those fiduciary duties include, but are not limited to, the duty of the Adviser to seek approval of any advisory agreement upon full disclosure of all information material to the Trustees' decision regarding the Adviser's compensation.

607.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment adviser of a mutual fund owes to the mutual fund the duty to furnish the directors of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

608.    Thus, among other things, Section 36(b) of the ICA prohibits and prohibited the Adviser from soliciting the approval of any advisory agreement from the Funds or the Trustees by use of false or misleading information, or by failing to disclose information material to the Trustees' decision regarding the Adviser's compensation.  Information concerning conflicts of interest, the nature and extent of market timing and late trading in the Funds, the nature and extent of capacity arrangements for market timing and late trading in the Funds, and the Adviser's permission, facilitation, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in the Funds, are

81

particularly important to the Funds and to their independent trustees.

609.   After a reasonable opportunity to conduct discovery, Plaintiffs believe the evidence will show that, for any of the Funds, the Adviser Defendants and their affiliates did not make full and fair disclosure of all information that would be material to the Trustees' decision regarding fees and/or other compensation under advisory and/or other agreements, including in particular the Adviser Defendants' permission, facilitation, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading.

610.   Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the trustees of a mutual fund owe to the mutual fund an independent duty to "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

611.   After a reasonable opportunity to conduct discovery, Plaintiffs believe the evidence will show that, for any of the Funds, the Trustee Defendants did not request and/or evaluate information as reasonably may be necessary to evaluate advisory and/or other agreements, including in particular the Adviser Defendants' facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading.

612.   Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), mutual fund shareholder may bring a civil action against an investment adviser or any affiliated person who has breached his or its fiduciary duty concerning such compensation

or other payments.

613.   The Adviser Defendants and the Distributor Defendant, as their affiliates, breached their fiduciary duty to the Funds by the acts alleged in this Complaint including, without limitation, facilitating, permitting, or encouraging, participating in, or failing to detect and prevent, market timing and late trading, all in exchange for their own benefit, including the receipt of "sticky assets" and other deposits on which they would and did receive fees and other compensation or by participating in insider timing themselves.

614.   By agreeing and/or conspiring with the market timers to facilitate, permit, or encourage, participate in, or by failing to detect and prevent, market timing and late trading, the Adviser Defendants and the Distributor Defendant placed their own self-interest in maximizing their compensation and other payments over the interests of the Funds.

615.   As alleged herein, the Adviser breached its fiduciary duties with respect to the receipt of compensation for services or other payments of a material nature from the Funds or their shareholders.

616.   By virtue of the foregoing, the Advisers have violated Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b).

617.   As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

618.   The Advisers conduct constituted willful misfeasance, bad faith, or gross

negligence, or reckless disregard of its duties.

## COUNT II

## VIOLATION OF SECTION 36(a) OF THE INVESTMENT COMPANY ACT

### (Against The Director, Adviser, Distributor, Parent And Federated Officers Defendants)

619.    Plaintiffs incorporate by reference the preceding paragraphs.

620.    The Federated Fund Complex consists of registered investment companies, as defined by Section 2 of the ICA.

621.    The Adviser Defendants are investment advisers under Section 36(a) as that term is defined in Section 2 of the ICA.

622.    The Distributor Defendant acts as the principal underwriter for the Funds under Section 36(a) as defined in Section 2 of the ICA.

623.    The Director Defendants are directors under Section 36(a) as that term is defined in Section 2 of the ICA.

624.    Pursuant to Section 36(a) of the ICA, 15 U.S.C. §80a-35(a), the Adviser Defendants, the Distributor Defendant, and the Director Defendants owe and owed to the Funds the fiduciary duties of loyalty, candor, and due care, including the duty of the advisers to seek approval of any advisory agreement will full disclosure of information material to the board's decision regarding their compensation and the duty of the trustees to request and evaluate such information as may reasonably be necessary to evaluate advisory agreements.

625.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment

adviser of a mutual fund owes to the mutual fund the duty to furnish the directors of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

626.   After a reasonable opportunity to conduct discovery, Plaintiffs believe the evidence will show that the Adviser, Distributor,  Defendant did not make full and fair disclosure of all information that would be material to a board's decision regarding advisory and/or other compensation under advisory and/or other agreements, including in particular their facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

627.   Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the trustees of a mutual fund owe to the mutual fund an independent duty to "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

628.   After a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that the Trustee Defendants did not request and/or evaluate information as reasonably may be necessary to evaluate advisory and/or other agreements, including in particular the Adviser Defendants' facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

629.   Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 46(b), an investment advisory or distribution agreement that is made in, or whose performance involves a, violation of the ICA, is null and void, and "is unenforceable by either party." Pursuant to that provision, any such agreement made in, or whose performance involves a, violation of the ICA, may be rescinded by the mutual fund.

630.   Each of the Adviser Defendants, the Distributor Defendant, and the Trustee Defendants breached his, her, or its fiduciary duty to the Funds by the other acts alleged in this Complaint including, without limitation, allowing market timing and late trading all in exchange for their own benefit, including the receipt of "sticky assets" and other deposits on which they would and did receive fees and other compensation or by participating in insider timing themselves.

631.   By agreeing and/or conspiring with the Additional Defendants to permit and/or encourage them to time the Funds, the Adviser Defendants and the Distributor Defendant placed their own self-interest in maximizing their compensation and other payments over the interests of the Funds.

632.   As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

633.   The Adviser's conduct constituted willful misfeasance, bad faith, or gross

negligence, or reckless disregard of its duties.

## COUNT III

### VIOLATIONS OF SECTION 47 OF THE INVESTMENT COMPANY ACT

#### (Against the Adviser, Distributor and Administrator Defendants)

634.    Plaintiffs incorporate by reference the preceding paragraphs.

635.    Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 80a-4(b), any contract made in violation, or the performance of which results in a violation, of the ICA is declared unenforceable.

636.    For the reasons alleged herein, the agreements between or among the Advisers, the Distributor, and the Funds and the 12b-1 Plans were made in violation of, and their performance resulted in violations of, the ICA and are, therefore, unenforceable.

637.    Under Section 47(b) of the ICA, 15 U.S.C. § 80a-4(b), the advisory agreements and the 12b-1 Plans may be voided and the Adviser Defendants and the Distributor Defendant are liable to return to the Funds all of the fees and consideration of any kind paid to them thereunder.

638.    The Advisers' conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

## COUNT IV

### VIOLATION OF SECTIONS 206 AND 215 OF
### THE INVESTMENT ADVISERS ACT

#### (Against The Adviser Defendant and the Distributor Defendant)

639.   Plaintiffs incorporate by reference the preceding paragraphs.

640.   The Adviser Defendants and the Distributor Defendant are investment advisers within the meaning of the IAA.

641.   The Funds are clients of the Adviser Defendants and the Distributor Defendant within the meaning of Section 206 of the IAA.

642.   Section 206 of the IAA, 15 U.S.C. § 80b-6, prohibits investment advisers from, among other things, directly or indirectly using the mails or any means or instrumentality of interstate commerce to (a) employ any device, scheme, or artifice to defraud a client or prospective client; (b) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon a client; and (c) engage in any act, practice, or course of conduct which is fraudulent, deceptive, or manipulative.

643.   The Adviser Defendants and the Distributor Defendant have violated Section 206 of the IAA by acting as alleged herein.  In particular, after a reasonable opportunity to conduct discovery, Plaintiffs believe the evidence will show that the Adviser Defendants and the Distributor Defendant facilitated, encouraged, permitted, and participated in, or failed to detect and prevent, market timing or late trading for their own personal gain at the expense of the Funds, and did not make full and fair disclosure of all information that would be material to a board's decision regarding advisory and/or other compensation under advisory and/or other agreements, including in particular their facilitation, permission or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

88

644.   Pursuant to Section 215 of the IAA, 15 U.S.C. § 80b-15, any investment adviser agreement made or approved in violation of any provision of the IAA, including the investment adviser agreements between the Adviser Defendants or the Distributor Defendant and the Funds and the 12b-1 Plans, is null and void and may not be enforced by any party thereto.

645.   As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

646.   The Adviser's conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

## COUNT V

## CONTROL PERSON LIABILITY UNDER SECTION 48 OF THE INVESTMENT COMPANY ACT

### (Against The Parent Defendants)

647.   Plaintiffs incorporate by reference the preceding paragraphs.

648.   Section 48 of the ICA, 15 U.S.C. § 47(a), provides that it is unlawful for any person, directly or indirectly, to cause another person to do any act or thing that violates the ICA.

649.   The Parent Defendant, Federated Investors, directly or indirectly, caused the

Adviser Defendants and the Distributor Defendant to engage in the unlawful conduct alleged herein.

650.    Pursuant to Section 48 of the ICA, 15 U.S.C. § 47(a), the Control Person Defendant is liable for causing, directly or indirectly, the Adviser Defendants and the Distributor Defendant to engage in the unlawful conduct alleged herein.

651.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT VI

## COMMON LAW BREACH OF FIDUCIARY DUTY

### (Against The Adviser Defendants, The Distributor Defendant And The Director Defendants)

652.    Plaintiffs incorporate by reference the preceding paragraphs.

653.    The Adviser Defendants, the Distributor Defendant, and the Director Defendants, and each of them, owe and owed to the Funds the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of each of the Funds and in the use and preservation of the Funds' property and assets.  Further, said defendants owed a duty to each of the Funds not to waste the Funds' assets and not to place their own personal self-interest above the best interest of the Funds.

654.   To discharge those duties, these defendants and each of them were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Funds.

655.   As alleged in this Complaint, each of these defendants breached his, her, or its fiduciary duties by approving or receiving unlawful or excessive compensation or payments in connection with the timing and late trading schemes and other manipulative devices as alleged in this Complaint.

656.   As alleged above, these defendants also breached their fiduciary duties to preserve and not to waste the assets of the Funds and each of them by permitting or incurring excess charges and expenses to the Funds in connection with the market timing and late trading scheme.

657.   As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

658.   These defendants' conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of duty.

## COUNT VII

## BREACH OF CONTRACT

## (Against The Adviser Defendants)

91

659.   Plaintiffs incorporate by reference the preceding paragraphs.

660.   The Funds have entered into Advisory Agreements with the Adviser Defendants, which are renewed annually.

661.   The Funds have fully performed their obligations under those agreements.

662.   These Advisory Agreements required the Adviser to comply with the requirements of the ICA and all rules and regulations of the SEC promulgated thereunder.

663.   These Advisory Agreements also required the Adviser to comply with all the rules,  regulations and policies of the Funds, as set forth in the prospectuses, the SAIs and otherwise.

664.   As a direct and proximate result of the wrongful conduct alleged above, the Advisers have breached these Advisory Agreements.  The Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead weight, Dilution and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which the Advisor Defendant is liable.

## COUNT VIII

## BREACH OF CONTRACT

### (Against Defendant BAS)

665.   Plaintiffs incorporate by reference the preceding paragraphs.

666.   Upon information and belief, throughout the relevant period, BAS and Federated Management or Federated Securities were parties to written or oral sales agreements governing BAS's duties as broker-dealer in selling and processing trades of Fund

shares (the "Dealer Agreements").

667.    The Funds, for whose benefit the Advisers entered into the Dealer Agreements, are intended third-party beneficiaries of the Dealer Agreements.

668.    There is implied in all agreements an obligation of good faith and fair dealing pursuant to which neither party make take any action that will deliberately frustrate the other party's purpose in entering into the contract.

669.    Upon information and belief, under the Dealer Agreements, information and belief, in the Dealer Agreements, BAS expressly agreed to clear mutual fund orders through the NSCC's Fund/SERV system and to transmit orders that are received prior to 4 p.m. by a certain time that day ("Day 1"), and those received after 4 p.m. by a certain time the next business day ("Day 2"). Under the Dealer Agreements, BAS and the Adviser Defendants agreed that Day 1 Trades would be priced at the Day 1 NAV and the Day 2 Trades at the Day 2 NAV.

670.    BAS had an express or implied obligation to comply with the federal securities laws, the ICA, the IAA, and all rules and regulations promulgated by the SEC, including the forward pricing rule.

671.    In breach of the express or implied terms of the Sales Agreements, and in violation of its obligation of good faith and fair dealing, defendant BAS permitted brokers and timers, including defendants Aurum, Trautman, Canary, and Pritchard, to submit orders for the purchase and sale of shares of mutual funds, on BAS's RJE electronic trading platform or otherwise, after 4 p.m. on a given day (Day 2 Trade) at that day's NAV (Day 1

NAV), in violation of the forward pricing rule, and permitted the funds in the Federated family of funds to be late traded and timed to the detriment of the funds.

672.    Accordingly, BAS has breached its Dealer Agreements with the Advisers.

673.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT IX

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

## (Against The Additional Defendants)

674.    Plaintiffs incorporate by reference the preceding paragraphs.

675.    The Additional Defendants knew of the existence and extent of the fiduciary duties owed by the Directors, the Advisors and the Distributor to the Funds.  The Additional Defendants knew that market timing and late trading the Funds were manipulative devices and knew that these acts were a breach of the fiduciary duties owed to the Funds by the Fiduciary Defendants.

676.    The Additional Defendants maliciously, without justification and through unlawful means, aided and abetted and conspired with the Advisor and Distributor Defendants in breaching their fiduciary duties and provided substantial assistance and encouragement to the Fiduciary Defendants in violating their fiduciary duties in the manner and by the actions described in this Complaint.

677.    The Additional Defendants are jointly and severally liable with the Advisor and Distributor Defendants to the Funds for damages proximately caused by their aiding and abetting as alleged herein

678.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT X

### UNJUST ENRICHMENT

### (Against All Defendants Except the Director Defendants)

679.    Plaintiffs incorporate by reference the preceding paragraphs.

680.    Defendants received a benefit in the profits it earned as a result of its unlawful conduct as described in this Complaint from trading on the Funds at the expense of the Funds.

681.    Justice and equity require that Defendants not be allowed to retain those profits.

682.    Justice and equity require that Defendants unlawfully earned profits be disgorged and returned to Funds because such profits belong to the Funds.

683.    The Defendants' conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

## COUNT XI

## COMMON LAW INTERFERENCE WITH CONTRACT

## (Against Additional Defendants)

684.    Plaintiffs incorporate by reference the preceding paragraphs.

685.    The Adviser and the Funds are parties to the Investment Advisory Agreement

686.    The Advisers breached the Investment Advisory Agreement in the manner and by the actions described in this Complaint.

687.    The Additional Defendants knew of the existence of the Investment Advisory Agreement between the Adviser and the Funds and knew its terms.

688.    The Additional Defendants knowingly and intentionally induced the Adviser to breach that contract and interfered with the Adviser's present and future performance of the Investment Advisory Agreement by its acts of wrongdoing as described in this Complaint, intending to and proximately causing the described breaches of the Investment Advisory Agreement.

689.    The Additional Defendants carried out this wrongful conduct with knowledge that this conduct would interfere with the Investment Advisory Agreements and cause such breaches of the Investment Advisory Contract and did in fact cause breaches of such contract.

690.    The actions of the Additional Defendants were improper and without justification or privilege.

691.    As a direct and proximate result of the Additional Defendants' wrongful conduct, Additional Defendants are jointly and severally liable to the Funds with the Adviser

96

for injuries and damages the Funds have suffered and which they will continue to suffer and are liable for actual and punitive damages.

## COUNT XII

## CIVIL CONSPIRACY

## (Against All Defendants Except Director Defendants)

692.    Plaintiffs incorporate by reference  the preceding paragraphs.

693.    The Defendants entered into an agreement or agreements or combinations with each other to accomplish by common plan the illegal acts described in this Complaint and by their actions demonstrated the existence of an agreement and combination.

694.    The Defendants by their actions have manifested actual knowledge that a tortious or illegal act or acts was planned and their intention to aid in such act or acts.

695.    The Director Defendants' conduct constituted willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of their office.

696.    The Defendants maliciously and intentionally conspired, combined and agreed with one another to commit the unlawful acts alleged in this Complaint or to commit acts by unlawful means proximately causing injury and damages to the Funds for which they are jointly and severally liable.

697.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

698.     The Defendants' conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Removing each of the Trustees of the Funds named in this Complaint and replacing them with independent Trustees;

B.      Removing the Adviser Defendants and the Distributor Defendant;

C.      Rescinding the management and other contracts for the Funds with the Advisers, Distributor and other Defendants;

D.      Rescinding the 12b-1 Plans adopted by the Funds;

E.      Ordering Defendants to disgorge all management fees and other compensation paid to the Adviser and all profits earned on unlawful trading and all management and other fees earned during the period of such trading;

F.      Awarding monetary damages against all of the Defendants, individually, jointly, or severally, in favor of the Funds, for all losses and damages suffered as a result of the wrongdoings alleged in this Complaint, including punitive damages where appropriate, together with interest thereon;

G.      Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiffs' attorneys, and experts,

H.      Granting Plaintiffs such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  September 29, 2004

<div style="margin-left:50%">

POMERANTZ,   HAUDEK,   BLOCK,
  GROSSMAN & GROSS, LLP

By:/S/_____
      Stanley M. Grossman
      H. Adam Prussin
      Jeremy A. Lieberman
100 Park Avenue
New York, NY  10017
(212) 661-1100

WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
   Daniel W. Krasner
   Mark C. Rifkin
   Demet Basar
   Christopher S. Hinton
   Robert Abrams
270 Madison Avenue
New York, NY  10016
(212) 545-4600

CHIMICLES & TIKELLIS, LLP
      Nicholas E. Chimicles
      Michael D. Gottsch
      Denise Davis Schwartzman
      Timothy N. Mathews
100 Haverford Centre
Haverford, PA  19085
(610) 642-8500

***Fund Derivative Executive Committee***

</div>

Law Office of Klari Neuwelt
110 East 59th Street
New York, NY 10022
(212) 593-8800

***Federated Funds Derivative Plaintiffs'***
***Steering Committee***

FARUQI & FARUQI
   David Leventhal
   Dennis Dollar
320 E. 39th Street
New York, NY 10016
(212) 983-9330

***Fund Derivative Plaintiffs' Counsel***

## APPENDIX: List of Federated Funds

American Leaders Fund, Inc.
Adjustable Rate Securities Fund
Bond Fund
California Municipal Income Fund
Capital Appreciation Fund
Capital Income Fund
Capital Preservation Fund
Conservative Allocation Fund
Equity Income Fund, Inc.
European Equity Fund
Fund for U.S. Government Securities
GNMA Trust
Global Equity Fund
Global Value Fund
Government Income Securities, Inc.
Government Ultrashort Duration Fund
Growth Allocation Fund
High Income Bond Fund, Inc.
High Yield Trust
Income Trust IS
Institutional High Yield Bond Fund
Intermediate Corporate Bond Fund
Intermediate Municipal Trust
International Bond Fund
International Capital Appreciation Fund
International Equity Fund
International High Income Fund
International Small Income Fund
International Value Fund
Kaufmann Fund
Kaufmann Small Cap Fund
Lage Cap Gowth Fund
Limited Duation Govenment Fund, Inc.
Limited Tem Municipal Fund
Maket Oppotunity Fund
Max Cap Index Fund
Michigan Intemediate Municipal Tust
Modeate Allocation Fund
Motage Fund
Muni and Stock Advantage Fund
Municipal High Yield Advantage Fund, Inc.
Municipal Secuities Fund, Inc.
Municipal Ultashot Fund

New Yok Municipal Income Fund
Noth Caolina Municipal Income Fund
Ohio Municipal Income Fund
Pennsylvania Municipal Income Fund
Shot-Tem Income Fund
Shot Tem Municipal Tust
Stock Tust
Stock and Bond Fund, Inc.
Stategic Income Fund
Technology Fund
Total etun Bond Fund
Total etun Govenment Bond Fund
U.S. Govenment Bond Fund
U.S. Govenment Secuities Fund: 1-3 yeas
U.S. Govenment Secuities Fund: 2-5 yeas
Ulta Shot Bond Fund
Vemont Municipal Income Fund