IN THE UNITED STATES DISTRICT COURT    MDL 1586
FOR THE DISTRICT OF MARYLAND

    Case No. 04-MD-15861
    (Hon. Catherine C. Blake)

IN RE MUTUAL FUNDS INVESTMENT
LITIGATION    CONSOLIDATED AMENDED
    CLASS ACTION COMPLAINT
[Federated Sub-Track]    JURY TRIAL DEMANDED

       The Court-appointed Lead Plaintiff, Colbart Birnet L.P. and plaintiff Donald Krause (collectively referred to herein as "Plaintiffs"), individually and on behalf of all others similarly situated, by their attorneys, allege the following upon information and belief based on the investigation of their counsel, except as to allegations specifically pertaining to the Plaintiffs and their counsel, which are based upon personal knowledge.  Plaintiffs' investigation included, among other things, a review of public announcements made by defendants, including statements made in press releases and on company websites, Securities and Exchange Commission ("SEC") filings, press releases and media reports regarding defendants, analyst reports, searches of various public informational databases, court filings, including the complaint filed by the New York State Attorney General in the Supreme Court of the State of New York in *State of New York v. Canary Capital Partners, LLC, et al.*, dated September 3, 2003, interviews of numerous confidential witnesses, including a witness with personal knowledge of timed trading by Canary Capital (defined below) in the Federated Investors, Inc. ("Federated") family of funds, as well as numerous former employees of Federated or its subsidiaries, including a former Federated employee, who held various positions at Federated from 1991 through October 2002; and a former Federated employee, who worked as a Transfer Agent at Federated's Call Center in

Rockland, MA from August 1999 through October 2001, and was responsible for handling purchases, redemptions and trades for individual clients.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of a class consisting of all persons and entities other than defendants who, during the period October 22, 1998 to October 21, 2003 (the "Class Period"), either purchased or held shares or other ownership units issued pursuant to registration statements and prospectuses for the Federated Funds (defined below) and were damaged thereby (the "Class").  Plaintiffs seek to pursue remedies under the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), the Investment Company Act of 1940 (the "ICA"), and the common law.

2.      This action charges defendants with engaging in an unlawful and deceitful course of conduct designed to improperly financially advantage defendants to the detriment of Plaintiffs and other members of the Class.  As part and parcel of defendants' unlawful conduct, the defendants, as defined below, in clear contravention of their fiduciary responsibilities and disclosure obligations, failed to properly disclose that:

(a)      select favored customers and certain Federated employees were allowed to engage in illegal "late trading," a practice, more fully described herein, whereby an investor may place an order to purchase fund shares after 4:00 p.m. and have that order filled at that day's closing net asset value.  This was in direct conflict with the representations in the relevant fund prospectuses that provided "[w]hen the Fund receives your transaction request in proper form (as described in this prospectus) it is processed at **the next calculated net asset value (NAV)**. . . . NAV is determined at the end of regular trading (normally 4:00 p.m. Eastern time) each day the NYSE is open."  (Emphasis added);

(b)    select favored customers and Federated employees were improperly allowed to "time" their mutual fund trades.  Such timing, as more fully described herein, improperly allows an investor to trade in and out of a mutual fund to exploit short-term moves and inefficiencies in the manner in which the mutual funds price their shares.  Defendants permitted timed trading by the foregoing, despite language in the relevant prospectuses that Federated did not tolerate timing.  The relevant prospectuses, in pertinent part, provide:

> The Fund's management or Adviser may determine from the amount, frequency and pattern of exchanges that a shareholder is engaged in excessive trading that is detrimental to the Fund and other shareholders.  If this occurs, the Fund may terminate the availability of exchanges to that shareholder and may bar that shareholder from purchasing other Federated funds;

and

(c)    certain Federated fund portfolio managers engaged in improper trading in their own funds.

3.    On October 22, 2003, Federated filed a Form 8-K with the SEC in which it stated that, based on an internal investigation, "it appears that a few investors in Federated funds were granted exceptions to the company's internal procedures for limiting frequent transactions, and that some of these investors made additional investments in other Federated funds."  The filing also stated that the investigation had identified instances of late trading (Federated is under investigation by the New York State Attorney General, the SEC, and the National Association of Securities Dealers).

4.    Federated has now admitted to numerous instances of late trading and excessive timing in its funds by certain hedge funds (including Canary and Veras (as defined herein)), and certain Federated fund portfolio managers.  In addition, Plaintiffs' investigation indicates that

there were other instances of timing and late trading in Federated during the Class Period.  These improper activities have damaged the Company's mutual fund investors.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to: § 22 of the Securities Act (15 U.S.C. § 77v); § 27 of the Exchange Act (15 U.S.C. § 78aa); § 44 of the Investment Company Act of 1940 (15 U.S.C. §§ 80a-43); and, 28 U.S.C. §§ 1331, 1337.  This Court also has supplemental jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1367.

6.      The claims alleged herein arise under: §§ 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77o); §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §§ 240.10b-5); §§ 34(b), 36(a), 36(b) and 48(a) of the Investment Company Act (15 U.S.C. §§ 80a-33(b), 80a-35(a)-(b), 80a-47(a)); and State and common law.  In connection with the acts, conduct and other wrongs complained of herein, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities exchange.

7.      Venue is proper in the Western District of Pennsylvania pursuant to § 22 of the Securities Act (15 U.S.C. § 77v), § 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1391(b) and 1391(c), because many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in that District; defendants conducted other substantial business within that District; many Class members reside within that District, and Defendant Federated, the ultimate parent of defendants bearing the Federated name, is headquartered within that District, at 1001 Liberty Avenue,

4

Pittsburgh, Pennsylvania.  Venue is also proper in the District of Maryland pursuant to § 22 of the Securities Act (15 U.S.C. § 77v), § 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1391(b) and 1391(c), and the multi-district litigation provisions under 28 U.S.C. § 1407.

## PARTIES

### A.    Plaintiffs

8.    Lead Plaintiff Colbart Birnet, LLC ("Lead Plaintiff"), as set forth in its certification, which is attached hereto and incorporated by reference herein, purchased or held shares or units of the Federated Prime Cash Series fund during the Class Period.  As a result of the wrongful conduct alleged herein, Lead Plaintiff suffered damages both in connection with its purchases of Federated Funds mutual funds and by virtue of holding Federated Funds mutual funds during the Class Period.

9.    Plaintiff Donald Krause ("Krause"), as set forth in the certification which is attached hereto and incorporated by reference herein, purchased shares or units of various Federated Funds during the Class Period, including the Federated American Leaders Fund (defined below), and Federated Equity Income (defined below).  In addition, during the Class Period, Plaintiff Krause held shares of various Federated Funds mutual funds.  As a result of the unlawful conduct alleged herein, Plaintiff Krause suffered damages both in connection with his purchases of Federated Funds mutual funds and by virtue of holding Federated Funds mutual funds during the Class Period.

B.       **Non-Parties Federated Funds**

10.      The Federated Fund Complex (the "Federated Funds") consists of a series of open-end mutual funds in which investors contribute cash for the purpose of creating a pool of assets with which to invest and purchase securities. In return for their deposits, Federated investors receive shares in the mutual fund in an amount directly proportionate to the amount of their investment (*i.e.*, the larger the amount invested, the more shares the investor receives in the fund). This cash is then used to purchase stocks or other securities, consistent with the investment goals and objectives of the fund.

11.      Federated Fund shares are issued to Federated investors pursuant to registration statements and prospectuses that must comply with the Securities Act of 1933 (the "Securities Act"), and the Investment Company Act of 1940 (the "ICA").

12.      Federated Funds hold no assets apart from the deposits of their investors, nor do they conduct any operating or investment activities on their own. Instead, Federated Funds are part of a labyrinthine related structure in which separate legal entities, which are nonetheless captive to Federated Investors perform and control all necessary activities related to the sale and redemption of securities, as well as the management of investments. Indeed, as detailed below, these related entities not only appoint their own representatives to the board of trustees charged with the fiduciary duty of protecting the interests of investors in each individual fund, but also control the appointment of the purportedly "independent" members of these boards. These same Federated-related entities receive substantial fees for the performance of these services, which are calculated as a percentage of the value of the total deposits under management, as set forth in paragraphs 15-19, below. Thus, the larger the amount of deposits under management, the more that these related entities stand to collect in fees from mutual fund investors. This means that,

even in the case in which a Federated mutual fund loses money on its investments, the related Federated entities can still increase the fees they earn by simply steering more investors into the mutual funds.

13.    Set forth below is a chart illustrating the relationship between the entities that made up the Federated-related entities during the Class Period.   Each of these entities is controlled not by investors in the individual Federated Funds, but by separate corporations owned or controlled by a single corporate parent, Federated, as described in paragraphs 14 through 37, below.  Federated operates these subsidiaries, which in turn are responsible for the operations of the individual funds.  The key subsidiaries, whose roles in the fund complex are explained below, include the following: (i) Parent; (ii) Investment Advisers; (iii) Registrant/Issuer; (iv) Administrator; and (v) Underwriter/Distributor:



C.      **The Federated Defendants**

1.      **The Parent Defendant**

14.     Defendant Federated, a Pennsylvania corporation, is the ultimate parent of defendants bearing the Federated name.  Federated is a provider of investment management products and related financial services.  It is one of the largest mutual fund managers in the United States with $195.4 billion in assets under management as of December 31, 2003. Federated maintains its principal offices at 1001 Liberty Avenue, Pittsburgh, Pennsylvania. During the Class Period, the various defendant registrants specified below were organized and managed by Federated as part of the Federated Funds.

2.      **The Adviser Defendants**

15.     Defendant Federated Investment Management Company ("FIM") is a business trust organized under the laws of the state of Delaware and registered as an investment advisor under the Investment Advisers Act.  During the Class Period, FIM managed and advised certain funds in the Federated Fund Complex, including funds that Federated has admitted were subject to timed and late trading.  FIM, which was known as "Federated Advisers" prior to March 31, 1999, is a wholly-owned subsidiary of Federated and maintains offices at Federated Investors Tower, 1001 Liberty Avenue, Pittsburgh, PA 15222-3779.

16.     Defendant Federated Equity Management Company of Pennsylvania ("Federated Equity") is a statutory trust organized under the laws of Delaware and registered as an investment advisor under the Investment Advisers Act.  During the Class Period, Federated Equity managed and advised certain funds in the Federated Fund Complex, including funds that Federated has admitted were subject to timed and late trading. Federated Equity is a wholly-

owned subsidiary of Federated and maintains offices at Federated Investors Tower, 1001 Liberty Avenue, Pittsburgh, PA 15222-3779.

17.     Defendants FIM, and Federated Equity are referred to collectively herein as the "Adviser Defendants."  During the Class Period, the Adviser Defendants managed the assets of the Federated Fund complex, including buying and selling portfolio securities. The Adviser Defendants advised approximately 136 mutual funds and a variety of separate accounts, which totaled approximately $198 billion in assets as of December 31, 2003. The Adviser Defendants and their affiliates are responsible for performing virtually all of critical functions of the Federated Funds, including: (i) hiring and employing portfolio managers; (ii) selling shares in the funds to the public; (iii)  determining the net asset value ("NAV") of the fund on a daily basis; (iv) directing and controlling the investments in the fund; (v) ensuring that the investment policies of the funds are observed; (vi) enforcing the policies of the funds, including restrictions on trading and other activities that could be detrimental to shareholders of the funds.

18.     The Adviser Defendants received annual advisory fees from the funds which ranged between 0.40% to 0.75% of the fund's average daily net assets plus out-of-pocket expenses.

### 3.     The Administrator Defendant

19.     Defendant Federated Services Company (the "Administrator Defendant" or "Federated Services") is a subsidiary of Federated, which maintains offices at Federated Investors Tower, 1001 Liberty Avenue, Pittsburgh, PA 15222-3779. The Administrator Defendant provided administrative personnel and services (including certain legal and financial reporting services) necessary to manage and operate the funds in the Federated Funds on a day-to-day basis during the Class Period.   The Administrator Defendant, through its registered

transfer agent subsidiary, FSSC, maintained all necessary shareholder records for the Federated

funds during the Class Period. The Federated Funds paid the transfer agent a fee based on the

size, type and number of accounts and transactions made by shareholders.  The Administrator

Defendant also provided certain accounting and recordkeeping services with respect to the

Federated Funds' portfolio investments for a fee based on the Federated Funds' assets. The

prospectuses for the Federated Funds during the Class Period stated that Administrator

Defendant was paid fees for its administrative services based on an annual rate of the average

aggregate daily net assets of all Federated funds as specified below:

> Maximum Administrative Fee
> Average Aggregate Daily Net Assets of the Federated Funds
>
> 0.150 of 1% on the first $250 million
> 0.125 of 1% on the next $250 million
>
> 0.100 of 1% on the next $250 million
> 0.075 of 1% on assets in excess of $750 million

> The administrative fee received during any fiscal year shall be at least $125,000
> per portfolio and $30,000 per each additional class of Shares. The Administrator
> Defendant Company may voluntarily waive a portion of its fee and may
> reimburse the Fund for expenses.

### 4.        The Underwriter/Distributor Defendant

20.        Defendant  Federated  Securities  Corp.  ("Federated  Securities"  or  the

"Underwriter/Distributor Defendant") is a wholly owned subsidiary of Federated, which

maintains offices at Federated Investors Tower, 1001 Liberty Avenue, Pittsburgh, PA 15222-

3779.   During the Class Period, Federated Securities was the principal underwriter and

distributor for the Registrant/Issuer Defendants specified below. Federated Securities markets

shares of the Federated Funds to individuals, directly or through investment professionals.

Federated Securities received marketing fees and sales charges for these services during the Class Period.

### 5.   The Registrant/Issuer Defendants

21.    Each of the defendants specified below is the registrant and issuer of shares of one or more of the funds of the Federated Funds (the Federated Funds consist of 44 investment companies comprising 136 portfolios) which Federated has admitted was subject to timed and late trading:

(a)    Defendant Federated American Leaders Fund, Inc. ("American Leaders Fund") is a diversified open-end, management investment company that was established under the laws of the State of Maryland on July 22, 1968, and maintains its principal offices at 5800 Corporate Drive, Pittsburgh, Pennsylvania 15237-7000.   American Leaders Fund was the registrant and issuer of five classes of American Leaders Fund shares during the Class Period: the Class A, B, C, F, and K shares.   The investment adviser for American Leaders Fund during the Class period was FIM.   American Leaders Fund is governed by a Board of Directors and invests primarily in a portfolio of equity securities issued by the 100 companies selected from a list of 100 blue chip U.S. companies selected by its adviser, consisting of leading companies in their industries determined in terms of sales earnings and/or market capitalizations.   American Leaders Funds' holdings are ordinarily in large capitalization companies that are in the top 25% of their industries in terms of revenues, and which, in FIM's opinion, are trading at a low valuation in relation to their history, to the current market and to their expected future price.   The principal underwriter and distributor for American Leaders Funds during the Class Period was defendant Federated Securities.

(b)     Defendant Federated Equity Funds ("FEF") is an open-end, management investment company established under the laws of the Commonwealth of Massachusetts on April 17, 1984, and registered under the Investment Company Act of 1940. FEF is managed by a Board of Trustees and maintains a portfolio of seven mutual funds, including Federated Capital Appreciation Fund ("Capital Appreciation Fund") and Federated Kaufmann Fund ("Kaufmann Fund").  FEF was the registrant and issuer of the Capital Appreciation Fund and Federated Kaufmann Fund during the Class Period.  FIM was the investment adviser the Capital Appreciation Fund and Federated Kaufmann Fund during the Class Period.

(c)     Defendant Federated Equity Income Fund ("Equity Income Fund") is a diversified open-end, management investment company that was established under the laws of the State of Maryland on July 29, 1986, and maintains its principal offices at 5800 Corporate Drive, Pittsburgh, Pennsylvania 15237-7000.  Equity Income Fund was the registrant and issuer of five classes of Equity Income shares during the Class Period: the Class A, B, C, F, and K shares. Equity Income Fund is governed by a Board of Trustees that oversees the investment adviser.  During the Class Period, Equity Income Fund's investment adviser was FIM.  Equity Income Funds' investment objective is to provide above average income and capital appreciation by investing primarily in income-producing equity securities, including securities that are convertible into common stocks.  The principal underwriter and distributor for Equity Income Fund during the relevant period was Federated Securities.

(d)     Defendant Federated Index Trust ("Index Trust") is an open-end, management investment company that was established under the laws of the Commonwealth of Massachusetts on January 30, 1990, and maintains its principal offices at 5800 Corporate Drive, Pittsburgh, Pennsylvania 15237-7000.  Index Trust is governed by a Board of Trustees.  Index

Trust maintains a portfolio of funds, including Federated Max-Cap Index Fund ("Max-Cap Fund"). Index Trust was the registrant and issuer, and Federated Equity was the investment adviser, of Max-Cap Fund during the Class Period.

(e)     Defendant Federated Stock Trust ("Stock Trust") is a diversified open-end, management investment company that was established under the laws of the Commonwealth of Massachusetts on December 30, 1981, and maintains its principal offices at 5800 Corporate Drive, Pittsburgh, Pennsylvania 15237-7000.   Stock Trust is governed by a Board of Trustees that selects and oversees Stock Trust's investment adviser which, during the relevant period, was Federated Equity.   Stock Trust was the registrant and issuer of Stock Trust shares during the Class Period. The principal underwriter and distributor for Stock Trust during the Class Period was Federated Securities.

(f)     Defendant Federated High Income Bond Fund, Inc. ("High Income Bond Fund") is a diversified open-end, management investment company that was established under the laws of the State of Maryland on October 14, 1977, and maintains its principal offices at 5800 Corporate Drive, Pittsburgh, Pennsylvania 15237-7000.   High Income Bond Fund is governed by a Board of Directors, and was the registrant and issuer of three classes of High Income Bond Fund shares during the Class Period: Class A, B, and C shares.   During the Class Period, FIM served as High Income Bond Fund's investment adviser.   The principal underwriter and distributor for High Income Bond Fund during the Class Period was Federated Securities.

(g)     Defendant Federated High Yield Trust ("High Yield Trust") is a diversified open-end, management investment company that was established under the laws of the Commonwealth of Massachusetts on April 17, 1984.   High Yield Trust is governed by a Board of Trustees that selects and oversees the fund's investment adviser which, during the Class

Period, was FIM.  High Yield Trust was the registrant and issuer of High Yield Trust shares issued during the Class Period.  The principal underwriter and distributor for High Yield Trust during the Class Period was Federated Securities.

(h)     Defendant Federated Institutional Trust ("Institutional Trust") is an open-end, management investment company that was established under the laws of the commonwealth of Massachusetts on June 9, 1994. Institutional Trust is governed by a Board of Trustees that selects and oversees the funds' investment adviser which, during the Class Period, was FIM.  Federated High Yield Bond Fund ("High Yield Bond Fund") is a diversified portfolio of Institutional Trust, which was the registrant and issuer of High Yield Bond Fund during the Class Period.

22.     The defendants in paragraph 21 (a) through (h) are collectively referred to herein as the "Registrant/Issuer Defendants."

**6.     The Director/Trustee Defendants**

**a.     The Insider Director/Trustee Defendants**

23.     Defendant John F. Donahue has been, at all times relevant hereto, the Chairman of the Board of Federated; the President and a director and/or trustee of the Federated Funds, including the Market-timed Funds (defined below).  John F. Donahue is the father of defendant J. Christopher Donahue.

24.     Defendant J. Christopher Donahue has been, at all times relevant hereto, the President, Chief Executive Officer and a director of Federated; a director and/or trustee of the Federated Funds, including the Market-timed Funds.  J. Christopher Donahue is the son of defendant John F. Donahue.

25.     The defendants identified in paragraphs 23 and 24 are collectively referred to herein as the Ínsider Director/Trustee Defendants."

### b.      The Outside Director/Trustee Defendants

26.      Defendant Lawrence D. Ellis has been, at all times relevant hereto, a director and/or trustee of the Federated Funds, including the Market-timed Funds (defined below).

27.      Defendant Thomas G. Bigley has been, at all times relevant hereto, a director and/or trustee of the Federated Funds, including the Market-timed Funds.

28.      Defendant John T. Conroy, Jr. has been, at all times relevant hereto, a director and/or trustee of the Federated Funds, including the Market-timed Funds.

29.      Defendant Nicholas P. Constantakis has been, at all times relevant hereto, a director and/or trustee of the Federated Funds, including the Market-timed Funds.

30.      Defendant John F. Cunningham has been, at all times relevant hereto, a director and/or trustee of the Federated Funds, including the Market-timed Funds.

31.      Defendant Peter E. Madden has been, at all times relevant hereto, a director and/or trustee of the Federated Funds, including the Market-timed Funds.

32.      Defendant Charles F. Mansfield, Jr. has been, at all times relevant hereto, a director and/or trustee of the Federated Funds, including the Market-timed Funds.

33.      Defendant John E. Murray, Jr. has been, at all times relevant hereto, a director and/or trustee of the Federated Funds, including the Market-timed Funds.

34.      Defendant Marjorie P. Smuts has been, at all times relevant hereto, a director and/or trustee of the Federated Funds, including the Market-timed Funds.

35.      Defendant John S. Walsh has been, at all times relevant hereto, a director and/or trustee of the Federated Funds, including the Market-timed Funds.

36.      The defendants identified in paragraphs 26 to 35 above are collectively referred to herein as the "Outside Director/Trustee Defendants."

37.     The Insider Director/Trustee Defendants and the Outside Director/Trustee Defendants (collectively, the "Director/Trustee Defendants") are responsible for managing the business affairs, and for exercising all the powers, of the Federated Fund Complex, except those reserved for the shareholders.  Each of the Director/Trustee Defendants signed the registration statements issued by the Registrant/Issuer Defendants during the Class Period (the "Registration Statements").     According to the Registration Statements, unless otherwise noted, each Director/Trustee Defendant oversees all portfolios in the Federated Funds; serves for an indefinite term.

### 7.     **The Federated Employee Defendants**

38.     Defendant Timothy Pillion ("Pillion") was, during the Class Period, Senior Vice President of Global Sales at Federated.  During the Class Period, Pillion, along with defendant Basu of Lehman (as defined below) negotiated $300 million in timing capacity in Federated Funds with defendant Canary (as defined below).

39.     Defendant Keith A. Nixon ("Nixon") was, during the Class Period, Senior Vice President, Institutional Sales Division at Federated.  Nixon and Federated Sales Representative Paul Hauf met with defendant Stern (as defined below) in or about April 2000 to negotiate timing capacity for Canary in Federated Funds.  In addition, in the Spring of 2003, Nixon negotiated an agreement to provide defendant Veras with timing capacity in certain of the Federated Funds.  Veras engaged in illicit timed trades during the Class Period pursuant to this agreement.

40.     Defendant Paul Hauf ("Hauf") was, during the Class Period, a Federated Regional Sales Representative.  As noted above, Hauf met with Stern in or about early April 2000 to negotiate timing capacity for Canary in Federated Funds.

41.     The defendants identified in paragraphs 14 through 40 above, are collectively referred to herein as the "Federated Defendants."

**8.     The Trader Defendants**

    **a.      The Canary Defendants**

42.     Defendant Edward J. Stern ("Stern") is the Managing Principal of Canary Capital Partners, LLC, Canary Investment Management, LLC, and Canary Capital Partners, Ltd. (collectively, "Canary"). Canary Investment Management, LLC receives a fee for managing Canary assets calculated as 1.5% of assets under management and 25% of profits above a certain threshold. As of July 2003, Canary Asset Management had received approximately $40 million in Canary management and incentive fees. As described below, Canary entered into agreements with Federated to time certain of the Federated Funds.

43.     Defendant Canary Capital Partners, LLC is a limited liability company organized and existing under the laws of the State of New Jersey, with office at 400 Plaza Drive, Secaucus, New Jersey.

44.     Defendant Canary Investment Management, LLC is a limited liability company organized and existing under the laws of the State of New Jersey, with office at 400 Plaza Drive, Secaucus, New Jersey.

45.     Defendant Canary Capital Partners, Ltd. is a Bermuda limited liability company.

    **b.      Defendant Veras**

46.     Defendant Veras Investment Partners, LLP ("Veras") was, during the Class Period, a Texas-based, statistical arbitrage hedge fund. Veras was headquartered at 19855 Southwest Freeway, Suite 200, Sugarland, Texas 77479. Veras, through its co-founder Kevin Larson and others negotiated timing arrangements with Federated and other mutual funds. Veras

is being investigated by the New York Attorney General's Office and the SEC for its illicit trading activities in connection with several mutual funds.  In or about October 2003, Veras ceased operations.

> **9.      The Broker/Dealer Defendants**

> **a.      Defendant Bank of America**

47.      Defendant Bank of America Corporation, through its subsidiary Banc of America Securities LLC, is registered as a broker-dealer under the Exchange Act and an investment adviser pursuant to the Advisers Act, facilitated illicit trading in various funds in the Federated Fund Complex, as specified below.

48.      Defendant Banc of America Securities LLC ("BAS"), is registered as a broker-dealer under the Exchange Act (Defendants Bank of America Corporation and BAS are collectively referred to herein as "BOA").  Theodore C. Sihpol, III ("Sihpol") was a broker in BAS' high-net worth group located in New York. In or about 2000, Sihpol and BOA entered into an illicit trading arrangement with Stern to permit Canary to engage in timing trades in certain BOA funds.  In the summer of 2001, BAS technicians installed an electronic direct access system in the offices of Canary.  Through this system, Canary was able to enter its trades directly into BAS' clearing function until 6:30 p.m. ET.  This enabled Canary to not only late trade BOA funds, but also to late trade mutual funds with which BAS had clearing agreements, including certain of the Federated Funds.  Canary used the electronic system to late trade mutual funds until the summer of 2003.  Canary paid BAS various fees and other charges for the mutual fund trading.

### b.       The Lehman Defendants

49.      Defendant Lehman Brothers, Inc. ("Lehman"), a direct subsidiary of Lehman Brothers Holdings, Inc., is registered as a broker-dealer under the Exchange Act and an investment adviser pursuant to the Advisers Act. Lehman has its principal place of business in New York, New York and maintains approximately 52 branch offices throughout the United States and worldwide.  Lehman facilitated illicit trading in certain of the Federated Funds during the Class Period by permitting Canary and Stern to utilize a Lehman account established for a Canary and Stern related entity, Nichols Point LLC, for the illicit timing transactions in certain of the Federated Funds. In addition, during the Class Period, Lehman provided Canary with financing to engage in timed trading in the Federated Funds.

50.      Defendant Ron Basu ("Basu") was, during the Class Period, a broker with Lehman.  Basu facilitated illicit trading in certain of the Federated Funds during the Class Period by negotiating and arranging timing capacity on behalf of Canary with Federated.  Further, Basu facilitated the creation of the Lehman account in the name Nichols Point LLC, and assisted in securing financing from Lehman that permitted Canary to conduct timed trades in the Federated Funds.

51.      Defendant Richard Kirsch ("Kirsch") was, during the Class Period, a broker in Lehman's Chicago offices.  During 2000, Kirsch negotiated timing capacity in the Federated Funds with Canary.  In addition, Kirsch established a Canary account at Lehman to facilitate timed trades in the Federated Funds.

### c.       Defendant STC

52.      Defendant Security Trust Company, N.A. ("STC"), is an Arizona company providing trust administrative services (including access to mutual funds) to retirement plans.

STC provided Defendant Canary with the ability to trade hundreds of mutual funds, including the Federated Funds, as late as 9:00 p.m. New York time.

53.    The defendants identified in paragraphs 47 to 51 above, are collectively referred to herein as the "Broker/Dealer Defendants."

### 10.    Non-Party Brean Murray

54.    Non-Party Brean Murray & Co., Inc. ("Brean Murray") is an investment bank that provides equity research, investment banking, institutional sales and trading, syndicate, and asset management services to its clients.  During the Class Period, Brean Murray broker Ryan Goldberg, facilitated illicit timed trading agreements between Federated and Canary by arranging a meeting between Defendants Basu and Pillion and Stern in which Canary and Federated entered into an agreement to permit Canary to time certain Federated Funds.  Brean Murray maintains its principal offices at 570 Lexington Avenue, New York, NY 10022.

55.    Non-Party Ryan Goldberg ("Goldberg") was, during the Class Period, a broker at Brean Murray.  As described below, Goldberg assisted Canary in negotiating timing capacity in various mutual fund families, including the Federated Funds.

### 11.    The John Doe Defendants

56.    John Does 1 through 100 (the "John Doe Defendants") are other active participants in the widespread unlawful conduct alleged herein whose true names and capacities have yet to be ascertained.  The John Doe Defendants include certain Federated Funds portfolio managers and other employees during the Class Period who Federated has admitted personally traded in the Federated 401(k) plan in funds that they managed. Federated stated that one portfolio manager had two offsetting trades over a five-month period, with durations of 35 and 76 days in amounts of approximately $600,000. The other manager had seven offsetting trades in

a 21-month period, with durations from nine to 62 days in amounts of up to $160,000.  Plaintiffs

will seek to amend this complaint to state the true names and capacities of the John Doe

Defendants when they have been ascertained.

### CLASS ACTION ALLEGATIONS

57.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a) and 23(b)(3) on behalf of all persons and entities who purchased and/or held

shares in any mutual fund in the Federated Funds adversely affected by market timing and/or late

trading which Federated mutual funds and/or their registrants were advised by FIM and/or

Federated Equity during the period from October 22, 1998 through October 21, 2003, inclusive.

Excluded from the Class are defendants, their legal representatives, parents, affiliates, heirs,

successors or assigns, the immediate family members of the defendants and any entity in which

defendants have or had a controlling interest, and any other person who engaged in the unlawful

conduct described herein (the "Excluded Persons").   Also excluded are any officers, directors, or

trustees of the Excluded Persons, and all directors and/or trustees and portfolio managers of the

Federated Funds or the Registrant/Issuer Defendants. The members of the Class are so numerous

that joinder of all members is impracticable.   While the exact number of Class members is

unknown to Lead Plaintiff at the present time and can only be ascertained from books and

records maintained by and/or its agent(s), plaintiffs believe that Class members number in the

hundreds of thousands.  Common questions of law and fact exist as to all members of the Class

and predominate over any questions solely affecting individual members of the Class.   Among

the questions of law and fact common to the Class are:

(a)  whether federal, state and/or common law was violated by defendants' acts

and omissions as alleged herein;

(b)  whether the registration statements and prospectuses set forth in Appendix A, annexed hereto, contained substantially the same misstatements of material fact or omitted to state substantially the same material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)  whether defendants breached their fiduciary duties to Plaintiffs and the members of the Class; and

(g)  whether Plaintiffs and the other members of the Class have sustained damages and, if so, the appropriate measure thereof.

58.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.   Plaintiffs has retained competent counsel experienced in class and securities litigation and intends to prosecute this action vigorously.  Plaintiffs are members of the Class and do not have interests antagonistic to, or in conflict with, the other members of the Class.

59.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class purchased or held shares of the mutual funds set forth in Appendix A, annexed hereto, and have sustained damages arising out of the uniform course of wrongful conduct alleged herein.

60.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## NATURE OF THE ACTION AND FACTUAL BACKGROUND

### Overview of the Unlawful Conduct

61.     This class action arises from a series of unlawful trading practices, commonly referred to as "market timing," that permeated the mutual fund industry, and cost mutual fund investors billions of dollars.  The harm to Federated investors took the form, among other things, of: (i) dilution of profits and exaggeration of losses from their investments; (ii) payment of excessive fees by investors as a result of the unlawful conduct; and (iii) improper management of their investment.  The Federated Defendants not only permitted, but actively facilitated this unlawful conduct, for the purpose of securing millions of dollars in advisory and management fees, all to the detriment of ordinary mutual fund investors.  Further, the Federated Defendants used the excessive fees they received from market timing activities to finance various other undisclosed and unlawful practices, which included improper payments to brokers and brokerage firms in return for these firms' agreement to steer investors into their funds.  Various other parties actively participated in and aided and abetted the mutual funds' unlawful scheme, including: (i) the parties who engaged in the unlawful trading activities themselves, for their own economic benefit; and (ii) intermediaries, including various broker-dealers and financiers, all of whom accepted unlawful commissions and/or other payments in exchange for facilitating timing or channeling investors into mutual funds where unlawful trading activity was taking place.

62.     The various Federated Funds prospectuses covering the issuance of shares of the Federated Funds at issue, as detailed below, misled and incorrectly assured investors that the funds prevented the unlawful trading practices described above through the imposition of various trading restrictions.  In reality, however, the Federated Defendants not only permitted, but actively encouraged the unlawful activity, which included selling the right to time Federated

Funds.  The Federated Defendants permitted and encouraged this conduct for the purpose of increasing the amount of assets under management, thereby increasing the fees payable to the investment advisors, who were captive entities within the fund family structure, by hundreds of millions of dollars.

63.     The Director/Trustee Defendants failed to prevent the unlawful conduct because of fundamental conflicts of interest inherent in the corporate governance structure of the Federated Funds.  As detailed in paragraphs 140 through 143 below, the interests of mutual fund investors were entrusted to trustees who were appointed and compensated by the Adviser Defendants and their affiliates.  The Director/Trustee Defendants served on numerous boards advised by the Adviser Defendants, collecting thousands of dollars in annual salary from by purportedly monitoring the same entities that collected fees for underwriting and serving as investment advisors to the Federated Funds.

**Market Timing Practices**

**Background Information And The Forward-Pricing Rule**

64.     The domination of the Federated Funds by FIM and Federated Equity, along with the inherent conflicts of interest described herein, led to the unlawful trading practices complained of in this action.  These practices provided a means for FIM and Federated Equity to increase deposits in their funds dramatically, by permitting short-term traders to engage in conduct prohibited by the terms of many fund prospectuses and highly detrimental to other investors in the funds.  Since the Adviser Defendants and the Administrator Defendant are paid a fee as a percentage of the value of the assets under management, the increased deposits resulting from market timing/late trading has served to increase their fees dramatically.

65.     Market timing and late trading opportunities stem from inefficiencies in the manner in which shares of individual Federated Funds are priced.  Federated Funds shares are priced daily, based on the funds' NAV at the time of the valuation.   Unlike equity or debt securities that are valued and traded on stock exchanges, Federated Funds continuously issue new shares as new investments are received, and redeem shares as investors withdraw assets. The value of these shares is calculated as of 4:00 p.m. EST each day (the close of trading on the New York Stock Exchange), by determining the NAV of the fund (the value of assets less liabilities), and then dividing that amount by the number of shares outstanding.  For example, if a mutual fund with 100,000 shares outstanding holds total assets with an NAV of $1 million, then it will be priced at $10 per share.  Thus, a Federated investor seeking to invest $1,000 in a fund would receive 100 newly issued shares, valued at $10 per share.

66.     Since Federated Funds shares are only priced once per day, the potential exists for an investor to purchase shares at a "stale" price that does not incorporate the latest information, and thereby make a quick profit.  For example, if an investor were able to purchase shares of a mutual fund at the NAV calculated <u>before</u> his purchase, with knowledge that the investments held within the fund had risen in value before the next NAV calculation, he could make a risk-free profit by simply buying the shares and then selling them the next day at the new, higher NAV.

67.     To prevent this arbitrage opportunity, the SEC enacted Rule 22c-1 under the ICA, which provides:

> No registered investment company issuing any redeemable security, no person designated in such issuer's prospectus as authorized to consummate transactions in any such security, and no principal underwriter of, or dealer in, any such security shall sell, redeem, or repurchase any such security except at a price based on the current net asset value of such security <u>which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security</u> . . . (emphasis added)

Under Rule 22c-1, (also known as the "forward-pricing rule"), Federated Funds investors who place orders to purchase fund shares during trading hours do not know the exact price at which their orders will be executed; instead, these orders are executed at the NAV calculated after the order is received, at the 4:00 p.m. close of trading on the New York Stock Exchange.   Thus, all Federated Funds investors should have the same opportunity to digest "pre-4:00 p.m. information" before they buy or sell, and no investor should have the benefit of "post-4:00 information" prior to making an investment decision.  Further, a Federated Funds investor who can avoid forward pricing and buy at the prior NAV has a significant trading advantage, since, for example, he can wait until after the market closes for significant news such as a positive earnings announcement to come out, and then buy the fund at the old, lower NAV that does not yet reflect the positive news, at essentially no risk.

## Subverting The Forward-Pricing Rule Through Market Timing

68.    The forward-pricing rule alone, however, does not eliminate the arbitrage opportunity for frequent traders in mutual funds.  This is due to the fact that the NAV of the fund, as calculated after the investor purchases his shares, still might not incorporate all public information.  A typical example is a U.S. mutual fund that holds Japanese shares.  Due to time zone difference, the Japanese market may close at 2:00 a.m. New York time.  If the U.S. mutual fund manager uses the closing prices of the Japanese shares in his fund to calculate an NAV at 4:00 p.m. in New York, he is relying on market information that is fourteen hours old.  Any positive market moves during the New York trading day that will likely cause the Japanese market to rise when it later opens, will not be reflected in the "stale" Japanese prices, and thus the overall fund's NAV will be artificially low.  "Market Timing" is the practice of trying to take

advantage of this information delay in the pricing of mutual funds.   A market timer who purchases the Japanese fund described above, at the "stale" price is virtually assured of a profit that can be realized the next day by selling.   Taking advantage of this kind of short-term arbitrage repeatedly in a single mutual fund is called "timing" the fund. Indeed, an article appearing on July 1, 2000, in TheStreet.com entitled "Your International Fund May Have the 'Arbs Welcome' Sign Out", described a significant opportunity for market timing that occurred within the past 10 years:

> On Oct. 28, 1997, on the heels of a 10% decline in the U.S. stock market, Asian markets dropped precipitously.   By 4 p.m. ET, however, the U.S. markets had recovered.   To anyone following the Asian markets, it was clear that those markets would follow suit when they opened for trading.

> Unfortunately, this was not so clear to some mutual funds that invest in securities traded in Asian markets.   These funds calculated their NAVs at the lower, 13 hours' stale closing prices on the exchange.   Many arbitragers, knowing the funds' next-day NAV would rise, stood ready to exploit this pricing discrepancy.

> . . . They poured money into Asia/Pacific funds and sold them the next day, pocketing a one-day profit of around 10%.   This profit came directly out of the pockets of the remaining shareholders.

> How much did shareholders in Asia-Pacific funds lose because the funds used stale prices to value their portfolios?  Not surprisingly, the funds aren't talking.  But based on methodology suggested by the SEC, shareholders in many of these funds would have seen their accounts drop by up to 2.5% overnight.

69.    Market timing opportunities in Federated Funds are not limited to mutual funds holding foreign investments, but instead also arise in other mutual fund asset categories, including mutual funds containing securities such as high-yield bonds or small capitalization stocks.  In such cases, the fact that some of a Federated Funds' securities may not have traded for hours before the New York closing time can render the fund's NAV stale, and thus open to being timed.

70.     The availability of timing opportunities can become scarce, as some fund families prevent timing and the families like Federated Funds, that prosper from it, tend to control timing. According to Confidential Witness 1, within the investment community aware of and/or participating in market timing, it is known that market timing activity is so disruptive to a fund's management and so deleterious to a fund's investment performance that only a certain amount of market timing can be sustained over the long term within any one mutual fund without completely undermining the performance of the mutual fund.

71.     According to the same witness, allowing completely unrestricted timing would generally result in very poor fund performance and therefore typically drive away the ordinary investors whose investments in the funds were needed to bear the hefty transaction costs and other liabilities that the timing activity generated.   Also, investment advisors who allow timing, understanding that the ability to time a fund is a limited and valuable commodity to a market timer, accordingly place some limits on timing that maximized the advisor's gains from the activity in light of the considerations discussed above.

72.     This finite "space" within a fund that could be used for timing assets is commonly referred to as market timing "capacity," and there was fierce competition among both timers and timing intermediaries, including the Trader and Broker/Dealer Defendants, to secure capacity and profit from it.  Finally, diametrically opposed to typical mutual fund investors, market timers have no designs to make money based upon the performance of the funds in which they invest and they are generally unconcerned about advisory and management fees, according to Confidential Witness 1.  Accordingly, by allowing timers into Federated Funds, the Federated Defendants signaled that they were perfectly willing to cater to a species of investor, the Traders, who did not care about the performance of Federated Funds' managers or fund returns and would

continue to inflate the assets under management at Federated so long as one condition was met: they were able to obtain market timing capacity.  The tension between the investment objectives of ordinary Federated investors and the Traders therefore created a serious conflict of interest within the Federated Funds.

### The Federated Funds Directly At Issue

73.     The following list represents, at a minimum, the Federated Funds that have been the direct subject of illegal trading practices by defendants (collectively, the "Market-timed Funds")[1]:

- Federated American Leaders Fund;

- Federated Capital Appreciation Fund;

- Federated Equity Income Fund;

- Federated Kaufmann Fund;

- Federated Max-Cap Index Fund;

- Federated Stock Trust;

- Federated High Income Bond Fund;

- Federated High Yield Trust, and;

- Federated High Yield Bond Fund.

74.     Throughout the Class Period, the Market-timed Funds were each members of the Federated Funds advised by either FIM and/or Federated Equity, serviced by the Administrator Defendant, and underwritten by Federated Securities.

---

[1]     The "Market-timed Funds" are those admitted by Federated to have been timed and/or late-traded.  As discussed herein, however, Plaintiffs have identified other Federated Funds that were also improperly traded and defendants have admitted that wrongdoing occurred in various other unidentified Federated Funds.  Thus, Plaintiffs do not intend the "Market-timed Funds" to be an exhaustive list of those funds involved in the wrongdoing alleged herein.

## FEDERATED SUBSTANTIVE ALLEGATIONS

### A.  General Federated Background

75.    Federated, a Pennsylvania corporation, together with its consolidated subsidiaries, is a provider of investment management products and related financial services.  Federated has been in the asset management business since 1955 and is one of the largest mutual fund managers in the United States with $197.9 billion in assets under management at December 31, 2003.

76.    Federated sponsors, markets and provides investment-related services to various investment products, including mutual funds and separately managed accounts.  Federated's principal source of revenue is investment advisory fee income earned by various subsidiaries of Federated pursuant to investment advisory contracts with the investment products.  These subsidiaries (FIM and Federated Equity) are compensated for their services in the form of investment advisory fees based upon the net assets of the fund or separately managed account.

77.    The Advisor Defendants provided investment advisory services to 136 Federated-sponsored funds as of December 31, 2003.  Federated markets these funds to banks, brokers/dealers and other financial intermediaries who use them to meet the needs of their customers, including retail investors, corporations and retirement plans.  Federated funds are registered under the ICA and under applicable federal and state laws.

78.    Each of the funds enters into an advisory agreement that is subject to annual approval by the fund directors or trustees, including a majority of the directors who are not "interested persons" of the funds or Federated, as defined under the ICA.  In general, amendments to such advisory agreements must be approved by the funds' shareholders.  A

significant portion of Federated's revenue is derived from these advisory agreements, which generally are terminable upon 60 days notice.

79.     Of the 136 mutual funds comprising the Federated Fund Complex during the Class Period, Federated's investment advisory subsidiaries managed 52 money market funds (and cash equivalents) totaling $128.9 billion in assets, 48 fixed-income funds with $24.0 billion in assets and 36 equity funds with $22.8 billion in assets.

80.     The prospectuses issued in connection with the funds of the Federated Fund Complex each represented that Federated did not permit timed trading of the funds:

> The Fund may modify or terminate the exchange privilege at any time.  The Fund's management or Adviser may determine from the amount, frequency and pattern of exchanges that a shareholder is engaged in excessive trading that is detrimental to the Fund and other shareholders.  If this occurs, **the Fund may terminate the availability of exchanges to that shareholder and may bar that shareholder from purchasing other Federated funds.** [Emphasis added.]

81.     Similarly, the prospectuses each represented that late trading was not permitted because all trade orders made after 4:00 P.M. Eastern time would be calculated using the net asset value for the following day:

> WHAT DO SHARES COST?
>
> You can purchase, redeem or exchange Shares any day the New York Stock Exchange (NYSE) is open.  **When the Fund receives your transaction request in proper form (as described in this prospectus) it is processed at the next calculated net asset value (NAV).**
>
> *               *               *
>
> **NAV is determined at the end of regular trading (normally 4:00 p.m. Eastern time)** each day the NYSE is open. [Emphasis added.]

82.     Historically, Federated also provided a broad range of services to support the operation, administration and distribution of Federated-sponsored funds.  These services, for which Federated received fees pursuant to agreements with the funds of the Federated Fund Complex, include administrative services, transfer agency services, shareholder servicing, accounting and general support.  Effective January 1, 2004, Federated is no longer responsible for providing accounting services to the Federated-sponsored funds.  Rather the funds began contracting directly with an independent third-party provider of portfolio accounting services.  In addition, on February 3, 2004, Federated announced its intent to outsource its transfer agency function to an independent third-party provider of such services.

## B.     The Mutual Fund Scandal Breaks

83.     On September 4, 2003 *The Wall Street Journal* reported that the New York Attorney General Elliot Spitzer filed a complaint in New York Supreme Court alleging that certain mutual fund companies secretly allowed, and in some instances facilitated Canary to engage in prohibited trading in mutual fund shares.  (the "Spitzer Complaint").  In return for receiving this favored treatment, which damaged the long term mutual fund investors, Canary parked funds in financial instruments controlled by the fund companies or their affiliates to increase fund management fees, and entered into other arrangements which benefited the fund companies and/or their affiliates.  The article reported as follows regarding the matter:

> Edward Stern . . . finds himself at the center of a sweeping investigation into the mutual-fund industry after paying $40 million to settle charges of illegal trading made by the New York State Attorney General's Office.  According to the settlement, Mr. Stern's hedge fund, called Canary Capital Partners LLC, allegedly obtained special trading opportunities with leading mutual-fund families -- including Bank of America Corp's Federated Funds, Bank One Corp., Janus Capital Group Inc. and Strong Financial Corp.-- by promising to make substantial investments in various funds managed by these institutions.

The article indicated that the practices enumerated in the Spitzer Complaint were just the tip of the iceberg, stating as follows:

> In a statement, Mr. Spitzer said "the full extent of this complicated fraud is not yet known," but he asserted that "the mutual-fund industry operates on a double standard" in which certain traders "have been given the opportunity to manipulate the system. They make illegal after-hours trades and improperly exploit market swings in ways that harm ordinary long-term investors."

84.     The Spitzer Complaint received substantial press coverage and sparked additional investigations by state agencies, the SEC and U.S. Attorney for the Southern District of New York, and led to calls for more regulation and tougher enforcement of the mutual and hedge fund industries. On September 5, 2003, *The Wall Street Journal* reported that the New York Attorney General's Office had subpoenaed "a large number of hedge funds" and mutual funds as part of its investigation, "underscoring concern among investors that the improper trading of mutual-fund shares could be widespread" and that the SEC, joining the investigation, plans to send letters to mutual funds holding about 75% of assets under management in the U.S. to inquire about their practices with respect to market-timing and fund-trading practices.

**C.     Federated Admits That It Engaged In Late Trading and Market Timing**

85.     On October 22, 2003, Federated filed a form 8-K with the SEC which stated, in pertinent part, as follows:

> Like many other mutual fund companies, Federated Investors has received detailed requests for information on shareholder trading activities from the Securities and Exchange Commission, the New York State Attorney General and the National Association of Securities Dealers. The company has retained the law firm of Reed Smith LLP to conduct an internal investigation, which is ongoing. Cooperating with these regulatory authorities and the completion of the internal investigation are top priorities for the company.
>
> The internal investigation is examining, among other things, circumstances in which it appears that a few investors in Federated

funds were granted exceptions to the company's internal procedures for limiting frequent transactions, and that some of these investors made additional investments in other Federated funds. The investigation has also identified instances in which it appears that orders for Federated variable net asset value funds were placed and accepted after the funds' closing time at 4 p.m.

**D.   Canary, Veras And Others**
**Engage In Improper Federated Mutual Fund Trading**

86.   On or about November 25, 2003, Federated's President and CEO, Defendant J. Christopher Donahue, issued a press release providing "additional information on past mutual fund trading issues.

**1.   Canary Timing Trades**

87.   According to Federated, one of these arrangements involved Canary. This was corroborated by Confidential Witness 1, who was familiar with Canary's timed trades in Federated Funds and other mutual funds during the Class Period. In or about early April 2000, Stern met with Defendant Hauf, a Federated Regional Sales Representative, and Defendant Nixon, Senior Vice President, Institutional Sales Division at Federated, to discuss Canary's interest in engaging in timed trades of Federated's funds. Although, no agreement was reached at that time, Confidential Witness 1 indicated that it was clear that Federated was engaged in timing arrangements with others because Hauf and Nixon were both familiar with the type of arrangement Canary was seeking.

88.   In mid-2000, Stern negotiated timing capacity in the Market-timed Funds with Defendant Kirsch, a broker at Lehman's Chicago offices. Canary opened accounts with Lehman in order to conduct timed trades in various funds, including the Market-timed Funds. Andrew Goodwin ("Goodwin"), a Canary employee, directed certain transactions in the Market-timed Funds on behalf of Canary, and identified both international and domestic funds in Federated that were good timing candidates.

89.     According to Confidential Witness 1, in or about December 2000, Goodwin  and Noah Lerner ("Lerner"), another Canary employee, were apprised that Federated had conducted a mass mailing regarding timing that warned, "Please be advised that Federated's tolerance of market timing activity has expired.  Effective immediately, any account having excessive trading activity <u>Federated</u> deems to be market timing will be frozen without advance notice."

90.     According to Confidential Witness 1, Canary was apprised that Rich Boyd, the head of Federated's retail broker/dealer area, was trying to get the timing at Federated under control because Federated had an industry-wide reputation for being "soft" on timing.   After identifying several hundred accounts that appeared to be used in timing, Federated was attempting to limit the practice.  However, Canary was assured that the capital market side of the Federated Funds, through which Canary traded, was more tolerant of timing because the total involved was not as large as that was identified from the retail side.  Indeed, it was suggested that the initiative by Federated might actually benefit Canary because less timed assets would create less of a problem for the managers of the Federated Funds.  In fact, Canary was only asked to stop its timed trading in some the Federated international funds that it had been trading, but still could still trade Federated small cap and mid-cap funds. Goodwin continued to direct timing transactions in various Federated funds, including European Equity Fund.

91.     Canary, however, temporarily terminated the relationship with Lehman in the Spring of 2001. According to Confidential Witness 1, from the Summer of 2001 through the Fall of 2002, Canary was offered Federated timing capacity by various sources, including: an offer for capacity in the Kaufmann Fund from Drew Kagan, a broker with Investment Associates; an offer for capacity in some large cap Federated Funds from "J. Fisher" of Federated in November 2001; an offer for capacity in Kaufmann Fund by Larry Auriana, a Portfolio Manager for

Kaufmann Fund, in exchange for sticky assets on a 1:1 ratio in 2002; and an offer for capacity in Kaufmann Fund by Dave Byck, a capacity consultant, in late 2002. According to the confidential witness, Canary declined all of these offers.

92. According to the same confidential witness, in December 2002, Stern met with Defendant Basu, a Lehman broker in New York, and Defendant Pillion, Federated Senior Vice president of Global Sales, at Lehman's New York offices regarding timing arrangements. Pillion told Confidential Witness 1 that he had authority to negotiate the timing arrangement with Canary from Federated senior management. Further, according to Confidential Witness 1, it was his understanding that the Donahues were aware of these arrangements. Pillion offered Stern and Canary timing capacity equal to 3% of the assets in each of five Federated funds: Stock Trust, Equity Income Fund, Capital Appreciation Fund, American Leaders Fund, and Federated Maximum Capital Index Fund. Stern was told that Canary would be permitted two round-trip transactions per month in exchange for investing "sticky assets," in an amount equal to 20% of its utilized capacity, in a Federated Euro-dominated money market fund.

93. According to Confidential Witness 1, Canary consummated the agreement with Federated, opening a Lehman account under the name "Nichols Point Associates LLC" to conduct the timed trades. Canary invested "sticky assets" in Federated's Euro money market fund through a Bermuda entity named "McCaw Capital, Ltd." Lehman also agreed to provide Canary with financing to conduct the timed transactions with Federated.

94. Federated has admitted that from January 22 to July 2, 2003, Canary made forty-six "round trip" transactions between the money market fund and six domestic equity funds. The largest number of "round trips" in a single domestic equity fund was fifteen, eight of which purportedly occurred in June 2003.

95.     These transactions were made with the knowledge and active participation of Federated.  For example, according to Confidential Witness 1, Defendant Miehl of Federated Sales, requested to be, and was, informed of Canary's transactions in the Market-timed funds.  In addition, Miehl worked with Defendant Basu to include Federated's Euro Money Market Fund, which was purportedly limited to investments by off-shore entities, in Lehman's "sweep system."

96.     While Canary initially invested $85 million of trading capital in the Market-timed Funds, its investment was later reduced to $50 million.  According to Confidential Witness 1, Pillion met with Stern, in a meeting arranged by Ryan Goldberg, a broker at Brean Murray, in New York in or about April 2003, to discuss the reduction of Canary's investments in Federated.

## BANK OF AMERICA

97.     Eventually, Canary stopped trading in Federated through Lehman.  Establishing accounts under the names Cockatiel and Syren, Stern and Canary utilized BOA to continue to conduct their timed trading in Federated.  To reduce its capital commitments in connection with its timing activity, Canary entered into a derivative swap arrangement with BOA.  Under this arrangement, certain assets were carried on BOA's books with Canary paying any loss on the assets and reaping the benefit of any profit generated by the assets. Jim Sweeney ("Sweeney") of BOA Securities LLC assisted in structuring the derivative swap for Stern and Canary.  Although Stern and Canary had switched from Lehman to BOA to conduct the timing activity in Federated, Stern maintained contact with Federated's senior management throughout 2003, including Defendant Pillion.

98.     According to Confidential Witness 1, Canary also traded Federated Funds outside of the negotiated agreement with Federated.   Some of Canary's non-negotiated trading was conducted by Goodwin, a Canary employee, and Jim Nesfield, a "capacity consultant."

99.     According to the confidential witness, all of the trades that went through BOA were late trades, which were often determined before 4:00 p.m., but were not entered until after 4:00 p.m.   Moreover, by using BOA, Canary was able to change its trade orders if something affecting the fund happened between 4:00 and 6:30 p.m.   The opportunity to change trades after 4:00 p.m. on the BOA platform was not offered to others.

100.     According to Confidential Witness 1, BOA became Canary's largest fund counter-party through an agreement between Stern and Sihpol in 2001.   Sihpol and his partner, Mike Tierney ("Tierney") met with Stern at the office of the Hartz Group (an affiliate of Stern) to discuss timing capacity and financing.   Stern subsequently met with BOA's mutual fund clearing people: Kevin Brown ("Brown"), Stu Heller ("Heller"), and Matt Auglugiaro.   Sihpol advised Stern that BOA could provide Canary with access to all the mutual funds' BOA distributors (thousands of funds) by installing an ADP system in Canary's offices.   Canary could enter their own orders in the ADP system, doing away with manual entries, and preventing other brokers from telling Canary's competition what Canary was doing.

101.     BOA eventually installed the system in Canary's offices.   The ADP system enabled Canary to enter trades after 4:00 p.m. without the use of any special codes.   The cut-off time was for entering trades through the ADP system was 6:30 p.m., utilizing Prichard Capital as the broker.

102.     Canary printed out all of its orders each day and sent copies to Sihpol.   BOA earned 12b-1 fees, as well as other fees on the Canary trades made through the ADP system.   In

addition, BOA gave Canary short mutual fund basket information, permitting Canary to create "synthetic short" positions, which generated $1 million per month in fees to BOA. Canary invested $200 million in BOA's mutual fund clearing accounts. Canary paid BOA a wrap fee on this investment of 100 bps for Nations/ 50 bps on all other funds. In total, Canary purchased 77 million shares in timed and/or late trading transactions Federated Funds through BOA, worth approximately $890 million.

103.   As set forth above, Federated has admitted that Stern, Canary and others have engaged in illicit negotiated timed trading in Federated Funds. According to Federated, Canary earned nearly $3.8 million from investments in Federated's S&P 500 index fund (the Max-Cap Fund). The two most profitable "round trips" in this fund had duration of 13 and 28 days.

104.   Federated provided a chart setting forth Canary's purported trading in Federated funds. A copy is reprinted below:

**Detail of Trading By Canary Related Entities: Trade Volume By Fund (Offering Trades)**

| Month | Federated Stock Trust | Federated Kaufmann Fund | Federated Max-Cap Index Fund | Federated American Leaders Fund | Federated Equity Income Fund | Federated Capital Appreciation Fund |
|-------|------|------|------|------|------|------|
| Jan-03 | 1 | 0 | 1 | 1 | 0 | 1 |
| Feb-03 | 1 | 0 | 1 | 1 | 1 | 1 |
| Mar-03 | 0 | 0 | 1 | 0 | 0 | 0 |
| Apr-03 | 1 | 2 | 3 | 1 | 1 | 1 |
| May-03 | 1 | 1 | 1 | 3 | 1 | 2 |
| Jun-03 | 0 | 1 | 0 | 8 | 0 | 7 |
| Jul-03 | 0 | 0 | 0 | 1 | 0 | 1 |

| Total | 4 | 4 | 7 | 15 | 3 | 13 |
|-------|---|---|---|----|----|----|

### 2.    Timing By Investment Advisers

105.    Federated also admitted to improper trading by two "investment advisers" in Federated Funds.  In this regard, two other trading arrangements involved investors in Federated high yield funds.  Those investors were requested to provide the funds with advance notice of any intended timing transactions, thereby putting Federated on notice of those trades. According to Federated, the first arrangement, which occurred in the summer of 2002, permitted investments of up to $20 million and resulted in a total of six "round trip" investments over approximately one year.  The second arrangement occurred in April 2002 and permitted investment of approximately $10 million, for not less than 15 days, and up to four times per year.  The specific Federated Funds involved were the High Income Bond Fund and High Yield Trust.  Both of these arrangements were purportedly still ongoing during the course of Federated's internal review.

### 3.    Failure to Review "Frequent Trading Reports"

106.    Federated also admitted to failing to review "frequent trading reports."  According to Federated, the Company has identified certain "internal frequent trading reports" that were not reviewed during the period from May to September 2003, when responsibility for reviewing such reports was purportedly being centralized within Federated.  This failure enabled eleven clients and two omnibus accounts (for which Federated purportedly did not have underlying client information) – whose trading activities would ordinarily have been reviewed – to engage in frequent trading in Federated Funds during that period.

107.    With respect to late trading, Federated claims that it had identified one investor, Veras Partners, an investment advisor, which made late trades by placing orders over the phone

between 4:00 p.m. and 5:00 p.m. on fifteen occasions.  Those orders were accepted by Federated (although Federated claims that the trades were accepted by a group of Company employees who did not have a sufficient understanding of the circumstances under which trades could be processed after 4:00 p.m.).

108.   Notably, Federated claims that, because of the previously described failure to review frequent trading reports, Veras Partners was also able to engage in frequent trading without being detected.  In this regard, $12 million was invested in a variety of funds, and the net gain realized was approximately $175,000.

109.   Federated also stated that it purportedly reviewed the trades processed by certain employees since January 2000 to ascertain whether they accepted other trades for variable net asset value funds that clients placed after the closing time.  Of the approximately 38,000 trades processed by this group during these 45 months, approximately 5,000 were properly processed after 4:00 p.m. in accordance with normal industry practices.  However, Federated has also identified approximately 100 additional instances in which this group incorrectly accepted orders after the 4:00 p.m. close.  Excluding the transactions by the investor mentioned above, the additional instances of orders accepted after 4:00 p.m. ranged from approximately $7 to $400,000 in a variety of funds, and averaged approximately $28,000.

### 4.   Document Destruction

110.   Shockingly, Federated also disclosed that, after the current regulatory investigation began, one mid-level Federated officer came forward and reported to Federated that he had deleted several e-mails relevant to the investigation.  Federated has purportedly accepted the resignation of the two officers who met with Canary to set up the arrangements with it.  In addition, Federated has terminated the employment of the employee who deleted e-mails.

### 5.     Improper Trading By Federated Employees

111.     Importantly, the February 3, 2004, Federated press release also contained information about improper trading by *Federated employees in certain of the Federated Funds*. In this regard, there was an unnamed Federated employee who, between January 1999 and March 2003, regularly placed orders after the funds' closing times.  The transactions ranged in amount from approximately $26,000 to less than $100.  Defendants did not disclose which Federated Funds were involved in this wrongdoing.

112.     Federated also announced that, "an employee in one instance incorrectly accepted orders from a *Company officer* after the applicable funds' closing times.  The officer has paid the funds for the difference between the correct share prices and the prices used in processing and is being sanctioned by the Company."  (Emphasis added).  Defendants did not disclose which Federated Funds were involved in this wrongdoing.

113.     The unidentified Federated employees referenced above are named as a John Doe Defendants herein.

114.     Federated's review also identified two Federated portfolio managers, identified herein as John Doe Defendants, who had personal trades in Federated's 401(k) plan in funds that they managed.  One portfolio manager had two offsetting trades over a five-month period, with durations of 35 and 76 days in amount of approximately $600,000.  The other manager had seven offsetting trades in a 21-month period, with durations from nine to 62 days in amounts of up to $160,000.  Federated stated that it deemed these trades "unacceptable." Defendants did not disclose which Federated Funds were involved in this wrongdoing.

115.    Federated has also announced that it has furnished the National Association of Securities Dealers, the U.S. Attorney's Office in Pittsburgh and authorities in West Virginia with information relating to trading in the Company's mutual funds.

### 6.    Federated Announces Remedial Measures and "Restoration Fund"

116.    Thereafter, Federated announced that: (a) it had enhanced its procedures with regard to the monitoring of frequent trading and the processing of fund orders placed after trading deadlines; (b) it was commencing a remedial training initiative to help ensure that its policies and procedures are adhered to by all employees; (c) it had retained an independent audit firm to conduct a review of policies and procedures and to make recommendations governing mutual fund trading; (d) it was in the process of identifying an independent consultant to evaluate and enhance the Company's internal audit and compliance departments; and (e) it was implementing previously planned redemption fees on its international and high yield funds.

117.    On or about February 3, 2004, Federated announced that it had created a $7.6 million "Restoration Fund."  Federated also announced that it had purportedly completed its assessment of past mutual fund trading.  The $7.6 million figure, as determined by Federated's expert, Cornerstone Research, included: (1) approximately $4.87 million related to the detrimental impact on the funds from frequent trading activity; (2) approximately $2 million related to the possible detrimental impact on the funds that may have resulted from orders incorrectly accepted by Federated employees after the funds' closing times; (3) fees of approximately $420,000 received by the Company from assets invested as a result of frequent trading arrangements; and (4) approximately $355,000 of interest on these amounts.  Federated also announced that the Company, with the concurrence of the Independent Trustees of Federated's mutual funds, announced in its intent to outsource its transfer agent functions to

Boston Financial Data Services ("Boston Financial").   This was to be accomplished by June 30, 2004.

**7.     Federated's Disclosures of
Wrongdoing Were Incomplete**

**a.     The Disclosures Concerning the Extent
of the Timing in the Federated Funds Were Incomplete**

118.   The foregoing disclosures by Federated were materially incomplete because Federated did not disclose the full extent of the timing and late trading in Federated Funds, or that numerous traders and timers were utilizing Federated Funds for their personal gain.   These traders and timers used outside intermediary brokers to facilitate their trades.   For example, during the Class Period, certain timers and traders identified by Plaintiffs purchased approximately 10,870,909 shares in Federated Funds, worth approximately $94,380,495.   These trades occurred in the following Federated Funds:  American Leaders Fund;  Federated International Equity;  Kaufmann Fund;  Federated International Small Company;  Federated Bond A;  Federated Global Equity;  Federated Limited Term;  Federated Government Income Securities;  Federated Growth Strategies;  Federated Aggressive Growth;  Federated European Growth;  and Federated International Growth Fund.

119.   In addition, according to Confidential Witness 1, the fees and interest that Federated claims it earned from the illicit trading in the Federated Funds indicates that such activity exceeded that described in Federated's disclosures.   Indeed, according to Confidential Witness 1, the $355,000 in interest earned by Federated from illicit timing in the Federated Funds indicates that Federated had permitted such activity for approximately 6-8 years.

### b.    Additional Veras Arrangements

120.   Federated's disclosures concerning the illicit trading in its funds, however, were incomplete.   In the Spring of 2003, Defendant Veras, through intermediaries, entered into negotiations with Defendant Nixon, Senior Vice President, Institutional Sales Division at Federated, to engage in timed trades in certain funds in the Federated Funds.

121.   In or about June 2003, Federated agreed to allow Veras to time the Max-Cap Fund in an amount equal to 0.5% of the fund's asset value per year, or approximately $10 million.  In addition to the Max-Cap Fund, Veras was negotiating with Federated for approval for timing capacity of approximately $10-$20 million in other funds in the Federated Funds.

### c.    Acceptance of Late Trades Due to Inadequate and Failed Procedures

122.   In addition, according to Confidential Witness 2, a former Federated employee, who held various positions at Federated from 1991 through October 2002, and maintains regular contact with current Federated employees, the Company did not disclose all information in its relating to the mutual fund investigation.  This former employee stated that the Trust Trading System (an in-house Federated trade clearing system) was utilized to push back trading deadlines to accommodate interfaces coming in from clients with no verification of what time the trades were received.   According to this former employee, trades were accepted and approved post-deadline, "without any verification of the trade's having been received at the client's site before the deadline."  Confidential Witness 2 explained that one of Federated's trading platforms, Trust Connect DC (used for defined contributions), had a high volume of after-hours trades which were to be accepted if the actual trade orders were placed prior to the closing time.  However, this former employee stated that despite the fact that all trade tickets for such trades were supposed to be approved an employee who held a Series 26 License, from approximately 1993

until 2000, no one signed-off on these trades; in 2000, Federated employees who did not have Series 26 Licenses routinely signed-off on such orders; and in 2002, the practice of signing the trade tickets was again discontinued until 2003.

### d.    Market Timing By Other Federated Clients, Including "Lifetime Members"

123.    In addition to the foregoing, even timing activity by individual investors was not uncommon at Federated.  According to Confidential Witness 3, a former Federated employee, who worked as a Transfer Agent at Federated's Call Center in Rockland, MA from August 1999 through October 2001 and was responsible for handling purchases, redemptions and trades for individual clients, there were many instances where "particular customers who would call and make a purchase or redemption in a Federated mutual fund, then they'd call back later on that day and do the opposite."  Among the funds subject to this timing activity were the Kaufmann Fund, Aggressive Growth Fund (which no longer exists), High Yield Bond Fund, and the High Income Bond Fund.

124.    According to this former employee, most of the individuals who engaged in timed trades were "Lifetime Members" of specific funds in which they had been invested for a long time.  This designation specifically exempted them from having to pay fees to Federated in connection with purchases or redemptions.  On a number of occasions, Confidential Witness 3 questioned a Call Center manager about the frequency of these trades.  The Call Center Manager told this former employee that "It is all right, as long as they don't do it repeatedly all the time."  Confidential Witness 3 stated, however, that there were no officially-stated guidelines in the department governing frequency or scope of trades.   The former employee stated, "I kind of questioned it a couple of times and that's when they said, "Well, as long as it's not all the time . . . ."  However, if clients wanted to trade in and out of funds a couple of times a month, they were

permitted to do so.  "We had clients calling on a regular basis.  Some of them, I would speak to once a day.  There were some, I would speak to once a week and others would call two or three times a month.  I got to the point where I knew their names, I knew who they were – that's how frequently they called."

125.    Confidential Witness 3 specifically recalled that "[t]here was one person who constantly called in – he would make a trade, he would make a purchase, he would redeem it, then he would purchase it again at the end of the day, and I thought this was odd.  I thought it was a little strange that [Federated] would actually allow this, because I knew at the time, it was messing with the market."    The former employee stated this customer, who was a "Lifetime Member" and a wealthy individual investor, would transact reverse trades within the same day at least once a month.

126.    Similarly, according to Confidential Witness 3, Federated regularly allowed individual clients to engage in late trading.   According to this individual, late trades were registered into the system as having occurred prior to 4 p.m. through the use of some sort of "overriding" function.   The former employee explained, "[i]f it was past 4 p.m., I always went to a supervisor for approval, and if they knew the customer well enough, they would allow it [the late trade] sometimes."

**The Federated Prospectuses Were Materially False and Misleading**

127.    Prior to investing in any of the Federated Funds, including the Market-timed Funds, Plaintiffs and each member of the Class were entitled to and did receive one of the Registration Statements, and the prospectuses incorporated therein, each of which contained substantially the same materially false and misleading statements regarding the funds' policies on timed trading.

128.    The Prospectuses falsely stated that the Federated Funds actively safeguard shareholders from the recognized harmful effects of timing.  The prospectuses issued for certain of the Market-timed Funds during the Class Period (American Leaders Fund, dated May 31, 2002 (Class A, B, and C shares) and May 31, 2003 (Class A, B, C, and F shares); the Capital Appreciation Fund, dated December 31, 2002 (Class A, B, and C shares); the Equity Income Fund, dated May 31, 2000 (class A, B, and C shares), May 31, 2002 (Class F shares), and May 31, 2003 (Class A, B, C, and F shares); the Kaufmann Fund, dated December 31, 2002 (Class A, B, and C shares); the Max-Cap Fund, December 31, 2001 (Institutional shares), April 7, 2003 (Class K shares); High Income Bond Fund, dated May 31, 2002 (Class A, B, and C shares) and May 31, 2003 (Class A, B, and C shares)) contained the following language:

> The Fund may modify or terminate the exchange privilege at any time.  The Fund's management or Adviser may determine from the amount, frequency and pattern of exchanges that a shareholder is engaged in excessive trading that is detrimental to the Fund and other shareholders.  If this occurs, the Fund may terminate the availability of exchanges to that shareholder and may bar that shareholder from purchasing other Federated funds.

129.    With respect to the pricing of mutual fund shares and late trading, the above-referenced prospectuses, as well as the prospectuses for the Stock Trust, dated December 31, 2002 and December 31, 2003, and the High Yield Trust, dated April 30, 2002 and April 30, 2003, contained the following language:

> WHAT DO SHARES COST?
>
> You can purchase, redeem or exchange Shares any day the New York Stock Exchange (NYSE) is open.  When the Fund receives your transaction request in proper form (as described in this prospectus) it is processed at the next calculated net asset value (NAV).

>                    *              *              *

NAV is determined at the end of regular trading (normally 4:00 p.m. Eastern time) each day the NYSE is open.

130.    The Prospectuses were materially false and misleading because they failed to disclose and misrepresented the following material and adverse facts:

a.    that defendants had entered into the agreements described above, allowing Canary, Veras, and the John Doe Defendants and others  to time and/or late trade shares of the Market-timed funds during the Class Period;

b.    that, pursuant to that agreement, Canary, Veras, and the John Doe Defendants, certain employees of Federated, and Lifetime Member clients regularly timed and/or late traded shares of the Market-timed Funds during the Class Period;

c.    that, contrary to the express representations in the Prospectuses, the Federated Funds enforced their policy against frequent traders selectively, *i.e.*, they did not enforce it against Defendants Canary, Veras, the John Doe Defendants, or others;

d.    that the Adviser Defendants regularly allowed defendants Canary, Veras, the John Doe Defendants, and others to engage in trades that were disruptive to the efficient management of, and/or increased the costs and reduced the actual performance of the Market-timed Funds during the Class Period; and

e.    the above-referenced Prospectuses also failed to disclose that, pursuant to the unlawful agreements, the Advisor Defendants benefited financially at the expense of the investors in the Market-timed Funds during the Class Period.

**Additional Allegations**

131.    As alleged herein, defendants knew that the public documents and statements issued or disseminated in connection with Federated Funds, including the Market-timed Funds, during the Class Period were materially false and misleading; knew that such statements or

documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding the foregoing funds, their control over, and/or receipt and/or modification of the allegedly materially misleading misstatements and/or their associations with the Federated which made them privy to confidential proprietary information concerning the Federated Fund Complex, participated in the scheme alleged herein.

132.     Additionally, the Adviser Defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein and participated in and/or had actual knowledge of the conduct alleged herein.  In exchange for allowing the unlawful practices alleged herein, the Adviser Defendants, among other things, received increased management fees as a result of the scheme alleged herein.  Moreover, mutual fund managers can easily spot market timing in their mutual funds simply by observing the trading activity within accounts; if the account, or persons controlling more than one account, engage in frequent trades the manager will know that they are engaging in market timing.  The Spitzer Complaint emphasizes the ease with which the practice can be spotted by fund managers or their employees, as follows:

> Mutual fund managers are aware of the damaging effect that timers have on their funds.   And while the effects on individual shareholders may be small once they are spread out over all the investors in a fund, their aggregate impact is not: for example, one recent study estimates that U.S. mutual funds lose $4 billion each year to timers.  Eric Zitzewitz, Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds (October 2002) 35, at http://faculty-gsb.stanford.edu/zitzewitz/Research/arbitrage1002. pdf.  While it is virtually impossible for fund managers to identify every timing trade, large movements in and out of funds -- like those made by Canary -- are easy for managers to spot.  And mutual fund managers have tools to fight back against timers.

133.   As described above, defendants not only entered into agreements with defendants Canary and Veras, and the John Doe Defendants to permit timing and late-trading in the shares of the Market-timed Funds during the Class Period, Federated has admitted to failing to review "frequent trading reports" during the period from May to September 2003, when responsibility for reviewing such reports was purportedly being centralized within Federated.

134.   Defendants Canary and Veras and the John Doe Defendants were motivated to participate in the wrongful scheme by the enormous profits they derived thereby.   They systematically pursued the scheme with full knowledge of its consequences to other investors.

### The Failure of Federated and the "Outside" Trustees

135.   The ICA requires that the various funds in the Federated Funds be governed by Boards of Trustees or Directors, and further requires that a majority of the members of those Boards be independent from and unaffiliated with the Adviser Defendants, or their parents, subsidiaries or affiliates.   The purpose of this independence requirement is to ensure that the management of the mutual funds is not dominated by the Fund Sponsor/Investment Advisor and that, instead, the fund is managed in the best interests of its shareholders.   This responsibility not only includes retaining and monitoring the performance of the Investment Advisor Defendants, FIM and Federated Equity, and Administrators, but negotiating contracts with these parties and ensuring that the fees paid are reasonable in relation to the services performed.   The Investment Company Institute ("ICI"), a mutual funds lobbying and trade group, recently described the duties of mutual fund boards:

More than 77 million Americans have chosen mutual funds to gain convenient access to a professionally managed and diversified portfolio of investments.

Investors receive many other benefits by investing in mutual funds, including strong legal protections and full disclosure. In addition, shareholders gain an extra layer of protection because each mutual fund has a board of directors looking out for shareholders' interests.

Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the funds' investors. The unique "watchdog" role, which does not exist in any other type of company in America, provides investors with the confidence of knowing the directors oversee the advisers who manage and service their investments.

In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the mutual fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company.

Accordingly, an effective and independent Board would have prevented the market timing and late trading at Federated due to its detrimental consequences to Federated Funds' shareholders.

136.    In reality, the Boards of the Federated Funds were dominated, throughout the Class Period, by the Adviser Defendants and their affiliates, who not only effectively controlled the Trustee nomination and appointment process, but also the fees that the purportedly independent or "outside" Trustees earned from serving on the fund boards. Further, the purportedly "independent" directors and trustees, who fulfill this role in addition to their full-time occupations, served on boards overseeing dozens of individual mutual funds within Federated Funds, rendering it difficult to oversee the activities of the funds consistent with their fiduciary duties.

137.    Throughout the Class Period, the Director/Trustee Defendants, who were insider directors and trustees and outside directors and trustees of the specific funds within the Federated

Funds breached their fiduciary duties and failed to adequately protect the interests of Federated

Funds' shareholders, to whom they owed duties of care and loyalty throughout the Class Period.

All of the unlawful activity alleged herein that harmed Federated Funds' investors  was permitted

to occur notwithstanding the presence of the Boards charged with protecting the interests of

Federated Funds' shareholders.  The Director/Trustee Defendants failed to fulfill their duties by

failing to detect and put an end to the unlawful practices and dealings that pervaded the

Federated Funds during the Class Period.

138.    The Outside Director/Trustee Defendants were well-compensated for their

service, earning thousands of dollars in fees.  Each of the Outside Director/Trustee Defendants

earned thousands of dollars every year because of their service as directors on numerous boards

of funds advised by FIM or Federated Equity.  As a result of the foregoing, the Outside

Director/Trustee Defendants, nominated by FIM and Federated Equity, are beholden to FIM and

Federated Equity and their affiliates, and therefore suffer from disabling conflicts of interests that

prevent them from discharging their fiduciary duties.

### Defendants' Profits from the Unlawful Conduct

### Excessive Investment Advisory Fees And Administrative Expenses

139.    The Adviser Defendants and their affiliated entities had powerful incentives to

facilitate the unlawful and improper trading activity described herein.  As described in paragraph

18, above, the Adviser Defendants' advisory fees from the funds which ranged between 0.40% to

0.75% of the fund's average daily net assets.  In addition, the Administrator Defendant, among

other captive entities within Federated, captured administrative fees based on the aggregate

average net daily assets of the Federated Funds that were as high as 0.150 of 1% on the first $250

million; 0.125 of 1% on the next $250 million; 0.100 of 1% on the next $250 million; and 0.075

of 1% on assets in excess of $750 million.  Thus, the large infusions of cash provided by the

Trader Defendants and others, while detrimental to other investors in the Federated Funds, were a source of large profits to the Adviser Defendants and their affiliates by dramatically increasing the amount of assets under management, and thereby increasing the dollar amount of fees payable from those assets.   As detailed in paragraphs 80 through 135, above, neither the Adviser Defendants, nor the Administrator Defendant, nor any other affiliated entities sued herein ever disclosed their practice of permitting and facilitating market timing, much less the fact that they earned millions of dollars in management and advisory fees as a result of permitting this unlawful activity.

140.    Throughout the Class Period, the Director/Trustee Defendants authorized, and the Adviser Defendants and the Administrator Defendant charged and collected, millions of dollars in fees.  As a direct result of the illegal market timing and activity alleged herein, the percentage of average annual assets under management was significantly increased by the influx of the timing assets.   Notwithstanding the corresponding economies of scale that resulted from the increase of assets under management at Federated Funds, the Director/Trustee Defendants, the Adviser Defendants, and the Administrator Defendant did not reduce their fees.   Rather, the Director/Trustee Defendants continued to authorize,  the Adviser and Administrator Defendants continued to charge and collect, and Federated continued to profit from, the same, or a greater, percentage of fees.

141.    The Prospectuses uniformly disclosed that the advisory fees were charged at an annual rate "which ranged between 0.40% to 0.75% of the fund's average daily net assets plus out-of-pocket expenses."   As detailed above, the influx of the illegal market timing and late-trading assets from the market timing in Federated Funds increased the average annual assets under management, thereby increasing the amount total fees authorized by the Director/Trustee

Defendants and charged and collected by the Adviser Defendants.   The advisory services provided by the Adviser Defendants on the assets of the Trader Defendants and other timers did not, however, justify the payment of advisory fees on the timing assets.   In fact, as further incentive to Federated and the Adviser Defendants specifically, the fees collected as a result of the increased assets under management resulting from market timing, were collected without any additional advisory services being provided.

142.    By facilitating the market timing and late trading activities alleged herein, Federated and the Adviser Defendants were able to profit substantially from the receipt of increased advisory fees, based upon the inclusion of Trader cash infusions into the calculation of assets under management.

### Profits Derived From "Sticky Assets"

143.    As an additional inducement for facilitating market timing, Federated employees often asked for and received "sticky assets."  These were typically long-term investments made not in the mutual fund in which the timing activity was permitted, but in one of the Adviser Defendants other financial vehicles that assured a steady flow of fees or other benefits to Federated, but added no value for Federated Funds' shareholders. Often the sticky assets would be placed, and sit quietly, in low-risk money-market or government bond funds; but sometimes they would end up in a hedge fund run by the fund managers with a higher fee structure than the typical mutual fund, generating huge fees for the investment advisors and their affiliated entities. For example, Canary invested $10 million in Federated Euro-dominated money market fund as part of the negotiated agreement made with Federated in December 2002.

## Trader Defendant-Related Profits

144.    The Trader Defendants made millions of dollars timing Federated Funds.  Their profits were independent of the overall investment performance of the Federated Funds in which they invested, and, in fact, as described throughout this action, their rapid trading actually hurt the performance of the Federated Funds mutual funds in which the Traders had invested.  In fact, Canary purchased in excess of 77 million shares, $890 million worth of Federated Funds, during the Class Period, reaping millions of dollars in profits.

## Broker-Dealers Facilitated Market Timing and/or Late Trading

145.    During the Class Period, many of the top brokerage firms in the country, including Prudential, Paine Webber, Salomon Smith Barney, Bear Stearns, Oppenheimer, and defendant Lehman became known as "timing brokers" for their ability to facilitate market timing.  These brokers actively negotiated timing capacity on behalf of the market timers.  The defendant broker-dealers were motivated to engage in such conduct by, among other things, fees they received from the market timers.  The brokers arranged for the market timers to place "sticky" assets in certain mutual funds, thereby improving the brokers' abilities to earn lucrative commissions deals for buying and selling the stocks that comprise each specific fund.  Brokers routinely telephoned the market timers to provide them with a list of mutual funds in which they had market timing capacity and offered capacity to the timers in return for the placement of sticky assets in the funds.

146.    The Defendant Brokers also earned contingent deferred sales charges ("CDSC"s), or back-end loads, that were often triggered by market timers redeeming their shares within stated time periods.  Such loads were designed to encourage investors to buy and hold their mutual funds for the long-term.  By collecting such loads when triggered by market timing

activity, brokers benefited from the rapid in-and-out trading by certain of the market timers, while harming long-term fund investors who bore the transaction costs of such excessive trading.

147.    Additionally, certain broker-dealers including, but not limited to, defendant BOA, operated mutual fund clearing "platforms" that facilitated the market timers' processing of trades in the targeted mutual funds.  These institutions recklessly and/or knowingly disregarded the excessive mutual fund trades being transacted through such platforms by the market timers and substantially assisted and participated in such excessive trading.

148.    As described above, Defendant BOA provided Canary with an electronic trading system that permitted Canary to circumvent restrictions on the frequency and timeliness of its trades.  Beginning in 2001, BOA:  (1) set Canary up with a state-of-the-art electronic late trading platform, allowing it to trade late in the hundreds of mutual funds that the bank offered its customers; (2) provided Canary with approximately $300 million of credit to finance its late-trading and market timing activity in the hundreds of mutual funds that the bank offered its customers; and (3) sold Canary the derivative short positions it needed to time the funds as the market dropped.  Canary became one of BOA's largest customers.  Both Canary and BOA made tens of millions through late trading and timing.  All of this activity was coordinated through the BOA broker who brought Canary in as a client, Theodore C. Sihpol, III.

149.    Canary had a computer system, dubbed the "BOA Box," that was connected to Bank of America's access to the NSCC trading platform.  This set-up enabled Canary to buy and sell mutual fund shares at the price as of 4:00 p.m. ET until 6:30 p.m. ET.  Through the BOA Box, Canary had direct access to the NSCC, the "clearing house" for mutual fund trades, through which Canary could execute trades at any time of day, including late trades, without involving an intermediary.

150.    Through its illegal trading, Canary became one of BOA's largest customers.   In return, Canary agreed to leave millions of dollars of "sticky assets" with BOA bond funds on a long-term basis.   BOA profited from the fees generated by Canary's trading.   Both Canary and the various parts of BOA that serviced Canary made tens of millions of dollars through late trading and timing.

### Defendants Lehman and BOA Facilitated Market Timing and/or Late Trading

151.    During the Class Period, market timing and/or late trading constituted a niche-business catered to by investment banks, including defendants Lehman and BOA.   These defendants provided market timers and/or late traders with financing specifically designed for this purpose.

152.    In some cases, the mutual fund family permitting the market timing and/or late trading arranged the financing by the investment banks for the market timers and/or late traders. In other cases, the market timers and/or late traders approached the investment banks for financing.   Market timers and/or late traders openly discussed with the investment banks the purpose of the loans -- to market time and/or late trade mutual funds -- and often disclosed such purpose expressly in the financing documents.   Loan agreements regularly specified collateral -- sometimes fund concentration and market exposure -- demonstrating that the investment banks knew they were providing financing to market timers and/or late traders.   Some market timers and/or late traders even provided lenders with daily reports on the collateral and trades.

153.    A market timing/late trading financing tool used by defendant investment banks included "equity swaps" whereby market timers/late traders were actually allowed to manage accounts in the investment bank's name pursuant to a management agreement.   The steps taken in a swap agreement were as follows:   The bank would open an account and the market

timer/late trader would create a subsidiary that was made the manager of the account.  The bank and the market timer/late trader would enter into a management agreement outlining the market timing and/or late trading, and overall investment objectives.  The bank would have a subsidiary, often in London, do the swap with the market timer/late trader.  The market timer/late trader would pay libor +125-200 to the bank subsidiary, which would pay the market timer/late trader the return on a reference index.  For every $1 in collateral provided by the market timer/late trader, the bank would put up $3 for trading.

154.    The credit facilities extended to market timers and/or late traders were not long term, relative to the usual long-term investments in mutual funds.  The investment banks knew that the credit provided the market timers and/or late traders was intended for short-term speculation in mutual funds.  The investment banks also knew that such conduct was harmful to the long-term investors in such mutual funds.

### Broker and Financier Profits

155.    The Broker/Dealer Defendants, including Lehman, BOA, as well as non-party Brean Murray, also profited from the timing activity.  The Broker/Dealer Defendants, and others, collected fees from both their timer clients and Federated for adding to the assets under management at Federated, as well as other related financing fees and services, as described above.

### The Harm of the Unlawful Trading to Federated Investors

156.    Market Timing caused significant harm to typical Federated Funds' investors in a variety of ways.  For example, market timing caused "dilution", by not only depriving non-timer Federated Funds' investors of gains they would otherwise realize on their investments, but also by forcing them to incur a disproportionate share of the losses on days that the NAV declines.

The timer steps in at the last minute and takes part of the buy-and-hold investors' upside when the market goes up; and as a result the next day's NAV, as calculated on a per share basis, is less than it would have been had the timer not invested in the fund.  Conversely, if the timer sells shares on days that  market prices are falling below the calculated NAV, the arbitrage has the effect of making the next day's NAV, as calculated on a per share basis, lower than it would otherwise have been, thus magnifying the losses that experienced by other investors in the fund.

157.    The harm to Federated Funds' investors from market timing extends beyond dilution. For example, as detailed above, successful market timing requires repeated, rapid trading of Federated Funds' shares with significant amounts of cash which, in turn dramatically increases transaction costs, such as commissions, on the long-term investors that eat away at returns.  Trades necessitated by timer redemptions can also lead to realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market which impose costs on the fund's long term investors.

158.    Market timing at Federated also harms other mutual investors by forcing mutual fund managers to invest heavily in highly liquid, short-term investments that carry a lower rate of return than other securities, to ensure their ability to redeem shares sold by market timers.  Fund managers are therefore forced to enter into special investments as an attempt to "hedge" against timing activity (instead of simply refusing to allow it), thus deviating altogether from the ostensible, publicly stated investment strategy of their funds, and incurring further transaction costs while at the same time leading to decreased investment performance and additional expenses.

159.    Indeed As further explained by Len Rosenthal, a finance professor at Bentley College stated in a *Boston Herald* article published on November 23, 2003 detailing the

wrongdoing at PBHG: "The returns that the market-timers make are basically being taken away from the long-term shareholders. It's like stealing other people's money."

160.   In general, experts estimate that mutual fund investors, including Federated Funds' shareholders, have lost billions of dollars annually as a result of market timing. Indeed, one recent study estimated that U.S. mutual funds lose $4-$5 billion per year to timers. Eric Zitzewitz, Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds (October 2002) 35, http://faculty-gsb.stanford.edu/zitzewitz/Research/arbitrage1002.pdf.; Money, October 2003, "The Great Fund Rip-Off" at p. 52. University of South Carolina law professor John Freeman has similarly estimated that market timing trades may have drained more than $5 billion a year from long-term fund shareholders.

161.   Federated was aware of the harm caused by market timing as evidenced by Federated's December 2000 "crackdown" on timing by retail broker/dealers in response to the industry perception that Federated was soft on timers.

## Harm Caused by the Trader Defendants

162.   The Trader Defendants' market timing of Federated Funds specifically diluted the Market-timed funds and caused other harm to the purchasers and shareholders of the Federated Funds. The harm caused to Federated Funds' shareholders because of this trading included increased transaction costs that they were forced to bear on a pro-rata basis. Furthermore, the impact of market timing on Federated Funds by the Trader Defendants was substantial, given the massive amounts of money that were being rapidly rifled through the funds. The result of these massive in and out flows was a frustration of the each timed funds' investment objectives, increased fees, expenses, and tax liabilities, and added expenses generated by the resulting

unneeded work on behalf of the Adviser Defendants and the Administrator Defendant that did not benefit typical investors, but were nonetheless paid for by all Federated Funds' shareholders.

## CAUSES OF ACTION

### VIOLATIONS OF THE SECURITIES ACT

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF SECTION 11 OF THE SECURITIES ACT**

163.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter, except that, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

164.    This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against the Registrant/Issuer Defendants, the Director/Trustee Defendants, and Defendant Federated Securities on behalf of Plaintiffs and all members of the Class that purchased shares of Federated Funds during the Class Period.

165.    The Registrant/Issuer Defendants, the Director/Trustee Defendants, and Defendant Federated Securities violated Section 11 of the 1933 Act in that the Prospectuses issued for Market-timed Funds during the Class Period contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.  The Prospectuses failed to disclose and misrepresented, *inter alia*, the following material and adverse facts:

> (a)    that, contrary to the representation that it was Federated's policy and practice to monitor and take steps to prevent timed trading because of its adverse effect on fund investors, in fact, such timed trading was taking place and the policy was only enforced selectively;

(b)    that Federated regularly allowed, and had entered into agreements which allowed, certain investors to engage in trades that were disruptive to the efficient management of the Market-timed Funds and/or increased the costs, and thereby reduced the actual performance the Market-timed Funds; and

(c)    pursuant to these unlawful agreements, defendants benefited financially at the expense of the American Market-timed Funds' investors.

166.    The Registrant/Issuer Defendants, the Director/Trustee Defendants, and Defendant Federated Securities issued, caused to be issued, and participated in the issuance of the materially false and misleading written statements and/or omissions of material facts that were contained in the Prospectuses.

167.    The Registrant/Issuer Defendants, the Director/Trustee Defendants, and Defendant Federated Securities, and each of them, had the duty of conducting investigation of the information contained in the Prospectuses before the dissemination to the shareholders of the Market-timed Funds, and failed to satisfy that duty. Defendants, and each of them, owed to the shareholders of the Market-timed Funds, including Plaintiffs and the members of the Class that purchased shares of Federated Funds, the duty to ensure that the statements contained in the Prospectuses were true and complete and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading. By virtue of the misrepresentations and omissions contained in or omitted from the Prospectuses, as herein alleged, defendants, and each of them, are liable to Plaintiffs and the members of the Class that purchased shares of Federated Funds.

168.   Prior to purchasing and/or reinvesting in shares of the Market-timed Funds, Plaintiffs and members of the Class were provided with the appropriate Prospectuses, without the knowledge of the untruths and/or omissions contained herein.   Plaintiffs and members of the Class purchased and/or reinvested in the shares of the Market-timed Funds traceable to the false and misleading Prospectuses.

169.   As a direct and proximate result of the misconduct of the Registrant/Issuer Defendants, the Director/Trustee Defendants, and Defendant Federated Securities, as well as the material misstatements and omissions contained in the Prospectuses, Plaintiffs and the members of the Class that purchased shares of Federated Funds suffered substantial damages.   The value of shares of the Market-timed Funds decreased substantially subsequent to and due to defendants' violations.

170.   This claim was brought within the applicable statute of limitations.   At the time they purchased and/or reinvested in the shares of the Market-timed Funds, traceable to the defective Prospectuses, Plaintiffs and members of the Class that purchased shares of Federated Funds were without knowledge of the facts concerning the false and misleading statements and omissions alleged herein and could not reasonably have possessed such knowledge.

171.   The statutory safe harbor provided for forward looking statements under certain circumstances does not apply to the defendants' false statements and material omissions alleged in this Complaint.   The "safe harbor" for forward looking statements is not applicable since defendants' statements were contained in a prospectus issued by defendants and disseminated to Plaintiffs and members of the Class that purchased shares of Federated Funds; defendants' statements were not identified as forward looking statements when made; they were not accompanied by meaningful cautionary statements identifying important factors which could

cause actual results to differ materially from those in forward looking statements; and they were not forward looking statements within the meaning of the statute.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT

172.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

173.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), against the Registrant/Issuer Defendants, the Director/Trustee Defendants, and Defendant Federated Securities on behalf of Plaintiffs and members of the Class that purchased shares of Federated Funds during the Class Period.

174.     The actions of solicitation taken by the Registrant/Issuer Defendants, the Director/Trustee Defendants, and Defendant Federated Securities defendants included participation in the preparation and dissemination of the false and misleading Prospectuses.  The written communications made in connection with the prospectuses contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed to disclose material facts.

175.     By means of the Prospectuses, the Registrant/Issuer Defendants, the Director/Trustee Defendants, and Defendant Federated Securities offered for sale and/or sold and participated in such selling activities of the Federated Funds to Plaintiffs and the members of the Class that purchased shares of Federated Funds.  Defendants' actions of solicitation consisted primarily of the preparation and dissemination of the Prospectuses and amendments thereto.

176.     The Registrant/Issuer Defendants, the Director/Trustee Defendants, and Defendant Federated Securities Defendants solicited the purchase by each member of the Class that purchased shares of Federated Funds pursuant to the defective Prospectuses.  But for the

participation by these defendants, including the solicitation by these defendants as set forth herein, defendants could not and would not have sold shares or units of the Federated Funds to Plaintiffs and members of the Class that purchased shares of Federated Funds.  The defendants named herein participated in the acts detailed as follows:

    i.    they actively and jointly drafted, revised and approved the Prospectuses and other written selling materials by which shares or units of the Market-timed Funds were sold to the investing public.  These written materials were "selling documents" and calculated by these defendants to create interest in the securities offered and were widely distributed by defendants for that purpose;

    ii.    these defendants finalized the Prospectuses and caused them to become effective. But for these defendants having signed and/or drafted the Prospectuses, shares or units of the Federated Funds could not have been sold; and

    iii.    these defendants conceived and jointly orchestrated all activities necessary to effect the sale of these securities to the investing public by issuing the securities, promoting the securities and supervising their distribution and ultimate sale to the investing public.

177.    Defendants were obligated to make a reasonable and diligent investigation of the written statements made in the Prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

178.    Plaintiffs and the other members of the Class that purchased shares of Federated Funds pursuant to the defective Prospectuses.  Plaintiffs did not know, or in the exercise of

reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses.

179.   Plaintiffs and the members of the Class that purchased shares of Federated Funds seek rescissory damages for the shares or units of the Federated Funds that Plaintiffs and the other members of the Class continue to own, in return for the consideration paid for those securities, together with interest thereon.

180.   By reason of the conduct alleged herein, defendants violated Section 12(a)(2) of the Securities Act.   As a direct and proximate result of these violations of Section 12(a)(2), Plaintiffs and the other members of the Class that purchased shares of Federated Funds sustained substantial damages.

181.   Less than three years has elapsed between the time that the securities upon which this claim for relief is brought were sold to the public, and the time of the filing of this action. Less than one year has elapsed between the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this claim for relief is based and the time of the filing of this action.

### THIRD CLAIM FOR RELIEF
### <u>VIOLATION OF SECTION 15 OF THE SECURITIES ACT</u>

182.   Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter, except that, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

183.   This claim is brought pursuant to Section 15 of the Securities Act against the Adviser Defendants, the Administrator Defendant, Federated, and the Director/Trustee Defendants, as control persons of the Registrant/Issuer Defendants on behalf of the Plaintiffs and

the members of the Class that purchased shares of Federated Funds during the Class Period.  It is appropriate to treat these defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Prospectuses, public filings, press releases and other publications are the collective actions of the Adviser Defendants.

184.    The Registrant/Issuer Defendants, Federated, and the Director/Trustee Defendants are each liable under Section 11 of the Securities act as set forth herein.

185.    Each of Adviser Defendants, the Administrator Defendant, Federated, and the Director/Trustee Defendants was a "control person" of the Registrant/Issuer Defendants within the meaning of Section 15 of the Securities Act, by virtue of their position of operational control and/or authority over such funds.   The Adviser Defendants, the Administrator Defendant, Federated, and the Director/Trustee Defendants directly and indirectly, had the power and authority, and exercised the same, to cause the Registrant/Issuer Defendants to engage in the wrongful conduct complained of herein.   The Adviser Defendants, the Administrator Defendant, Federated, and the Director/Trustee Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements in the Prospectuses.

186.    Pursuant to Section 15 of the Securities Act, by reason of the foregoing, the Adviser Defendants, the Administrator Defendant, Federated, and the Individual Defendant are liable to Plaintiffs and the Class to the same extent as are each of the Registrant/Issuer Defendants for their primary violations of Section 11 of the Securities Act.

187.    By virtue of the foregoing, Plaintiffs and other members of the Class that purchased shares of Federated Funds are entitled to damages against the Adviser Defendants, the Administrator Defendant, Federated, and the Director/Trustee Defendants.

**VIOLATIONS OF THE EXCHANGE ACT**

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT**
**AND RULE 10b- 5 PROMULGATED THEREUNDER**

188.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter, except for Claims brought pursuant to the Securities Act.

189.    This claim is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, against all defendants on behalf of Plaintiffs and all persons who purchased shares in any mutual fund in the Federated Funds adversely affected by market timing and/or late trading which funds and/or their registrants/issuers were advised by FIM and/or Federated Equity during the Class Period.

190.    During the Class Period, each of the defendants named herein carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Plaintiffs and the Purchasers, as alleged herein, and caused Plaintiffs and the Purchasers to purchase Federated Funds shares or interests at distorted prices that they would not have paid had they known of the unlawful conduct alleged herein.  In addition, in connection with the unlawful purchases and sales of securities described above, members of the Class suffered damages from, among other things, the dilution of their investment in the Federated Funds.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

191.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Federated Funds' securities, including Plaintiffs and other members of the Class, in an effort to enrich themselves through undisclosed

manipulative trading tactics by which they wrongfully appropriated Federated Funds' assets and otherwise distorted the pricing of their securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

192.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Federated Funds' operations, as specified herein.

193.    Defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from secretly timed trading and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and members of the Class.

194.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

195.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Federated Funds securities were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein.  In ignorance of these facts that market prices of the shares were distorted, and relying directly or indirectly on the false and misleading statements made by the Federated Defendants, or upon the integrity of the market in which the

securities trade, and/or on the absence of materially adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired the shares or interests in the Federated Funds during the Class Period at distorted prices and were damaged thereby.

196.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and other members of the Class and the marketplace known of the truth concerning the Federated Funds' operations, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their shares or, if they had acquired such shares or other interests during the Class Period, they would not have done so at the distorted prices which they paid.

197.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## FIFTH CLAIM FOR RELIEF
## VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT
## AND RULE 10b- 5 PROMULGATED THEREUNDER

198.    This claim is brought pursuant to Section 10(b) of the Exchange Act (15 U.S.C. § 78j) against all defendants on behalf of all persons who held shares in any mutual fund in the Federated Funds during the Class Period and were injured in connection with the purchase and/or sale of the Federated Funds by the market timers and late traders, as alleged herein.

199.    During the Class Period, each of the defendants named herein carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Plaintiffs and other Class members, as alleged herein, and caused Plaintiffs and other members of the Class to hold Federated Funds shares or interests that they would not have had they known of the unlawful conduct alleged herein.  In addition, in

connection with the unlawful purchases and sales of securities by the market timers and late traders described above, members of the Class suffered damages from, among other things, the dilution of their investment in the Federated Funds.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

200.   Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the holders of the Federated Funds' securities, including Plaintiffs and other members of the Class, in an effort to enrich themselves through undisclosed manipulative trading tactics by which they wrongfully appropriated Federated Funds' assets and otherwise distorted the pricing of their securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

201.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Federated Funds' operations, as specified herein.

202.   Defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from secretly timed trading and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiffa and members of the Class.

203.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

204.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Federated Funds securities were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein.   In ignorance of these facts that market prices of the shares were distorted, and relying directly or indirectly on the false and misleading statements made by the Federated Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of materially adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class held the shares or interests in the Federated Funds during the Class Period and were damaged thereby.

205.   At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.   Had Plaintiffs and other members of the Class and the marketplace known of the truth concerning the Federated Funds' operations, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have held their shares or other interests during the Class Period.

206.   Plaintiffs and the other members of the Class were also damaged by virtue of their status as holders of the various mutual funds in the Federated Funds adversely affected by market timing and/or late trading which funds and/or their registrants/issuers were advised by FIM and/or Federated Equity.   In connection with the unlawful purchases and sales of securities by market timers and late traders, as alleged herein, Plaintiffs and the other members of the Class

suffered substantial damages, including but not limited to the dilution of the value of their investment stemming from the activity of the market timers and late traders.  But for these unlawful purchases and sales, Plaintiffs and the other members of the Class would not have suffered damages from the dilution of their investment alleged herein.

207.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT**

198.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter, except for Claims brought pursuant to the Securities Act.

199.    This claim is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Adviser Defendants, the Director/Trustee Defendants, the Registrant/Issuer Defendants, the Administrator Defendant, and Federated.

200.    It is appropriate to treat these Defendants as a group for pleading purposes and to presume that the materially incomplete information conveyed in the Federated Funds public filings, press releases and other publications are the collective actions of the Federated Funds.

201.    The Adviser Defendants, the Director/Trustee Defendants, the Registrant/Issuer Defendants, the Administrator Defendant, and Federated acted as controlling persons of the Federated Funds within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein.  By virtue of their operational and management control of the Federated Funds respective businesses and systematic involvement in the fraudulent scheme alleged herein, the Adviser Defendants, the Director/Trustee Defendants, the Registrant/Issuer Defendants, the Administrator Defendant, and Federated each had the power to influence and control and did influence and control, directly or indirectly, the decision making and actions of the Federated

Funds, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Adviser Defendants, the Director/Trustee Defendants, the Registrant/Issuer Defendants, the Administrator Defendant, and Federated had the ability to prevent the issuance of the statements alleged to be false and misleading by virtue of the material omissions alleged above or cause such statements to be corrected.

202.    In particular, each of the Adviser Defendants, the Director/Trustee Defendants, the Registrant/Issuer Defendants, the Administrator Defendant, and Federated had direct and supervisory involvement in the operations of the Federated Funds and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

203.    As set forth above, the Adviser Defendants, the Director/Trustee Defendants, the Registrant/Issuer Defendants, the Administrator Defendant, and Federated each violated Section 10(b) and Rule 10b 5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Director/Trustee Defendants, the Registrant/Issuer Defendants, the Administrator Defendant, and Federated are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages during the Class Period.

**VIOLATIONS OF THE INVESTMENT COMPANY ACT OF 1940**

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 34(b) OF THE INVESTMENT COMPANY ACT**

204.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

205.    This claim is brought pursuant to Sections 34(b) of the Investment Company Act, 15 U.S.C. § 80a 33(b), against all the Registrant/Issuer Defendants and the Director/Trustee Defendants.

206.    Under Section 34(b) of the Investment Company Act, it is unlawful for any person to make any untrue statement of a material fact in any registration statement application, report, account, record, or other document filed or transmitted pursuant to this title or the keeping of which is required pursuant to section 31(a) [15 U.S.C. § 80a 30(a)].  It is also unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.

207.    The Registrant/Issuer Defendants and the Director/Trustee Defendants made untrue statements of a material fact in its registration statement, application, report, account, record, and/or other document filed or transmitted pursuant to this title, or the keeping of which is required pursuant to section 31(a) [15 U.S.C. § 80a 30(a)].

208.    Plaintiffs and the Class have been injured as a result of the statements, conduct, and violations of the Registrant/Issuer Defendants and the Director/Trustee Defendants.

**EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 36(A) OF THE INVESTMENT COMPANY ACT**

209.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

210.    This claim is brought pursuant to Section 36(a) of the Investment Company Act, 15 U.S.C. § 80a 35(a), against the Adviser Defendants and the Underwriter/Distributor Defendant.

211.    Under Section 36(a), the defendants named in this Count are deemed to owe fiduciary duties to Plaintiffs and other Class members and are prohibited from engaging in misconduct with respect to Federated.

212.    The defendants named in this Count devised and participated in a scheme to obtain substantial fees and other income for themselves and their affiliates by allowing others to engage in market timing of Federated Funds throughout the Class Period, solely for their own benefit and to the detriment of Plaintiffs and the Class, in violation of their fiduciary duties to Plaintiffs and other Class members.  Defendants further failed to reveal material facts concerning their conduct, such that Plaintiffs and other Class members could have made informed decisions about the true value and performance of Federated Funds.

213.    Plaintiffs and other Class members have been injured as a result of defendants' statements, conduct, and violations.

### NINTH CLAIM FOR RELIEF
### VIOLATION OF SECTION 36(B) OF THE INVESTMENT COMPANY ACT

214.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

215.    This claim is brought pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a 35(b), against all defendants.

216.    Under Section 36(b) of the Investment Company Act, defendants are deemed to owe a fiduciary duty to Plaintiffs and other Class members with respect to the receipt of fees and compensation that defendants receive for services of a material nature.

217.    Defendants devised and implemented a scheme to obtain substantial and excessive fees and other income for themselves and their affiliates by allowing others to engage in timing [and/or late trading] of the Federated Funds throughout the Class Period and in

violation of their fiduciary duties to their customers, *i.e.*, Plaintiffs and other Class members. Defendants failed to reveal material facts concerning their conduct, such that Plaintiffs and other Class members could have made informed decisions about the true value and performance of the Federated Funds.

218.    Plaintiffs and other Class members have been injured as a result of defendants' statements, conduct, and excessive fees.

## TENTH CLAIM FOR RELIEF
## VIOLATION OF SECTION 48(A) OF THE INVESTMENT COMPANY ACT

219.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

220.    This claim is brought pursuant to Section 48(a) of the Investment Company Act, 15 U.S.C. §80a 47, against all defendants.

221.    Under Section 48(a) of the Investment Company Act, it is unlawful for any defendant to do indirectly that which, under the Act, it could not do directly.

222.    Defendants devised and implemented a scheme to obtain substantial fees and other income for themselves and their affiliates by allowing others to engage in timing [and/or late trading] of the Federated Funds throughout the Class Period and in violation of their fiduciary duties to their customers, *i.e.,* Plaintiffs and other Class members.  Defendants failed to reveal material facts concerning their conduct, such that Plaintiffs and other Class members could have made informed decisions about the true value and performance of the Federated Funds.

223.    Plaintiffs and other Class members have been injured as a result of defendants' statements, conduct, and excessive fees.

224.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

225.    By virtue of Plaintiff's and the Class members' ownership of the Federated Funds, the representations that defendants made in the Prospectuses about timing, and the obligations imposed by law as set forth in further detail in the SEC letters, defendants owed Plaintiffs and the Class members fiduciary duties of the highest good faith, integrity and fair dealing.

226.    Defendants and each of them breached their fiduciary duties by engaging in the acts and omissions detailed more fully above, including but not limited to, treating certain mutual fund investors differently than other mutual fund investors; failing to follow their disclosed policy and procedures of preventing market timing, affirmatively allowing certain investors to engage in timing [and after market trading] in exchange for investing in defendants' funds; and failing to disclose their true practices and procedures to Plaintiffs and the Class.

227.    Each of the Defendants knew that the other Defendants were breaching their fiduciary duties to Plaintiffs and the Class.  Notwithstanding their knowledge, Defendants and each of them, engaged in conduct, herein before described, which rendered substantial assistance to, encouraged, and/or aided and abetted the breaches of duty.

228.    As a result of the wrongful conduct of defendants, Plaintiffs and the Class have suffered and will continue to suffer economic losses and other general and specific damages, all in an amount to be determined according to proof.

229.    The aforementioned acts of defendants, and each of them, were done maliciously, oppressively, and with intent to defraud, and Plaintiffs and the Class are entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

## COMMON LAW CLAIMS

### ELEVENTH CLAIM FOR RELIEF
### BREACH OF FIDUCIARY DUTY/CONSTRUCTIVE FRAUD

230.   Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

231.   This claim is brought against Defendant Federated, the Registrant/Issuer Defendants, the Adviser Defendants, the Administrator Defendant, Defendant Federated Securities, the Federated Employee Defendants, and the Director/Trustee Defendants on behalf of all persons who held shares in any mutual fund in the Federated Funds.

232.   Defendant Federated, the Registrant/Issuer Defendants, the Adviser Defendants, the Administrator Defendant, Defendant Federated Securities, the Federated Employee Defendants, and the Director/Trustee Defendants owed fiduciary duties to Plaintiffs and the Class to use reasonable care and skill in operating, administering, issuing, underwriting, distributing and managing the Federated Funds.  As a part of their fiduciary duties to Plaintiffs and the Holders, the Defendant Federated, the Registrant/Issuer Defendants, the Adviser Defendants, the Administrator Defendant, Defendant Federated Securities, the Federated Employee Defendants, and the Director/Trustee Defendants also owed a duty to make a full and truthful disclosure of all material facts, to ensure that their representations regarding market timing and late trading were complete and accurate, and to ensure that actions were taken to protect long term holders of mutual fund shares in the Federated Funds from damage caused to their investments from market timing and late trading.

233.   Defendant Federated, the Registrant/Issuer Defendants, the Adviser Defendants, the Administrator Defendant, Defendant Federated Securities, the Federated Employee Defendants, and the Director/Trustee Defendants intentionally or recklessly breached their

fiduciary duties by allowing favored investors to conduct timed and/or late trading in the Federated Funds, by misrepresenting and concealing the existence of such market timing and late trading, and by placing their own financial interests above those of Plaintiffs and the Class.

234.    Defendant Federated, the Registrant/Issuer Defendants, the Adviser Defendants, the Administrator Defendant, Defendant Federated Securities, the Federated Employee Defendants, and the Director/Trustee Defendants breaches of their fiduciary duties to Plaintiffs and the Holders tended to deceive, to violate public and private confidence and to injure public interests.

235.    Plaintiffs and the Holders suffered injury as a result of the conduct of Defendant Federated, the Registrant/Issuer Defendants, the Adviser Defendants, the Administrator Defendant, Defendant Federated Securities, the Federated Employee Defendants, and the Director/Trustee Defendants in the form of, *inter alia*, the following:  increased transaction costs; requiring the family of funds to keep excessive cash on hand to pay out timers' redemptions; lower NAV; and management fees.

236.    The breaches of their fiduciary duties by Defendant Federated, the Registrant/Issuer Defendants, the Adviser Defendants, the Administrator Defendant, Defendant Federated Securities, the Federated Employee Defendants, and the Director/Trustee Defendants proximately caused the damages suffered by Plaintiff and the Class.

**TWELFTH CLAIM FOR RELIEF**
**<u>AIDING AND ABETTING BREACH OF FIDUCIARY DUTY</u>**

237.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

238.    This claim is brought against Defendants Canary, Veras, BOA, and Lehman on behalf of all persons who held shares in any mutual fund in the Federated Funds.

239.     As alleged above, Defendant Federated, the Registrant/Issuer Defendants, the Adviser Defendants, the Administrator Defendant, Defendant Federated Securities, and the Director/Trustee Defendants owed a fiduciary duty to Plaintiffs and the Class.  That duty was breached when those Defendants permitted favored investors to late trade and/or market time in the Federated Funds, including the Market-timed Funds.

240.     Defendants Veras, BOA, and Lehman knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted Defendant Federated, the Registrant/Issuer Defendants, the Adviser Defendants, the Administrator Defendant, Defendant Federated Securities, and the Director/Trustee Defendants in the breaches of their fiduciary duties.

241.     As a result of Defendants Veras', BOA's, and Lehman's aiding and abetting of the breaches of fiduciary duty by Defendant Federated, the Registrant/Issuer Defendants, the Adviser Defendants, the Administrator Defendant, Defendant Federated Securities, and the Director/Trustee Defendants, Plaintiffs and the Class suffered damages.

**THIRTEENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

242.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

243.     This claim is brought on behalf of all persons who held shares in any mutual fund in the Federated Funds against all Defendants.

244.     Plaintiffs and the Class conferred a benefit on the Defendants.  Defendants derived management fees and other benefits and were otherwise unjustly enriched from transactions connected with the Federated Funds, including the Market-timed Funds, to the detriment of Plaintiffs and the Class.

245.    Defendants' enrichment is directly and causally related to the detriment of Plaintiffs and the Class.

246.    The benefit was accepted by Defendants under such circumstances that it would be inequitable for it to be retained without payment.  As alleged above, Defendants, *inter alia*, breached their fiduciary duties to Plaintiffs and the Class and breached contracts with Plaintiffs and the Class, and therefore Defendants are not justified to retain the benefits conferred upon them.

247.    As a result of all of the Defendants' conduct, Plaintiffs and the Class suffered damages.

248.    There is no adequate remedy at law to compensate for the injuries of Plaintiffs and the Class.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

## PRAYER FOR RELIEF

A.    Determining that this action is a proper class action and certifying Plaintiffs as the representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Purchasers rescission of their contracts with the Federated Defendants and recovery of all fees paid to the Federated Defendants pursuant to such agreements;

D.    Awarding Plaintiffs and members of the Class punitive damages;

E.      Awarding Plaintiffs and members of the Class disgorgement of all illicit proceeds generated as a result of the wrongful conduct alleged herein;

F.      Awarding Plaintiffs and members of the Class restitution;

G.      Awarding Plaintiffs and members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

H.      Such other and further relief as the Court may deem just and proper.

Dated: September 29, 2004

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**


By:   /s/ Timothy J. MacFall_____
          Keith M. Fleischman
          U. Seth Ottensoser
          Timothy J. MacFall
          Gregory M. Egleston
          Stephanie M. Beige
          10 East 40th Street
          New York, NY  10016
          Tel: (212) 779-1414

          **Lead Counsel for Plaintiffs and the Class**


          **MILBERG WEISS BERSHAD
            & SCHULMAN LLP**
          David J. Bershad
          Deborah Clark-Weintraub
          Clifford S. Goodstein
          Kim E. Levy
          One Pennsylvania Plaza
          New York, NY  10119-0165
          Telephone:   (212) 594-5300
          Facsimile:    (212) 868-1229

          **Counsel for Plaintiff Donald Krause**

## APPENDIX A

**Parties Added to Consolidated Amended Complaint**

1) Lead Plaintiff Colbart Birnet, LLC

2) Plaintiff Donald Krause

3) Federated Investors, Inc.

4) Federated Equity Management Company of Pennsylvania

5) Federated Services Company

6) Federated Securities Corp.

7) Federated American Leaders Fund, Inc.

8) Federated Equity Funds

9) Federated Equity Income Fund

10) Federated Index Trust

11) Federated Stock Trust

12) Federated High Income Bond Fund, Inc

13) Federated High Yield Trust

14) Federated Institutional Trust

15) John F. Donahue

16) J. Christopher Donahue

17) Lawrence D. Ellis

18) Thomas G. Bigley

19) John T. Conroy, Jr.

20) Nicholas P. Constantakis

21) John F. Cunningham

22) Peter E. Madden

23) Charles F. Mansfield, Jr.

24) John E. Murray, Jr.

25) Marjorie P. Smuts

26) John S. Walsh

27) Timothy Pillion

28) Keith A. Nixon

29) Paul Hauf

30) Edward J. Stern

31) Canary Capital Partners, LLC

32) Canary Investment Management, LLC

33) Canary Capital Partners, Ltd. is a Bermuda limited liability company.

34) Veras Investment Partners, LLP

35) Bank of America Corporation

36) Banc of America Securities LLC

37) Lehman Brothers, Inc.

38) Ron Basu

37) Richard Kirsch

39) Security Trust Company, N.A.

**Parties Named in Initial Complaint and**
**Omitted From Consolidated Amended Complaint**

1)   Federated Investors Funds

2)   Federated Adjustable Rate Securities Fund

3)   Federated American Leaders Fund, Inc.

4) Federated Bond Fund

5) Federated California Municipal Income Fund

6) Federated Capital Appreciation Fund

7) Federated Capital Income Fund

8) Federated Capital Preservation Fund

9) Federated Communications Technology Fund

10) Federated Conservative Allocation Fund

11) Federated Equity Income Fund, Inc.

12) Federated European Equity Fund

13) Federated Fund for US Government Securities Fund

14) Federated US Government Securities Fund: 1-3 Years

15) Federated US Government Securities Fund: 2-5 Years

16) Federated GNMA Trust

17) Federated Government Income Securities, Inc.

18) Federated Government Ultrashort Duration Fund,

19) Federated Growth Allocation Fund

20) Federated Growth Strategies Fund

21) Federated High Income Bond Fund, Inc.

22) Federated High Yield Trust

23) Federated Income Trust

24) Federated Institutional High Yield Bond Fund

25) Federated Intermediate Income Fund

26) Federated Intermediate Municipal Trust

27) Federated International Bond Fund

28) Federated International Capital Appreciation Fund

29) Federated International Equity Fund

30) Federated International High Income Fund

31) Federated International Small Company Fund

32) Federated International Value Fund

33) Federated Kaufmann Fund

34) Federated Kaufmann Small Cap Fund

35) Federated Large Cap Growth Fund

36) Federated Limited Duration Fund

37) Federated Limited Duration Government Fund, Inc.

38) Federated Limited Term Fund

39) Federated Limited Term Municipal Fund

40) Federated Managed Income Portfolio

41) Federated Market Opportunity Fund

42) Federated Max-cap Index Fund

43) Federated Mini-cap Index Fund

44) Federated Moderate Allocation Fund

45) Federated Mortgage Fund

46) Federated Muni and Stock Advantage Fund

47) Federated Municipal Ultrashort Fund

48) Federated New York Municipal Income Fund

49) Federated North Carolina Municipal Income Fund

50) Federated Ohio Municipal Income Fund

51) Federated Pennsylvania Municipal Income Fund

52) Federated Short-Term Income Fund

53) Federated Short-Term Municipal Trust

54) Federated Stock Trust

55) Federated Stock and Bond Fund, Inc.

56) Federated Strategic Income Fund

57) Federated Total Return Bond Fund

58) Federated Total Return Government Bond Fund

59) Federated US Government Bond Fund

60) Federated Investors Ultrashort Bond Fund

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

COLBART BIRNET L.P. ("Plaintiff"), declares the following as to the claims asserted under the federal securities laws, that:

1.   Plaintiff has reviewed the complaint filed in this matter and has authorized the filing of a complaint based on similar allegations in a related or amended complaint. Plaintiff retains Bernstein Liebhard & Lifshitz, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.   Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

3.   Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial. I understand that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this Certification.

4.   Plaintiff's transaction(s) in the **FEDERATED MUTUAL FUNDS** security that is the subject of this action are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Paid/Received |
|---|---|---|---|---|
| 603,810.480 | CTPXX | B | 1999 | $603,810.480 |
| 507,080.650 | CTPXX | S | 1999 | $507,080.650 |
| 1,069,733.31 | CTPXX | B | 2000 | $1,069,733.31 |
| 541,000 | CTPXX | S | 2000 | $541,000 |
| 1,530,538.44 | CTPXX | B | 2001 | $1,530,538.44 |

Please list other transactions on a separate sheet of paper, if necessary.

5.   · During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for the class in any action filed under the federal securities laws except as indicated here:

6.   Plaintiff has complete investment authority and is the agent and attorney-in-fact with full power and authority to bring suit to recover for investment losses.

7.   The undersigned is authorized to sign this Certification on behalf of Plaintiff.

8.   Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of _____ C , 2003.

Signature _____

MIRIAM WERCZBERGER
Print Name

_____
Address

_____
City, State, Zip

_____
Phone Number

_____
Email Address

DEC 1 2 2003

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Donald Krause declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the Federated Investors Mutual Funds complaint prepared by Milberg Weiss Bershad Hynes & Lerach LLP, whom I designate as my counsel in this action for all purposes.

2.      I did not acquire Federated Investors Mutual Fund units at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

5.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except:_____

6.      I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is unaffected by my decision to serve as a representative party.

7.      Since November 1, 1998, I have made the following transactions in Federated Investors Mutual Funds, and will provide records of those transactions upon request:

| Fund | No. of Shares/Units | Buy/Sell | Date | Price Per Share/Unit |
|------|------|------|------|------|
| FSBBX | 745.241 | Buy | 8/2/99 | 17.360 |
| FALBX | 514.402 | Buy | 8/2/99 | 21.210 |
| LEIBX | 666.206 | Buy | 8/2/99 | 15.040 |
| LTFSX | 828.041 | Buy | 8/2/99 | 8.970 |
| FHBBX | 864.502 | Buy | 8/2/99 | 7.930 |

Please use and attach additional pages if necessary.

**I declare under penalty of perjury that the foregoing is true and correct**

Executed this   11   day of   December , 2003

Donald Krause
**Print Name**

DRKrause
**Signature**