## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

IN RE MUTUAL FUNDS INVESTMENT
LITIGATION

MDL 1586

[Scudder Track]

Case No. 04-MD-15861

JURY TRIAL DEMANDED

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Post-Retirement Health Insurance Plan and Trust and plaintiff Linda S. Cape (collectively, "Plaintiffs") allege the following based upon the investigation of Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings as well as other regulatory filings and reports and advisories about the Scudder mutual funds, press releases, media reports and interviews with confidential witnesses with direct knowledge of unlawful trading activities at Scudder funds and throughout the mutual fund industry ("CW 1" and "CW 2").

1.      Plaintiffs bring this action on behalf of all persons that purchased and/or held shares of Scudder mutual funds (the "Scudder funds") during the period January 22, 1999 to January 12, 2004, inclusive (the "Class Period"), and were harmed by a pattern of trading practices known as "market timing," or "late trading."  The wrongful acts and misconduct alleged herein, much of which has been admitted by defendants,  are the subject of administrative actions and investigations currently underway by various regulatory agencies, including the SEC and the New York State Attorney General.  Excluded from the Class are defendants, members of their immediate families and their legal representatives, parents, affiliates, heirs, successors or assigns and any entity in which defendants have or had a

controlling interest, and any other person who engaged in the unlawful conduct described herein (the "Excluded Persons").  Also excluded are any officers, directors, or trustees of the Excluded Persons, and all trustees and portfolio managers of the Funds.  Plaintiffs seek to pursue remedies under the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), the Investment Advisers Act of 1940 (the "Investment Advisers Act"), the Investment Company Act ("the Investment Company Act") and State law.

2.     This action charges defendants with engaging in an unlawful and deceitful course of conduct designed to improperly financially advantage defendants to the detriment of plaintiffs and the other members of the Class.  As part and parcel of defendants' unlawful conduct, defendants in clear contravention of their fiduciary responsibilities and disclosure obligations, failed to properly disclose that "timing" was improperly allowed in mutual fund trades in exchange for paying large maintenance fees and other remuneration to Defendants.  "Timing," as more fully described below, improperly allows an investor to trade in and out of a mutual fund to exploit short-term moves and inefficiencies in the manner in which the mutual funds price their shares.

3.     As a result of the wrongful and illegal misconduct described herein, defendants have caused plaintiffs and members of the Class to suffer damages.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to: § 22 of the Securities Act (15 U.S.C. § 77v); § 27 of the Exchange Act (15 U.S.C. § 78aa); § 44 of the Investment Company Act of 1940 (15 U.S.C. §§ 80a-43); § 14 of the Investment Advisers Act (15 U.S.C. § 80b-14); and, 28 U.S.C. §§ 1331, 1337.  This Court also has supplemental jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1367.

5.      The claims alleged herein arise under: §§ 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77o); §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §§ 240.10b-5); §§ 34(b), 36(a), 36(b) and 48(a) of the Investment Company Act (15 U.S.C. §§ 80a-33(b), 80a-35(a)-(b), 80a-47(a)); §§ 206 and 215 of the Investment Advisers Act (15 U.S.C. §§ 80b-6, 80b-15); and State law.  In connection with the acts, conduct and other wrongs complained of herein, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities exchange.

6.      Venue is proper in this District pursuant to § 22 of the Securities Act (15 U.S.C. § 77v), § 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1391(b) and 1391(c), and pursuant to the multi-district litigation provisions under 28 U.S.C. § 1407.  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District, Defendants conducted other substantial business within this District and many Class members reside within this District.

## **PARTIES**

7.      Lead Plaintiff, Post-Retirement Health Insurance Plan and Trust ("Post-Retirement HIPT") is a defined benefit pension plan.  During the Class Period, Post-retirement HIPT purchased shares of various Scudder funds.  In addition, during the Class Period, Post-Retirement HIPT held shares of various Scudder funds.  As a result of the unlawful conduct alleged herein, Post-Retirement HIPT suffered damages both in connection with its purchases of Scudder funds and by virtue of holding Scudder funds during the Class Period.

8.      Plaintiff Linda S. Cape purchased and held shares of various Scudder funds during the Class Period.  As a result of the unlawful conduct alleged herein, Plaintiff Cape

suffered damages both in connection with her purchases of Scudder funds and by virtue of holding Scudder funds during the Class Period.

## THE DEFENDANTS

9.     Defendant Deutsche Bank AG is a major global banking institution that is engaged in a wide range of financial services, including investment management, mutual fund, retail, private and commercial banking, investment banking and insurance.

10.     Deutsche Asset Management, "DeAM," with headquarters at 345 Park Avenue, New York, New York 10154, is an investment management company.

11.     Deutsche Asset Management Investment Services Ltd. ("DeAMIS"), with headquarters at One Appold Street, London, England is an investment management company.

12.     DeAM and DeAMIS act as investment advisors and/or sub-advisors to mutual funds in the Scudder family, are referred to collectively as the "Investment Advisors defendants" and are indirect, wholly owned subsidiaries of Deutsche Bank AG.

13.     The Investment Advisor defendants are responsible for the day-to-day investment decisions, the execution of portfolio transactions and the general management of the Portfolio's investments and provides certain supervisory services.

14.     Defendant Scudder Advisor Funds is an open-end management company organized on July 21, 1986 under the laws of the Commonwealth of Massachusetts; it is the registrant for 13 Scudder funds including the Scudder International Equity Fund — A, B, C, and Investment Class.

15.     Scudder Institutional Funds, formerly BT Institutional Funds is an open-end management company organized on March 15, 1990 under the laws of the Commonwealth of Massachusetts; it is the registrant for 8 Scudder funds including the Scudder International Equity Fund — Institutional Class I and Institutional Class II.

16.     Scudder MG Investments Trust is an open-end, management investment company formed as a business trust under the laws of the State of Delaware on September 13, 1993, and commenced investment operations on January 3, 1994; it is the registrant for 10 Scudder funds including the Scudder European Equity Fund and the Scudder International Select Equity Fund.

17.     Collectively, the defendants identified in paragraphs 14 – 16 will be referred to herein as the "Registrant defendants."

18.     The International Equity Fund, International Select Equity Fund, and European Equity Fund are mutual funds in the Scudder family of funds, and are collectively referred to herein as the "Scudder International funds."

19.     Scudder Distributors, Inc. ("SDI" or the "Distributor") is the principal distributor for shares of the Funds. SDI is a registered broker-dealer and is SDI is a wholly owned subsidiary of Deutsche Bank AG.  The principal business address of SDI is 222 South Riverside Plaza, Chicago, IL 60606.

20.     Investment Company Capital Corporation ("ICCC" or the "Administrator") is the administrator for mutual funds in the Scudder family and is located at One South Street, Baltimore, Maryland 21202.  The Administrator calculates the net asset value of the funds, calculates the value of the assets of the funds, and generally assists the Board of Trustees of the Trusts in all aspects of the administration and operation of the Trusts.

21.     Defendant Brenda Lyons currently serves as President of the Scudder International Funds and Managing Director of Deutsche Asset Management.

22.     Defendant William F. Glavin, Jr. served as President of the Scudder International Funds and Managing Director of Deutsche Asset Management in 2003.

23.     Defendant Richard T. Hale served as President of the Scudder International Funds from 2001 through 2002 and for the International Select Equity Fund and European Equity Fund in 2000 and as Managing Director of Deutsche Asset Management from 2000 through 2002.

24.     Defendant John A. Keffer served as President and Chief Executive Officer of the International Equity Fund in 1999 through 2000 and of the European Equity Fund in 1999.

25.     Defendant James E. Minnick served as President and Chief Executive Officer of the International Select Equity Fund in 1999.

26.     Defendant Charles A. Rizzo has served as Treasurer of the Scudder International Funds since 2001, of the International Equity Fund since 2000, currently serves as Chief Financial Officer of the Scudder International Funds and served as Managing Director of Deutsche Asset Management since 2000.

27.     Defendant Amy Olmert served the International Equity Fund as Assistant Treasurer in 2002 and served the International Select Equity Fund and European Equity Fund as Assistant Treasurer from 2000 through 2002, as Chief Financial Officer in 2000, and as a Director of Deutsche Asset Management from 2000 through 2002.        .

28.     Defendant Joseph A. Finelli served as Treasurer of the International Equity Fund and European Equity Fund, Vice President of the International Equity Fund and Chief Financial Officer of the European Equity Fund in1999.

29.     Defendant Tracie Richter served as Treasurer and Chief Financial Officer of the International Select Equity Fund in 1999.

30.     Defendant Kenneth Murphy has served as Vice President of the Scudder International Funds since 2003.

31.     Defendant Salvatore Schiavone currently serves as Assistant Treasurer of the Scudder International Funds and as a Director of Deutsche Asset Management.

32.     Defendant Lucinda Stebbins currently serves as Assistant Treasurer of the Scudder International Funds and as a Director of Deutsche Asset Management.

33.     Defendant Kathleen Sullivan D'Eramo currently serves as Assistant Treasurer of the Scudder International Funds and as a Director of Deutsche Asset Management.

34.     Defendant John Millette currently serves as Secretary of the Scudder International Funds and as a Director of Deutsche Asset Management.

35.     Defendant Daniel O. Hirsch has served in several roles for each of the Scudder funds.  For the International Equity fund he currently serves as Assistant Secretary, and he served as Secretary in 1999 and from 2001 through 2003.  He served as Principal in 1999.  For the International Select Equity fund, he currently serves as Assistant Secretary, and he served as Secretary from 2000 through 2003.  For the European Equity Fund, he currently serves as Assistant Secretary, and he served as Secretary from 1999 through 2003.  He also served as Principal in 1999.  He also served as a Director of Deutsche Asset Management from 2000 through 2002 and as Managing Director since 2003.

36.     Defendant Caroline Pearson has served as Assistant Secretary of the Scudder International Funds and as Managing Director of Deutsche Asset Management since 2003.

37.     Defendant Bruce A. Rosenblum currently serves as Vice President, Assistant Secretary of the Scudder International Funds and as Director of Deutsche Asset Management.

38.     Defendant David W. Baldt served as Vice President from 2000 through 2002 for the International Select Equity Fund and European Equity Fund, as Vice President of the International Select Equity Fund in 1999, and as Managing Director of Deutsche Asset Management from 2000 through 2002.

39.     Defendant James H. Grifo served as Vice President from 2000 through 2001 for the International Select Equity Fund and European Equity Fund, as Vice President and Director of the International Select Equity Fund in 1999, and as Managing Director of Deutsche Asset Management from 2000 through 2001.

40.     Defendant Neil P. Jenkins served as Vice President in 2000 for the International Select Equity Fund and European Equity Fund, as Vice President of the International Select Equity Fund in 1999, and as Director of Deutsche Asset Management from 1999 through 2000.

41.     Defendant Patrick W. W. Disney served as Senior Vice President of the International Select Equity Fund and as a Director of Deutsche Asset Management in 1999.

42.     Defendant Ian D. Kelson served as Vice President of the International Select Equity Fund and as a Director of Deutsche Asset Management in 1999.

43.     Defendant Joan A. Binstock served as Secretary and Vice President of the International Select Equity Fund in 1999.

44.     Defendant Richard R. Burt served as a trustee of the Scudder International funds since 2003.

45.     Defendant Martin J. Gruber served as a trustee of the Scudder International funds since 2000.

46.     Defendant S. Leland Dill has served as a trustee of the Scudder International funds at all times relevant hereto.

47.     Defendant Philip Saunders, Jr. has served as a trustee of the Scudder International funds at all times relevant hereto.

48.     Defendant Joseph R. Hardiman has served as a trustee of the Scudder International funds since 2003.

49.     Defendant Richard J. Herring has served as a trustee of the Scudder International funds since 2003.

50.     Defendant Graham E. Jones has served as a trustee of the Scudder International funds at all times relevant hereto.

51.     Defendant Rebecca W. Rimel has served as a trustee of the Scudder International funds since 2003.

52.     Defendant William N. Searcy has served as a trustee of the Scudder International funds at all times relevant hereto.

53.     Defendant Robert H. Wadsworth has served as a trustee of the Scudder International funds since 2003.

54.     Defendant Richard T. Hale has served as a trustee of the Scudder International funds since 2000.

55.     Defendant  Charles P. Biggar served as a trustee of the International Equity Fund from 1999 through 2002 and of the European Equity Fund in 1999.

56.     Defendant Bruce E. Langton served as a trustee of the International Equity Fund from 2000 through 2002.

57.     Defendant Harry Van Benschoten served as a trustee of the International Equity Fund from 2000 through 2002.

58.     Defendant Kelvin J. Lancaster served as a trustee of the European Equity Fund in 1999.

59.     Defendant Paul K. Freeman served as a trustee of the International Select Equity Fund from 2000 through 2002.

60.     Defendant Hugh G. Lynch served as a trustee of the International Select Equity Fund and European Equity Fund from 1999 through 2002.

61.     Defendant Edward T. Tokar has served as a trustee of the International Select Equity Fund and European Equity Fund from 1999 through 2002.

62.     Defendant James E. Minnick served as a trustee of the International Select Equity Fund in 1999.

63.     Defendant Patrick W. W. Disney served as a trustee of the International Select Equity Fund in 1999.

64.     Collectively, the defendants identified in paragraphs 44 – 63 will be referred to herein as the "Trustee defendants."

65.     Collectively, the defendants identified in paragraphs 9 – 63 will be referred to herein as the "Scudder defendants."

66.     Defendant UBS Painewebber ("Painewebber") is a wealth manager who provides many services to its clients, including securities brokerage.  On November 3, 2000, UBS AG completed its merger with PaineWebber.  PaineWebber was first rebranded as UBS PaineWebber in early 2001, and then as UBS Wealth Management USA in the second half of 2003.  UBS Wealth Management USA now operates as a wholly owned subsidiary of UBS.

67.     Defendant UBS Wealth Management USA operates as a wholly owned subsidiary of UBS.

68.     The true names and capacities of defendants sued herein as John Does 1 through 100 were other active participants in the widespread unlawful conduct alleged herein whose identities have yet to be ascertained.  Plaintiffs will seek to amend this complaint to state the true names and capacities of said defendants when they have been ascertained.

## SUBSTANTIVE ALLEGATIONS

### Background:  Timed Trading and Its Effects on Long-Term Investors

### Overview of the Conduct

69.     This class action arises from a series of trading practices, commonly referred to as "market timing" or "late trading," that permeated the mutual fund industry, and cost investors in these funds billions of dollars.  The harm to investors took the form of: (i) dilution of profits and exaggeration of losses from their investments; (ii) payment of excessive fees by investors as a result of the conduct; and (iii) improper management of their investment.  Defendants not only permitted, but actively facilitated this conduct, for the purpose of securing hundreds of millions of dollars in management and distribution fees, all to the detriment of ordinary mutual fund investors.  Various other parties actively participated in and aided and abetted the mutual funds' unlawful scheme, including: (i) the parties who engaged in the unlawful trading activities themselves, for their own economic benefit; and (ii) various broker-dealers who served as distribution outlets for the mutual funds, and who accepted unlawful commissions and other payments in exchange for channeling investors into mutual funds where unlawful trading activity was taking place.

70.     The various prospectuses covering the issuance of shares of the mutual funds at issue, as detailed below, assured investors that the funds prevented the unlawful trading practices described above through the imposition of various trading restrictions and redemption fees.  In reality, however, the fund families not only permitted, but in many cases actively encouraged the unlawful activity.  Defendants permitted and encouraged this conduct for the purpose of increasing the amount of assets under management, thereby increasing the fees payable to the investment advisors, who were captive entities within the fund family structure, by hundreds of millions of dollars.

71.     The trustees of the individual funds failed to prevent the unlawful conduct because of fundamental conflicts of interest inherent in the corporate governance structures of the mutual fund complexes.  As detailed below, the interests of mutual fund investors were entrusted to trustees who were appointed and compensated by the investment advisors and distributors of the funds.  Many of these trustees served on dozens of boards within a single mutual fund family, collecting hundreds of thousands of dollars in annual salary from the same entities that collected fees for underwriting and serving as investment advisors to the funds.

**Structure and Organization of Mutual Fund Families**

72.     An open-end mutual fund is an entity in which investors contribute cash for the purpose of creating a pool of assets with which to invest and purchase securities.  In return for their deposits, investors receive shares in the mutual fund in an amount directly proportionate to the amount of their investment.  This cash is then used to purchase stocks or other securities, consistent with the investment goals and objectives of the fund.  Mutual fund shares are issued to fund investors pursuant to registration statements and prospectuses that must comply with the Securities Act, and the Investment Company Act of 1940.

73.     The mutual funds at issue in this Action hold no assets apart from the deposits of their investors, nor do they conduct any operating or investment activities on their own.  Instead, the funds are part of a labyrinthine related structure, commonly known as a "complex," in which separate legal entities, which are nonetheless related to the fund, perform and control all necessary activities related to the sale and redemption of securities, as well as the management of investments.  Indeed, these related entities not only appoint their own representatives to the board of trustees charged with the fiduciary duty of protecting the interests of  investors in each individual fund, but also control the appointment of the purportedly "independent" members of these boards.  These same related entities within the fund complex receive substantial fees for the performance of these services, which are calculated as a percentage of the value of the total deposits under management.  Thus, the larger the amount of deposits under management, the more that these related entities stand to collect in fees from mutual fund investors.  This means that, even in the case in which a mutual fund loses money on its investments, the related entities can still increase the fees they earn by simply steering more investor deposits into the funds.

74.     Set forth below is a chart illustrating the relationship between the typical entities that comprise most mutual fund complexes.  Each of these entities is controlled not by investors in the individual mutual funds, but by separate corporations owned or controlled by a single corporate parent.  This corporate parent operates these subsidiaries, which in turn are responsible for the operations of the individual funds, for their own benefit rather than the benefit of fund investors.  These key subsidiaries, whose roles in the fund complex are explained below, include the following: (i) Investment Advisor/Fund Sponsor; (ii) Administrator; (iii) Registrant/Issuer; and (iv) Underwriter/Distributor:



### The Investment Advisor/Fund Sponsor

75.     The Investment Advisor/Fund Sponsor is responsible both for the creation of the individual fund (including the determination of its investment goals and strategy), as well as for managing the day-to-day activities and individual investments of the funds.  Investment advisors, or their subsidiaries or affiliates, are responsible for performing virtually all critical functions of the funds, including: (i) hiring and employing portfolio managers; (ii) selling shares in the fund to the public; (iii) performing all "back-office" operations; (iv) determining the net asset value ("NAV") of the fund on a daily basis; (v) directing and controlling the investments in the fund; (vi) ensuring that the investment policies of the funds are observed; (vii) enforcing the policies of the funds, including restrictions on trading and other activities that could be detrimental to fund shareholders; and (viii) otherwise managing the day-to-day activities of the funds.

76.     The Investment Advisor (and through it, the Corporate Parent) is typically paid for its services pursuant to a contract (the "Advisory Agreement") negotiated between the

Investment Advisor and the Trustees, on behalf of the individual fund itself.  Advisory agreements within the mutual fund industry provide for the funds to pay the Investment Advisor a percentage annually of their NAV, calculated on a daily basis and payable monthly or quarterly, in return for their investment advisory services.

### **The Administrator**

77.     The Administrator is typically a corporate subsidiary of the Investment Advisor, and is responsible for performing the day-to-day administrative functions associated with the business of the individual fund.  These tasks include: (i) performing back-office operations; (ii) calculating the NAV of the individual funds within the mutual fund complex on a daily basis; and (iii) maintaining books and records for the individual funds.

78.     Similar to the Investment Advisor, the Administrator, (and through it ultimately, the Corporate Parent), is typically paid for its services pursuant to a contract (the "Administrative Agreement") negotiated between the Investment Advisor and the Trustees, on behalf of the individual fund itself.  Administrative Agreements within the mutual fund industry provide for the funds to pay the Administrator a percentage annually of their NAV, calculated on a daily basis and payable monthly or quarterly, in return for their services.

### **The Registrant/Issuer**

79.     The Registrant/Issuer is typically a corporate subsidiary or affiliate of the Investment Advisor,  and is the legal issuer of the mutual fund.  As such, the Registrant/Issuer may only issue such shares to the public pursuant to a registration statement and prospectus that complies with Section 10 of the Securities Act, and is absolutely liable to purchasers of the shares for any material misstatement and omission in the prospectus under the Securities Act.

### **The Underwriter/Distributor**

80.     The Underwriter/Distributor is also typically a corporate subsidiary or affiliate of the Investment Advisor, and is responsible for the sale of mutual fund shares to the public pursuant to a registration statement and prospectus.  The Underwriter/Distributor is strictly liable for any material misstatements or omissions contained in the registration statement and prospectus under the Securities Act.

**Corporate Governance of Mutual Funds**

81.     The Investment Company Act of 1940 (the "ICA") requires individual mutual funds to be governed by a Board of Trustees (the "Board"), and further requires, in most cases, that a majority of the members of the Board be independent from and unaffiliated with the Investment Advisor or its parents, subsidiaries or affiliates.  The purpose of this independence requirement is to ensure that the management of the mutual funds is not dominated by the Fund Sponsor/Investment Advisor and that, instead, the fund is managed in the best interests of its shareholders.  This responsibility not only includes retaining and monitoring the performance of the Investment Advisor and Administrator, but negotiating contracts with these parties and ensuring that the fees paid are reasonable in relation to the services performed.

82.     In reality, however, the Boards of the funds are typically dominated by the Investment Advisor and its affiliates, who not only control the nomination and appointment process, but also the fees that the purportedly independent trustees earn from serving on the fund boards.  Indeed, in most circumstances, (as set forth in the relevant registration statements and prospectuses), the Boards of the individual funds do not even accept nominations from shareholders for membership, but instead only consider a slate proposed by the Investment Advisor.  Further, many of these purportedly "independent" directors, who fulfill this role in addition to their full-time occupations, serve on the boards of dozens, and in some cases

hundreds, of individual mutual funds within a single mutual fund family complex, rendering it difficult to oversee the activities of the funds consistent with their fiduciary duties. These independent directors are well-compensated for their service, often earning hundreds of thousands of dollars in fees. Although these fees are purportedly set by the compensation committee of the board of each individual fund, the compensation levels are usually based upon the recommendations of the Investment Advisor. The fees themselves, however, are paid from investments in the funds themselves.

83.     As a result of the foregoing, both the "independent" trustees of the mutual funds at issues and those nominated as representatives of the Investment Advisor/Fund Sponsor are beholden to the Advisor and its affiliates, and therefore suffer from disabling conflicts of interests that prevent them from discharging their fiduciary duties. For example, despite numerous instances in which individual funds have performed poorly and lagged their peers in economic return, no board of any of the funds at issue herein, has ever replaced its investment advisor with an advisor that is part of another mutual fund complex. Instead, the boards typically renew their agreements with the captive investment advisor within the fund complex regardless of the fund's performance, usually without even seeking competitive bids from other advisors. Nevertheless, these same boards have, in many cases, approved the investment advisor's retention of a "sub-advisor" from another mutual fund complex, which often serves to increase the management costs borne by investors.

**Market Timing and Late Trading**

**Background Information And The Forward-Pricing Rule**

84.     The domination of individual mutual funds by their Sponsors and Investment Advisors, along with the inherent conflicts of interest described above, have led to the unlawful

market timing and late trading practices complained of herein.  These practices have provided a means for the mutual fund complexes to increase deposits in their funds dramatically, by permitting short-term traders to engage in conduct prohibited by the terms of many fund prospectuses and highly detrimental to other investors in the funds.  Since Investment Advisors and Administrators are paid a fee as a percentage of the value of the assets under management, the increased deposits resulting from market timing has served to increase their fees dramatically.  The Investment Advisors have, in turn, used these increased fees to make improper payments to other brokerage firms, in exchange for their promise to direct investors into the funds where unlawful trading is permitted.

85.     Market Timing opportunities stem from inefficiencies in the manner in which shares of individual mutual funds are priced.  Shares of open-end mutual funds are priced daily, based on its NAV at the time of the valuation.  Unlike equity or debt securities that are valued and traded on stock exchanges, open-end mutual funds continuously issue new shares as new investments are received, and redeem shares as investors withdraw assets.  The value of these shares is calculated at 4:00 p.m. each day (the close of trading on the New York Stock Exchange), by determining the NAV of the fund (the value of assets less liabilities), and then dividing that amount by the number of shares outstanding.  For example, if a mutual fund with 100,000 shares outstanding holds total assets with an NAV of $1 million, then it will be priced at $10 per share.  Thus, an investor seeking to invest $1,000 in this fund would receive 100 newly issued shares, valued at $10 per share.

86.     Since mutual fund shares are only priced once per day, the potential exists for an investor to purchase shares at a "stale" price that does not incorporate the latest information, and thereby make a quick profit.  For example, if an investor were able to purchase shares of a

mutual fund at the NAV calculated <u>before</u> his purchase, with knowledge that the investments held within the fund had risen in value before the next NAV calculation, he could make a risk-free profit by simply buying the shares and then selling them the next day at the new, higher NAV.

87.     To prevent this arbitrage opportunity, the SEC enacted Rule 22c-1 under the ICA, which provides as follows:

> No registered investment company issuing any redeemable security, no person designated in such issuer's prospectus as authorized to consummate transactions in any such security, and no principal underwriter of, or dealer in, any such security shall sell, redeem, or repurchase any such security except at a price based on the current net asset value of such security <u>which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security</u> . . . (emphasis added)

88.     Under Rule 22c-1, (also known as the "forward-pricing rule"), mutual fund investors who place orders to purchase fund shares during trading hours do not know the exact price at which their orders will be executed; instead, these orders are executed at the NAV calculated after the order is received, at the 4:00 p.m. close of trading on the New York Stock Exchange.  Thus, all investors should have the same opportunity to digest "pre-4:00 p.m. information" before they buy or sell, and no investor should have the benefit of "post-4:00 information" prior to making an investment decision.  Further, an investor who can avoid forward pricing and buy at the prior NAV has a significant trading advantage, since he can wait until after the market closes for significant news such as a positive earnings announcement to come out, and then buy the fund at the old, low NAV which does not yet reflect the positive news, at essentially no risk.

**<u>Subverting The Forward-Pricing Rule Through Market Timing and Late Trading</u>**

89.     The forward-pricing rule alone, however, does not eliminate the arbitrage opportunity for frequent traders in mutual funds.  This is due to the fact that the NAV of the fund, as calculated after the investor purchases his shares, still might not incorporate all public information.  A typical example is a U.S. mutual fund that holds Japanese shares.  Due to time zone difference, the Japanese market may close at 2:00 a.m. New York time.  If the U.S. mutual fund manager uses the closing prices of the Japanese shares in his fund to calculate an NAV at 4:00 p.m. in New York, he is relying on market information that is fourteen hours old.  Any positive market moves during the New York trading day that will likely cause the Japanese market to rise when it later opens, will not be reflected in the "stale" Japanese prices, and thus the overall fund's NAV will be artificially low.

90.     "Market Timing" is the practice of trying to take advantage of this information delay in the pricing of mutual funds.  Specifically, a market timer who purchases the Japanese fund described above, at the "stale" price is virtually assured of a profit that can be realized the next day by selling.  Taking advantage of this kind of short-term arbitrage repeatedly in a single mutual fund is called "timing" the fund. Indeed, an article appearing on July 1, 2000, in TheStreet.com entitled "Your International Fund May Have the 'Arbs Welcome' Sign Out," described a significant opportunity for market timing that occurred within the past 10 years:

> On Oct. 28, 1997, on the heels of a 10% decline in the U.S. stock market, Asian markets dropped precipitously.  By 4 p.m. ET, however, the U.S. markets had recovered.  To anyone following the Asian markets, it was clear that those markets would follow suit when they opened for trading.
>
> Unfortunately, this was not so clear to some mutual funds that invest in securities traded in Asian markets.  These funds calculated their NAVs at the lower, 13 hours' stale closing prices on the exchange. Many arbitragers, knowing the funds' next-day NAV would rise, stood ready to exploit this pricing discrepancy.
>
> . . . They poured money into Asia/Pacific funds and sold them the

next day, pocketing a one-day profit of around 10%.  This profit
came directly out of the pockets of the remaining shareholders.

How much did shareholders in Asia-Pacific funds lose because the
funds used stale prices to value their portfolios?  Not surprisingly,
the funds aren't talking.  But based on methodology suggested by
the SEC, shareholders in many of these funds would have seen their
accounts drop by up to 2.5% overnight.

91.     Market Timing opportunities are not limited to mutual funds holding foreign

investments, but instead also arise in mutual funds containing illiquid securities such as high-

yield bonds or small capitalization stocks.  In such cases, the fact that some of the fund's

securities may not have traded for hours before the New York closing time can render the fund's

NAV stale, and thus open to being timed.

92.     Even more significantly, the Scudder Defendants either knew or, but for their

recklessness and/or negligence, should have known of arrangements between investors and

certain brokers that allowed these investors to engage in "late trading" in their mutual fund

complexes:  an illegal form of market timing that directly violates the forward-pricing rule.

Specifically, late traders were permitted to purchase shares in various mutual funds at the prior

day's NAV, which did not reflect news announced after the market closed, thereby ensuring a

quick profit with no risk.

93.     One of the most prominent beneficiaries of late trading was hedge fund Canary

Capital Partners, LLC ("Canary"), which engaged in this practice on a daily basis from

approximately March 2000 until July 2003, targeting dozens of mutual funds and wrongfully

obtaining tens of millions of dollars from them.  Canary obtained direct assistance in its late

trading scheme from Bank of America, the parent of the Nations Funds complex, which installed

special computer equipment in Canary's office that allowed it to buy and sell its mutual funds --

and hundreds of others -- at the 4:00 p.m. NAV price until 6:30 p.m. New York time.  Canary

obtained additional late trading capacity from intermediaries, including Security Trust Company ("STC"), an Arizona company providing trust administrative services (including access to mutual funds) to retirement plans.  STC gave Canary the ability to trade hundreds of additional mutual funds as late as 9:00 p.m. New York time.

**Harm Of Market Timing To Mutual Fund Investors**

94.     Market Timing causes significant harm to other mutual fund investors in a variety of ways.  For example, market timing causes "dilution," by not only depriving other mutual fund investors of gains they would otherwise realize on their investments, but also by forcing them to incur a disproportionate share of the losses on days that the NAV declines.  The timer steps in at the last minute and takes part of the buy-and-hold investors' upside when the market goes up; and as a result the next day's NAV, as calculated on a per share basis, is less than it would have been had the timer not invested in the fund.  Conversely, if the timer sells shares on days that market prices are falling below the calculated NAV, the arbitrage has the effect of making the next day's NAV, as calculated on a per share basis, lower than it would otherwise have been, thus magnifying the losses that experienced by other investors in the fund.

95.     The harm to mutual fund investors from market timing extends beyond dilution. For example, successful market timing requires repeated, rapid trading of mutual fund shares with significant amounts of cash which, in turn dramatically increases transaction costs, such as commissions, on the long-term investors that eat away at returns.  Trades necessitated by timer redemptions can also lead to realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market which impose costs on the fund's long term investors.

96.     Market Timing also harms other mutual investors by forcing mutual fund managers to invest heavily in highly liquid, short-term investments that carry a lower rate of return than other securities, to ensure their ability to redeem shares sold by market timers.  Fund managers are sometimes forced to enter into special investments as an attempt to "hedge" against timing activity (instead of simply refusing to allow it), thus deviating altogether from the publicly stated investment strategy of their funds, and incurring further transaction costs.

97.     Experts estimate that mutual fund investors have lost billions of dollars annually as a result of market timing.  Indeed, one recent study estimated that U.S. mutual funds lose $4-$5 billion per year to timers.  Eric Zitzewitz, Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds (October 2002) 35, http://faculty-gsb.stanford.edu/zitzewitz/Research/arbitrage1002.pdf.; Money, October 2003, "The Great Fund Rip-Off" at p. 52.  University of South Carolina law professor John Freeman has similarly estimated that market timing trades may have drained more than $5 billion a year from long-term fund shareholders.

**Purported Efforts Of Mutual Fund Complexes To Prevent Market Timing**

98.     The various registration statements and prospectuses covering the mutual fund shares at issue contained assurances that the investment advisors took steps to protect investors against the negative affect of market timing.  Typically, the profits from a successful market timing purchase or sale are relatively small as a percentage of the total value of the transaction, possibly resulting in a gain of only pennies per share.  Therefore, to secure substantial profits from market timing, it is necessary not only for timers to invest significant sums of cash, but also to engage in multiple transactions over a short period so as to aggregate their gains.  Thus, frequent purchase and sales of large blocks of mutual fund shares by the same investors within a

short period of time raises a "red flag" for portfolio managers, providing a means by which to identify market timing activity.

99.     Thus, the registration statements and prospectuses at issue purported to both prohibit market timing and lessen substantially the ability to profit from market timing activity, by the following: (i) limiting the number of exchanges investors are permitted to make in and out of the fund over the course of one year; (ii) imposing significant redemption fees for exchanges made in close time proximity; and (iii) reserving the right to disallow any proposed transaction found not to be in the best interest of fund investors as a whole.

**Active Participation Of The Fund Complexes
And Investment Advisors In Market Timing and Late Trading**

100.     In reality, the Investment Advisors not only failed to discourage market timing and late trading, but in many instances were aware of and actively encouraged and facilitated timing activity, to the detriment of other mutual fund investors.  During at least 1999 to 2003, various hedge funds directly, or through brokers and other middlemen, entered into secret agreements with Investment Advisors within numerous mutual fund complexes allowing them to time many different mutual funds.  The hedge funds or their intermediaries agreed with the mutual fund managers on a predetermined amount of money to run in and out of predetermined target funds to be timed which would exempt the market timers from short-term redemption fees. In return, the market timers agreed to move money among those funds, and another "resting place," such as a money market or similar fund, in the same family.  By keeping their money -- often millions of dollars -- in the mutual fund complex, the hedge funds assured the manager that he would receive management and other fees on the amount, whether it was in one of the target funds, or the "resting fund."  Notably, by waiving applicable early redemption fees, the fund

manager would directly deprive the fund of money that would have partially reimbursed the fund for the impact of the permitted market timing.

101.    Even more significantly, the Scudder Defendants either knew or, but for their recklessness and/or negligence, should have known of arrangements between investors and certain brokers that allowed these investors to engage in "late trading" in their mutual fund complexes:  an illegal form of market timing that directly violates the forward-pricing rule. Specifically, late traders were permitted to purchase shares in various mutual funds at the prior day's NAV, which did not reflect news announced after the market closed, thereby ensuring a quick profit with no risk.

102.    One of the most prominent beneficiaries of late trading was hedge fund Canary Capital Partners, LLC ("Canary"), which engaged in this practice on a daily basis from approximately March 2000 until July 2003, targeting dozens of mutual funds and wrongfully obtaining tens of millions of dollars from them.  Canary obtained direct assistance in its late trading scheme from Bank of America, the parent of the Nations Funds complex, which installed special computer equipment in Canary's office that allowed it to buy and sell its mutual funds -- and hundreds of others -- at the 4:00 p.m. NAV price until 6:30 p.m. New York time.  Canary obtained additional late trading capacity from intermediaries, including Security Trust Company ("STC"), an Arizona company providing trust administrative services (including access to mutual funds) to retirement plans.  STC gave Canary the ability to trade hundreds of additional mutual funds as late as 9:00 p.m. New York time.

**Unlawful Profits And Activities Stemming From Market Timing**
**Excessive Investment Advisory And Administrative Fees**

103.    The Investment Advisors and other affiliated entities within the mutual fund complexes had powerful incentives to facilitate the improper market timing activity described

herein.  As described above, the Investment Advisor and the Administrator, among other captive

entities within the mutual fund complex, earned advisory and management fees calculated on a

daily basis.  Thus, the large infusions of cash provided by market timers, while detrimental to

other investors in the funds themselves, were a source of large profits to the Investment Advisor

and its affiliates by dramatically increasing the amount of assets under management, and thereby

increasing the dollar amount of fees payable from those assets.   As detailed below, none of the

Investment Advisors or other affiliated entities sued herein ever disclosed their practice of

permitting and facilitating market timing, much less the fact that they earned millions of dollars

in management and advisory fees as a result of permitting this unlawful activity.

104.    Moreover, the active participation in and facilitation of market timing by

financial institutions, acting as clearing platforms for market timing was central to the success of

defendants' scheme.  During the Class Period, many of the largest financial firms in the country,

including defendant Painewebber acted as key conduits of the market timing activities described

herein.  Defendant Painewebber recklessly and/or knowingly disregarded the excessive mutual

fund trades being transacted through its trading system, or "platform," by the market timers and

substantially assisted and participated in such excessive trading.  Defendant Painewebber was

motivated to engage in such conduct by the many sources of income offered by opening its

execution systems to market timers and late traders, including the fees and commissions

(including contingent deferred sales charges, or "CDSC's") it received for processing the market

timer and late trading transactions.  Defendant Painewebber also benefited from its role as the

executor of market timing  by leveraging various *quid pro quo* benefits from market timers and

timing brokers, including the ability to cross-sell other products and services they offered to the

timers and brokers, including financing and private client services.  By collecting such fees and

other benefits, Defendant Painewebber directly benefited from the rapid in-and-out trading by certain of the market timers, while harming long-term fund investors who bore the transaction costs and other harms, as described herein, of such excessive trading.

**Improper Receipt And Use Of 12b-1 Distribution Fees**

105.    By facilitating market timing, and the resultant large infusions of cash, the Investment Advisors and their affiliates gained significant sums that could be used in the promotion and sale of additional shares in the mutual funds they managed, thereby further increasing the funds under management.  Prior to 1980, it was generally unlawful for open-end mutual fund to use any portion of their assets under management to fund the distribution of shares; instead, any such costs were generally borne by the investment advisor.  Indeed, after public hearings held in 1976, the SEC determined that it is generally improper under the ICA for mutual funds themselves to bear direct or indirect expenses related to the distribution of their shares.  One of the factors that the SEC considered in reaching this conclusion was the investment advisor's conflict of interest with respect to any recommendation that the fund itself should bear distribution expenses and the benefits that would be realized by the investment adviser in having the fund bear these expenses.

106.    Despite these concerns, in 1980, the SEC promulgated Rule 12b-1 under the ICA, which permits an open-end mutual fund to pay expenses in connection with the distribution of its shares, "provided that any payments made by such company . . . are made pursuant to a written plan describing all material aspects of the proposed financing of distribution and that all agreements with any person relating to implementation of the plan are in writing . . ."  Rule 12b-1 further requires such a plan to be approved by a majority of the fund shares, as well as a majority of the "independent" directors of the fund.  The written plan must include not only the

total dollar amount and percentage of average net assets under management used for distribution expenses, but also the manner in which such amount was spent on the following areas: (i) advertising; (ii) printing and mailing of prospectuses; (iii) compensation to underwriters; (iv) compensation to dealers; (v) compensation to sales personnel; and (vi) others uses for which funds were spent.  As set forth in its release adopting Rule 12b-1, the SEC reasoned that mutual fund investors would benefit from the use of their funds to expand distribution, since such expenditures would encourage growth in the assets under management which, in turn, would foster economies of scale and ultimately reduce the expenses borne by individual investors.

107.    In reality, investment advisors have used Rule 12b-1 to tap an additional source of fees, with little if any corresponding benefit to mutual fund investors.  Indeed, since the promulgation of Rule 12b-1, the percentage of fund assets used for distribution has remained little changed, while the aggregate dollar amount paid to the investment advisors by investors in the funds has grown substantially.

108.    By facilitating market timing, the investment advisors and their affiliated entities were able to profit substantially from the receipt of increased 12b-1 fees, based upon the inclusion of the timers' cash infusions in the calculation of assets under management.  Certain investment advisors then used these 12b-1 fees to make payments to outside brokerage firms and other intermediaries, in return for the intermediaries' promise to direct retail investors into the mutual funds within the investment advisors' complex, including the timed funds.

**Profits Derived From "Sticky Assets"**

109.    As an additional inducement for facilitating market timing, fund managers often received "sticky assets."  These were typically long-term investments made not in the mutual fund in which the timing activity was permitted, but in one of the fund manager's financial

vehicles that assured a steady flow of fees to the manager. Often the sticky assets would be placed, and sit quietly, in low-risk money-market or government bond funds; but sometimes they would end up in a hedge fund run by the fund managers with a higher fee structure than the typical mutual fund, generating huge fees for the investment advisors and their affiliated entities.

## ORGANIZATION, MANAGEMENT, AND GOVERNANCE OF THE SCUDDER FUNDS

110.    According to its public filings, Scudder Advisor Funds, formerly BT Investment Funds and BT Tax-Free Investment Trust, is an open-end management company.  Prior to May 16, 2003, Scudder Advisor Funds was known as BT Investment Funds. Prior to May 16, 1988, Scudder Advisor Funds was known as BT Tax-Free Investment Trust. Scudder Advisor Funds was organized on July 21, 1986 under the laws of the Commonwealth of Massachusetts. Currently, Scudder Advisor Funds consists of the following series– Cash Management Fund Investment, Tax Free Money Fund Investment, NY Tax Free Money Fund Investment, Treasury Money Fund Investment, International Equity Fund (A, B, C, and Investment Class), Mid Cap Fund (A, B, C, R, Institutional and Investment Class), Lifecycle Long Range Fund (Investment Class), Lifecycle Mid Range Fund (Investment Class), Lifecycle Short Range Fund (Investment Class), Small Cap Fund (A, B, C, R and Investment Class), Quantitative Equity Fund (Institutional and Investment Class), PreservationPlus Income Fund (A, C and Investment Class), and Global Equity Fund (A, B, C, and Institutional Class).

111.    According to its public filings, Scudder Institutional Funds, formerly BT Institutional Funds, is an open-end management company.  Prior to May 16, 2003, Scudder Institutional Funds was known as BT Institutional Funds.  Scudder Institutional Funds was organized on March 15, 1990 under the laws of the Commonwealth of Massachusetts. Currently, Scudder Institutional Funds consists of the following series – Cash Management Fund

(Institutional Class), Cash Reserves Fund (Institutional Class), Treasury Money Fund (Institutional Class), International Equity Fund (Institutional Class I and Institutional Class II), Equity 500 Index Fund (Premier Class and Investment Class), Liquid Assets Fund (Institutional Class), Daily Assets Fund (Institutional Class), and Treasury and Agency Fund (Institutional Class).

112.    According to its public filings, Scudder MG Investments Trust is an open-end, management investment company consisting of ten investment portfolios, each having separate and distinct investment objectives and policies.  The Trust was formed as a business trust under the laws of the State of Delaware under the name "Morgan Grenfell Investment Trust" on September 13,1993, and commenced investment operations on January 3, 1994.  The Fund assumed its current name on May 16, 2003.  Currently, Scudder MG Investments Trust consists of the following series – Scudder Fixed Income Fund, Scudder Short Duration Fund, Scudder High Income Plus Fund, Scudder Total Return Bond Fund, Scudder Micro Cap Fund, Scudder Municipal Bond Fund, Scudder Short-Term Municipal Bond Fund (Investment Class and Institutional Class), Scudder European Equity Fund, Scudder Emerging Markets Debt Fund (Institutional Class), International Select Equity Fund.

113.    According to the Funds' public filings, "the overall business and affairs of each Trust and the Portfolio are managed by the Board of Trustees."

114.    According to the Funds' public filings, DeAM acts as an investment advisor to mutual funds in the Scudder family of funds pursuant to the terms of a management contract.

115.    According to the Funds' public filings, DeAMIS acts as acts as an investment advisor and/or sub-advisor to mutual funds in the Scudder family of funds pursuant to the terms of a management contract.

116.    According to the Funds' public filings, DeAM is the marketing name in the US for the asset management activities of Deutsche Bank AG, Deutsche Investment Management Americas Inc., Deutsche Asset Management, Inc., DeAMIS, Deutsche Bank Trust Company Americas and Scudder Trust Company.

117.    According to the International Equity Fund's public filings, pursuant to a management contract, the Advisor receives a fee from the fund, computed daily and paid monthly, at the annual rate of 0.65% of the average daily net assets of the fund.

118.    According to the International Select Equity Fund's public filings, pursuant to a management contract, the Trust, on behalf of the Fund, is obligated to pay the Advisor a monthly fee at 0.70% of the Fund's average daily net assets.

119.    According to the European Equity Fund's public filings, under a management contract, the Trust, on behalf of the Fund, is obligated to pay the Advisor a monthly fee at 0.70% of the Fund's average daily net assets.

120.    According to the Fund's public filings, the advisor and the administrator have contractually agreed to waive their fees and reimburse expenses so that total expenses will not exceed those set forth in each Fund's Prospectuses.

121.    According to the funds public filings, during the Class Period the Portfolios paid the Advisors the following net management fees:

| International Year End | International Equity | Select Equity | European Equity |
|---|---|---|---|
| 10/31/99 | $15,628,752 | $138,068 | $312,589 |
| 10/31/00 | $19,634,406 | $1,629,360 | $3,158,800 |
| 10/31/01 | $11,899,349 | $1,352,896 | $434,400 |
| 10/31/02 | $5,545,776 | $1,329,746 | $0 |
| 10/31/03 | $2,866,003 | $3,899,374 | $6,900 |

122.    According to the Funds' public filings, the Advisors are responsible for the day-

31

to-day investment decisions, the execution of portfolio transactions and the general management of the Portfolio's investments and provide certain supervisory services.

123.    Investment Company Capital Corporation serves as the Funds' administrator pursuant to an Administration Agreement and for its services under receives a monthly fee at the following annual rates of the aggregate average daily net assets of such fund: 0.30% for the European Equity Fund, 0.30% for the International Select Equity Fund, and 0.85% for the International Equity Fund Investment Class and Class A, B and C, 0.40% for International Equity Fund Institutional Class I and 70% for Institutional Class II.

124.    According to the funds public filings, during the Class Period the Portfolios paid the Administrators the following net administration fees:

| International Year End | International Equity | Select Equity | European Equity |
|---|---|---|---|
| 10/31/99 | $21,743,115 | $59,172 | $133,967 |
| 10/31/00 | $27,308,286 | $698,297 | $135,377 |
| 10/31/01 | $12,482,039 | $775,988 | $186,168 |
| 10/31/02 | $5,838,979 | $751,705 | $87,225 |
| 10/31/03 | $3,158,298 | $1,805,289 | $56,086 |

125.    SDI is the principal distributor for shares of the Funds.  Class A Shares, the distributor receives an annual fee, paid monthly, equal to 0.25% of the average daily net assets of the Class A Shares, for Class B and C Shares, the distributor receives an annual fee, paid monthly, equal to 0.75% of their respective average daily net.  In addition the distributor receives, for Class B and C shares, a shareholder servicing fee at an annual rate of 0.25% of their respective average daily net assets.  In addition for International Select Equity Fund Class R shares, the distributor receives both an annual fee, paid monthly, equal to 0.25% of the average daily net assets of Class R shares and a shareholder servicing fee at an annual rate of 0.25% of the average daily net assets.

126.    According to the funds public filings, during the Class Period the Portfolios paid

the Distributors the following net distribution fees:

| International Year End | International Equity | Select Equity | European Equity |
|---|---|---|---|
| 10/31/99 | N/A | N/A | N/A |
| 10/31/00 | N/A | N/A | N/A |
| 10/31/01 | $12,693 | $1,441.91 | $1,018.57 |
| 10/31/02 | $28,679 | $4,622 | $4,998 |
| 10/31/03 | $17,464 | $783,778 | $6,946 |

**Defendants' Fraudulent Scheme:  Secret Timed**
**Trading in Exchange for Fees and Other Remuneration**

127.    Unknown to investors, from at least as early as January 22, 1999 and until January

12, 2004, inclusive, defendants engaged in fraudulent and wrongful schemes that enabled certain

favored investors to reap many millions of dollars in profits at the expense of plaintiffs and other

members of the Class, through improper, secret timed trading.

128.    The Investment Advisors, as manager of the Scudder funds, profited from fees the

Investment Advisors charged to the Scudder funds that were measured as a percentage of the

fees under management.

129.    In exchange for the right to engage in timing, which hurt plaintiffs and other Class

members by artificially and materially affecting the value of the Scudder funds, Painewebber and

the John Doe Defendants, agreed to park substantial assets, referred to as "sticky assets," in the

Scudder funds, thereby increasing the assets under Scudder funds' management and the fees paid

to the Investment Advisors.

130.    A former Scudder employee, who worked as a Scudder mutual fund wholesale

salesman with knowledge of Scudder's market timing activities, has provided information to

Plaintiffs on a confidential basis.  This confidential witness is referred to herein as "CW 1."

131.     CW 1 stated that one of the investment advisory firms that he had contact with was Painewebber, and that he had met with two representatives from their Paramus, New Jersey office.  As a result of that contact, sometime in either 2000 or 2001 he received a call from these two brokers who told him they wanted to invest $1 or $2 million in a Scudder international mutual fund.  These Painewebber brokers told him that the funds would only remain in the fund overnight, but if they were allowed to do that, they would later invest $10 million in a Scudder equity fund.

132.     CW 1 said he sent an email to his bosses at Scudder informing them what was being done, and asked if this was something they wanted to do, to which the reply was yes.

133.     CW 1 said that to the best of his knowledge, during 2000 to 2002, brokers from Painewebber in New York and Long Island moved hundreds of millions of dollars into Scudder mutual funds on an overnight or, "roundtrip" basis.  In other words, Painewebber was market timing.  CW 1 said that to the best of his knowledge market timing was taking place in the Scudder High Yield Bond Fund, the Blue Chip Equity Fund, the Japan Fund, and the Global Discovery Fund.

134.     A Scudder internal sales Report from the first quarter of 2002, entitled "Broker Dealer Division Relationship Overview – UBS Painewebber 2002 Q1," was sent to the wholesalers from senior management noting that most of the sales with Painewebber were from timing.  The Report stated:  "We are a Primary Vendor within the PW [Painewebber] system – one of nineteen.  Last year we ranked 17 of 19; this year we are currently 19 of 19.  Much of our business had been with market timers . . . ."

135.    According to CW 1, in 2001, Scudder had over two hundred million dollars worth of mutual fund trading activity with Painewebber, up from fifty million the prior year, and at least one hundred million was from timing.

136.    Another confidential witness ("CW 2") with direct knowledge of market timing activities at Scudder and Painewebber has provided information to  Plaintiffs on a confidential basis.  CW 2 stated that market timing was taking place in Scudder High Yield Fund, Scudder Greater Europe Fund, Scudder Japan Fund, and Scudder International Equity Fund.

**The Prospectuses Were Materially False and Misleading**

137.    Plaintiffs and each of the Class members purchased shares or other ownership units in Scudder funds pursuant to a Prospectus.  Prior to investing in any of the Scudder funds, plaintiffs and each member of the Class were entitled to and did receive a Prospectus for the respective fund, each of which contained substantially the same materially false and misleading statements regarding the Scudder funds' policies on timed trading.

138.    The Prospectuses falsely stated that the Scudder funds safeguarded shareholders from the harmful effects of timing by refusing to execute trades that might damage shareholders. For example, in the Scudder International Select Equity Fund and Scudder European Equity Fund Prospectuses, filed February 28, 2000 and in the Scudder International Equity Fund Prospectus, filed January 31, 2000, Scudder stated:

> We will reject purchases if we conclude that the purchaser may be
> investing only for the short-term or for the purpose of profiting
> from day to day fluctuations in the Fund's share price.

139.    The statement set forth in the preceding paragraph was stated in the Scudder funds' following SEC filings:

> **a.**    Post-Effective Amendment filed with the SEC on February 28, 2000,
> which was signed by defendants Graham E. Jones, William N. Searcy,
> Richard T. Hale, Daniel O. Hirsch, Hugh G. Lynch, Edward T. Tokar,

Amy Olmert, Bruce E. Langton;

**b.** Post-Effective Amendment filed with the SEC on February 28, 2000, which was signed by defendants  Graham E. Jones, William N. Searcy, Richard T. Hale, Daniel O. Hirsch, Paul K. Freeman, Hugh G. Lynch, Edward T. Tokar, Amy Olmert;

**c.** Post-Effective Amendment filed with the SEC on January 31, 2000, which was signed by defendants S. Leland Dill, Martin J. Gruber, Richard J. Herring, Philip Saunders, Jr., Richard T. Hale, Charles A. Rizzo, Daniel O. Hirsch, Charles P. Biggar, Bruce E. Langton, Harry Van Benschoten, John A. Keffer.

140.     Further, in Prospectuses for each fund dated February 28, 2001, Scudder

reiterated and clarified this protection for shareholders by stating:

> Your purchase order may not be accepted...if the Fund determines that your purchase would be detrimental to the interests of its shareholders.  The fund specifically reserves the right to refuse your order if it is part of multiple purchase or exchange requests that the Fund, in its sole discretion, deems to involve excessive trading or to be part of a market timing strategy.

141.     The statement set forth in the preceding paragraph was stated in the

Scudder funds' following SEC filings:

**a.** Post-Effective Amendment filed with the SEC on February 28, 2001, which was signed by defendants Graham E. Jones, William N. Searcy, Richard T. Hale, Charles A. Rizzo, Daniel O. Hirsch, Hugh G. Lynch, Edward T. Tokar;

**b.** Post-Effective Amendment filed with the SEC on February 28, 2001, which was signed by defendants Graham E. Jones, William N. Searcy, Richard T. Hale, Charles A. Rizzo, Daniel O. Hirsch, Paul K. Freeman, Hugh G. Lynch, Edward T. Tokar;

**c.** Post-Effective Amendment filed with the SEC on February 28, 2001, which was signed by defendants Martin J. Gruber, Richard J. Herring, Philip Saunders, Jr., Richard T. Hale, Charles A. Rizzo, Daniel O. Hirsch, Charles P. Biggar, Bruce E. Langton, Harry Van Benschoten;

**d.** Post-Effective Amendment filed with the SEC on February 28, 2002, which was signed by defendants Graham E. Jones, William N. Searcy, Richard T. Hale, Charles A. Rizzo, Daniel O. Hirsch, Hugh G. Lynch, Edward T. Tokar;

**e.** Post-Effective Amendment filed with the SEC on February 28, 2002, which

was signed by defendants Graham E. Jones, William N. Searcy, Richard T. Hale, Charles A. Rizzo, Daniel O. Hirsch, Paul K. Freeman, Hugh G. Lynch, Edward T. Tokar;

    **f.**   Post-Effective Amendment filed with the SEC on February 28, 2002, which was signed by defendants S. Leland Dill, Martin J. Gruber, Joseph R. Hardiman, Richard J. Herring, Philip Saunders, Jr., Richard T. Hale, Charles A. Rizzo, Daniel O. Hirsch, Charles P. Biggar, Bruce E. Langton, Harry Van Benschoten.

142.    In Prospectuses for the funds dated February 28, 2003, they similarly represented that the Scudder funds protect shareholders from the harmful effects of frequent trading by limiting the number of share exchanges a customer can engage in is limited to six per year and simplified the expression of the protection it offered by shareholders by stating:

> Exchanges are a shareholder privilege, not a right: we may reject any exchange order or require a shareholder to own shares of a fund for 15 days before we process the purchase order for the other fund, particularly when there appears to be a pattern of "market timing" or other frequent purchases and sales.

143.    The statement set forth in the preceding paragraph was stated in the Fund's following SEC filings:

    **a.**   Post-Effective Amendment filed with the SEC on February 28, 2003, which was signed by defendants Richard R. Burt, S. Leland Dill, Martin J. Gruber, Joseph R. Hardiman, Richard J. Herring, Graham E. Jones, Rebecca W. Rimel, Philip Saunders, Jr., William N. Searcy, Robert H. Wadsworth, Richard T. Hale, Caroline Pearson, Charles A. Rizzo, William F. Glavin Jr.;

    **b.**   Post-Effective Amendment filed with the SEC on February 28, 2003, which was signed by defendants Richard R. Burt, S. Leland Dill, Martin J. Gruber, Joseph R. Hardiman, Richard J. Herring, Graham E. Jones Rebecca W. Rimel, Philip Saunders, Jr., William N. Searcy, Robert H. Wadsworth, Richard T. Hale, Caroline Pearson, Charles A. Rizzo, William F. Glavin Jr.;

    **c.**   Post-Effective Amendment filed with the SEC on February 28, 2003, which was signed by defendants Richard R. Burt, S. Leland Dill, Martin J. Gruber, Joseph R. Hardiman Richard J. Herring, Graham E. Jones, Rebecca W. Rimel, Philip Saunders, Jr., William N. Searcy, Robert H. Wadsworth, Richard T. Hale, Caroline Pearson, Charles A. Rizzo, William F. Glavin Jr;

**d.** Post-Effective Amendment filed with the SEC on February 28, 2004, which was signed by defendants Richard R. Burt, S. Leland Dill, Martin J. Gruber, Joseph R. Hardiman, Richard J. Herring, Graham E. Jones, Rebecca W. Rimel, Philip Saunders, Jr., William N. Searcy, Robert H. Wadsworth, Richard T. Hale, Caroline Pearson, Charles A. Rizzo;

**e.** Post-Effective Amendment filed with the SEC on February 28, 2004, which was signed by defendants Richard R. Burt, S. Leland Dill, Martin J. Gruber, Joseph R. Hardiman, Richard J. Herring, Graham E. Jones, Rebecca W. Rimel, Philip Saunders, Jr., William N. Searcy, Robert H. Wadsworth, Richard T. Hale, Caroline Pearson, Charles A. Rizzo;

**f.** Post-Effective Amendment filed with the SEC on February 28, 2004, which was signed by defendants Richard R. Burt, S. Leland Dill, Martin J. Gruber, Joseph R. Hardiman, Richard J. Herring, Graham E. Jones, Rebecca W. Rimel, Philip Saunders, Jr., William N. Searcy, Robert H. Wadsworth, Richard T. Hale, Caroline Pearson, Charles A. Rizzo.

144.    The Prospectuses also falsely stated that the Scudder funds safeguarded shareholders from the harmful effects of timing by forcing the timer to bear the costs of such trading.  For example, in language  that typically appeared in the Prospectuses, the February 28, 2003 Scudder International Equity Fund and Scudder International Select Equity Fund Prospectuses acknowledged that frequent trading is harmful to shareholders and is discouraged by the imposition of redemption fees:

> The Scudder International Select Equity Fund may charge a 2.00% short-term redemption fee of the net asset value of Class A shares (either by selling or exchanging into another fund) within 60 days (approximately two months) of purchase. This fee will compensate the fund for expenses directly related to the redemption of Class A shares, discourage short-term investment in Class A shares and facilitate portfolio management.

145.    The statement set forth in the preceding paragraph was stated in the Fund's following SEC filings:

**a.** Post-Effective Amendment filed with the SEC on February 28, 2002, which was signed by defendants Graham E. Jones, William N. Searcy, Richard T. Hale, Charles A. Rizzo, Daniel O. Hirsch, Hugh G. Lynch, Edward T. Tokar;

**b.** Post-Effective Amendment filed with the SEC on February 28, 2002, which was signed by defendants Graham E. Jones, William N. Searcy, Richard T. Hale, Charles A. Rizzo, Daniel O. Hirsch, Paul K. Freeman, Hugh G. Lynch, Edward T. Tokar;

**c.** Post-Effective Amendment filed with the SEC on February 28, 2002, which was signed by defendants S. Leland Dill, Martin J. Gruber, Joseph R. Hardiman, Richard J. Herring, Philip Saunders, Jr., Richard T. Hale, Charles A. Rizzo, Daniel O. Hirsch, Charles P. Biggar, Bruce E. Langton, Harry Van Benschoten;

**d.** Post-Effective Amendment filed with the SEC on February 28, 2003, which was signed by defendants Richard R. Burt, S. Leland Dill, Martin J. Gruber, Joseph R. Hardiman, Richard J. Herring, Graham E. Jones, Rebecca W. Rimel, Philip Saunders, Jr., William N. Searcy, Robert H. Wadsworth, Richard T. Hale, Caroline Pearson, Charles A. Rizzo, William F. Glavin Jr.;

**e.** Post-Effective Amendment filed with the SEC on February 28, 2003, which was signed by defendants Richard R. Burt, S. Leland Dill, Martin J. Gruber, Joseph R. Hardiman, Richard J. Herring, Graham E. Jones Rebecca W. Rimel, Philip Saunders, Jr., William N. Searcy, Robert H. Wadsworth, Richard T. Hale, Caroline Pearson, Charles A. Rizzo, William F. Glavin Jr.;

**f.** Post-Effective Amendment filed with the SEC on February 28, 2003, which was signed by defendants Richard R. Burt, S. Leland Dill, Martin J. Gruber, Joseph R. Hardiman Richard J. Herring, Graham E. Jones, Rebecca W. Rimel, Philip Saunders, Jr., William N. Searcy, Robert H. Wadsworth, Richard T. Hale, Caroline Pearson, Charles A. Rizzo, William F. Glavin Jr;

**g.** Post-Effective Amendment filed with the SEC on February 28, 2004, which was signed by defendants Richard R. Burt, S. Leland Dill, Martin J. Gruber, Joseph R. Hardiman, Richard J. Herring, Graham E. Jones, Rebecca W. Rimel, Philip Saunders, Jr., William N. Searcy, Robert H. Wadsworth, Richard T. Hale, Caroline Pearson, Charles A. Rizzo;

**h.** Post-Effective Amendment filed with the SEC on February 28, 2004, which was signed by defendants Richard R. Burt, S. Leland Dill, Martin J. Gruber, Joseph R. Hardiman, Richard J. Herring, Graham E. Jones, Rebecca W. Rimel, Philip Saunders, Jr., William N. Searcy, Robert H. Wadsworth, Richard T. Hale, Caroline Pearson, Charles A. Rizzo;

**i.** Post-Effective Amendment filed with the SEC on February 28, 2004, which was signed by defendants Richard R. Burt, S. Leland Dill, Martin J. Gruber, Joseph R. Hardiman, Richard J. Herring, Graham E. Jones, Rebecca W. Rimel, Philip Saunders, Jr., William N. Searcy, Robert H. Wadsworth, Richard T. Hale, Caroline Pearson, Charles A. Rizzo.

146.    The Prospectuses failed to disclose and misrepresented the following material and

adverse facts:

**a.** that defendants had entered into an agreement allowing Painewebber and the John Doe defendants to time their trading of the Scudder funds shares;

**b.** that, pursuant to that agreement, Painewebber and the John Doe Defendants regularly timed their trading in the Scudder funds shares;

**c.** that, contrary to the express representations in the Prospectuses, the Scudder funds enforced their policy against frequent traders selectively, i.e., they did not enforce it against Painewebber and the John Doe Defendants and waived the redemption fees, at Scudder funds' investors expense, that Painewebber and the John Doe Defendants should have been required to pay, pursuant to Scudder funds' stated policies;

**d.** that the defendants regularly allowed Painewebber and the John Doe Defendants to engage in trades that were disruptive to the efficient management of the Scudder funds and/or increased the Scudder funds' costs and thereby reduced the Scudder funds' actual performance.

## THE SCHEME BEGINS TO BE REVEALED

147.    The involvement of the defendants in the growing mutual fund scandal was revealed on January 12, 2004, at which time Deutsche Asset Management issued a media statement revealing that it had identified market timing arrangements with an investment advisory fund in Scudder funds.  In the media statement, Deutsche Asset Management stated as follows:

> As part of a review that is not yet complete, ***Scudder has identified an arrangement with an outside investment advisory firm that traded frequently in a small number of funds.***  The arrangement with the outside investment advisory firm, about which our review is continuing, began before the new Scudder management team was in place in 2002.  In early 2003, management initiated steps that led to the subsequent termination of this arrangement.
>
> We have provided the preliminary results of this review to the appropriate regulators and the fund boards. [Emphasis added.]

148.    On the same day, defendants filed with the SEC prospectus supplements for various funds, including the Scudder European Equity Fund, Scudder International Equity Fund,

and Scudder International Select Equity Fund, disclosing that the funds were subject to the

market timing arrangement mentioned above.  Defendants stated, in relevant part, as follows:

> Regulatory Update. As are many other mutual fund complexes,
> Scudder is conducting an ongoing review of market timing in the
> Scudder funds – including trading by clients, employees and ex-
> employees. Market timing refers generally to the frequent trading
> in and out of mutual fund shares in order to take advantage of
> pricing inefficiencies.
>
> ***Scudder has identified an investment advisory firm that had an
> arrangement with the organization that resulted in frequent
> trading, including trading in your fund, inconsistent with
> registration statement policies.*** We are currently investigating the
> extent of such trading and whether it caused dilution. The
> arrangement with the outside investment advisory firm began
> before the new Scudder management team was in place in 2002. In
> early 2003, management initiated steps that led to the subsequent
> termination of the arrangement. Scudder will work with your
> fund's board to establish an appropriate measure of dilution losses,
> if any, related to the trading, and reimbursement for those losses.
>
> The inquiry into market timing in the Scudder funds is ongoing.
> Scudder has provided information about the preliminary results of
> its review to the appropriate regulators and to the fund boards.
> Scudder continues to cooperate with each regulator that has sought
> information.  [Emphasis added.]

## ADDITIONAL SCIENTER ALLEGATIONS

149.    As alleged herein, defendants acted with scienter in that defendants knew that the

prospectuses issued by the Scudder funds were materially false and misleading; knew that such

prospectuses would be issued or disseminated to the investing public; and knowingly and

substantially participated or acquiesced in the issuance or dissemination of such documents as

primary violations of the federal securities laws.  As set forth elsewhere herein in detail,

defendants, by virtue of their receipt of information reflecting the true facts regarding Scudder

funds, their control over, and/or receipt and/or modification of Scudder funds' allegedly

materially misleading misstatements and/or their associations with the Scudder funds which

made them privy to confidential proprietary information concerning the Scudder funds, participated in the fraudulent scheme alleged herein.

150.    Additionally, the defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein and participated in and/or had actual knowledge of the fraudulent conduct alleged herein.  In exchange for allowing the unlawful practices alleged herein, the defendants, among other things, received increased management fees as a result of the scheme alleged herein. Moreover, mutual fund managers can easily spot market timing in their mutual funds simply by observing the trading activity within accounts; if the account, or persons controlling more than one account, engage in frequent trades the manager will know that they are engaging in market timing.

151.    Painewebber and the John Doe Defendants were motivated to participate in the wrongful scheme by the enormous profits they derived thereby. They systematically pursued the scheme with full knowledge of its consequences to other investors.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

152.    Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased and/or held shares in any mutual fund in the Scudder fund family adversely affected by market timing and/or late trading which funds and/or their registrants/issuers were advised by Scudder Investment Advisors during the period January 22, 1999 to January 12, 2004.  Excluded from the Class are defendants, members of their immediate families and their legal representatives, parents, affiliates, heirs, successors or assigns and any entity in which defendants have or had a controlling interest, and any other person who engaged in the unlawful conduct described herein (the "Excluded Persons").

153.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believes that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Scudder funds and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

154.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of law that is complained of herein.

155.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

156.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal, state and/or common law was violated by defendants' acts as alleged herein;

(b)  whether the registration statements and prospectuses set forth above contained substantially the same misstatements of material fact or omitted to state substantially the same material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)  whether defendants breached their fiduciary duties to Plaintiffs and the members of the Class; and

(d)  whether Plaintiffs and the other members of the Class have sustained damages and, if so, the appropriate measure thereof.

157.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIOLATIONS OF THE SECURITIES ACT

## FIRST CLAIM FOR RELIEF

## VIOLATION OF SECTION 11 OF THE SECURITIES ACT

158.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter, except that, for purposes of this claim, plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

159.    This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against the Trustee defendants, the Registrant defendants, and the Distributor defendant.

160.    Defendants violated Section 11 of the 1933 Act in that the Prospectuses issued for the Scudder funds contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.  The Prospectuses failed to disclose and misrepresented, inter alia, the following material and adverse facts:

a.  that, contrary to the representation that it was defendants' policy and practice to monitor and take steps to prevent timed trading because of its adverse effect on fund investors, in fact, such timed trading was taking place and the policy was only enforced selectively;

b.  that defendants regularly allowed, and had entered into agreements which allowed, certain investors to engage in trades that were disruptive to the efficient management of the Scudder funds and/or increased the Scudder funds' costs and thereby reduced the Scudder funds' actual performance; and

c.  that, pursuant to these unlawful agreements, defendants benefited financially at the expense of the Scudder fund investors.

161.    Defendants issued, caused to be issued, and participated in the issuance of the materially false and misleading written statements and/or omissions of material facts that were contained in the Prospectuses.

162.    Defendants, and each of them, had the duty of conducting investigation of the information contained in the Prospectuses before the dissemination to Scudder fund shareholders, and failed to satisfy that duty.  Defendants, and each of them, owed to the Scudder fund shareholders, including plaintiffs and the Class, the duty to ensure that the statements contained in the Prospectuses were true and complete and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.  By virtue of the misrepresentations and omissions contained in or omitted from the Prospectuses, as herein alleged, defendants, and each of them, are liable to plaintiff and the Class.

163.    Prior to purchasing and/or reinvesting in Scudder fund shares, plaintiffs and Class members were provided with the appropriate Prospectuses, without the knowledge of the untruths and/or omissions contained herein.  Plaintiffs and Class members purchased and/or reinvested in the shares of the Scudder funds traceable to the false and misleading Prospectuses.

164.    As a direct and proximate result of defendants' misconduct and material misstatements and omissions contained in the Prospectuses, plaintiff and the Class suffered substantial damages.  The value of Scudder funds shares decreased substantially subsequent to and due to defendants' violations.

165.    This claim was brought within the applicable statute of limitations.  At the time they purchased and/or reinvested in the Scudder funds shares traceable to the defective Prospectuses, plaintiffs and Class members were without knowledge of the facts concerning the false and misleading statements and omissions alleged herein and could not reasonably have possessed such knowledge.

166.    The statutory safe harbor provided for forward looking statements under certain circumstances does not apply to the defendants' false statements and material omissions alleged in this Complaint.  The "safe harbor" for forward looking statements is not applicable since defendants' statements were contained in a prospectus issued by defendants and disseminated to plaintiffs, defendants' statements were not identified as forward looking statements when made, they were not accompanied by meaningful cautionary statements identifying important factors which could cause actual results to differ materially from those in forward looking statements, and they were not forward looking statements within the meaning of the statute.

**SECOND CLAIM FOR RELIEF**

**<u>VIOLATION OF § 12(a)(2) OF THE SECURITIES ACT</u>**

167.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter, except that, for purposes of this claim, plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

168.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act against the Registrant defendants and the Distributor defendant.   Plaintiffs do not assert that the defendants named in this Count are liable for fraudulent or intentional conduct.

169.     Each of the defendants named in this Count was a seller of a security, specifically Scudder mutual funds sold pursuant to the Scudder Prospectuses.

170.     By means of the Scudder Prospectuses, the Registrant defendants sold the Scudder mutual funds to Plaintiffs and the members of the Class.   The Registrant defendants' actions of solicitation consisted primarily of the preparation and dissemination of the Scudder Prospectuses.

171.     The Scudder mutual funds sold pursuant to the Scudder Prospectuses by defendants named in this Count were sold through the use of interstate communication, the use of interstate commerce, and the use of the mails.

172.     The Scudder mutual funds were sold through the use of the Scudder Prospectuses which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading.

173.     The defendants named in this Count cannot prove that they did not know or, in the exercise of reasonable care, could not have known of the untruth or omission described in the preceding paragraph.

174.    By reason of the conduct alleged herein, each defendant violated § 12(a)(2) of the Securities Act.  As a direct and proximate result of defendants' conduct, Plaintiffs and the other members of the Class suffered substantial damage in connection with the purchase of Scudder mutual funds, and are entitled to rescission.

### THIRD CLAIM FOR RELIEF

### VIOLATION OF SECTION 15 OF THE SECURITIES ACT

175.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter, except that, for purposes of this claim, plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

176.    This claim is brought pursuant to Section 15 of the Securities Act against the Investment Advisor defendants as control persons of the Registrant defendants.

177.     It is appropriate to treat these defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Prospectuses, public filings, press releases and other publications are the collective actions of the defendants.

178.    The Registrant defendants are each liable under Section 11 of the Securities act as set forth herein.

179.    Each of the investment Adviser defendants was a "control person" of the registrants within the meaning of Section 15 of the Securities Act, by virtue of their position of operational control and/or authority over such funds.  The Investment Advisor defendants directly and indirectly, had the power and authority, and exercised the same, to cause the Registrant defendants to engage in the wrongful conduct complained of herein.  The Investment Adviser defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements in the Prospectuses.

180.    Pursuant to Section 15 of the Securities Act, by reason of the foregoing, the Investment Advisor defendants are liable to plaintiffs to the same extent as are each of the Registrant defendants for their primary violations of Section 11 of the Securities Act.

181.    By virtue of the foregoing, plaintiffs and other Class members are entitled to damages against the Investment Adviser defendants.

## VIOLATIONS OF THE EXCHANGE ACT

### FOURTH CLAIM FOR RELIEF

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b 5 PROMULGATED THEREUNDER

182.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter, except for Claims brought pursuant to the Securities Act.

183.    This claim is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, on behalf of both (i) purchasers and (ii) holders of  Scudder mutual fund shares against the Scudder defendants, Painewebber and John Does 1-100.

184.    During the Class Period, each of the defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including plaintiffs and other Class members, as alleged herein and cause plaintiffs and other members of the Class to purchase Scudder funds shares or interests at distorted prices and to otherwise suffer damages.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

185.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Scudder funds' securities, including

plaintiffs and other members of the Class, in an effort to enrich themselves through undisclosed manipulative trading tactics by which they wrongfully appropriated Scudder funds' assets and otherwise distorted the pricing of their securities in violation of Section 10(b) of the Exchange Act and Rule 10b 5.  All defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

186.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Scudder funds' operations, as specified herein.

187.    Defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from secretly timed trading and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and members of the Class.

188.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

189.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Scudder funds securities were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein.  In ignorance of these facts that market prices of the shares were distorted, and relying directly or indirectly on the false and misleading

statements made by the Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired the shares or interests in the Scudder funds during the Class Period at distorted prices and were damaged thereby.

190.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and other members of the Class and the marketplace known of the truth concerning the Scudder funds' operations, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their shares or, if they had acquired such shares or other interests during the class Period, they would not have done so at the distorted prices which they paid.

191.    Plaintiffs and the other members of the Class were also damaged by virtue of their status as holders of Scudder funds.  In connection with the schemes constituted by the unlawful purchases and sales of securities by market timers, as alleged herein, Plaintiffs and the other members of the Class suffered substantial damages, including but not limited to the dilution of the value of their investment stemming from the activity of the market timers and late traders. But for these unlawful purchases and sales, Plaintiffs and the other members of the Class would not have suffered damages from the dilution of their investment alleged herein.

192.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b 5 promulgated thereunder.

## FIFTH CLAIM FOR RELIEF

## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT

193.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter, except for Claims brought pursuant to the Securities Act.

194.     This claim is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Investment Advisor defendants, Deutsche Bank AG, and the Registrant defendants.

195.     It is appropriate to treat these Defendants as a group for pleading purposes and to presume that the materially false, misleading, and incomplete information conveyed in the Scudder funds' public filings, press releases and other publications are the collective actions of Defendants.

196.     Defendants acted as controlling persons of the Scudder funds within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein.  By virtue of their operational and management control of the Scudder funds' respective businesses and systematic involvement in the fraudulent scheme alleged herein, Defendants each had the power to influence and control and did influence and control, directly or indirectly, the decision making and actions of the Scudder funds, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Defendants had the ability to prevent the issuance of the statements alleged to be false and misleading or cause such statements to be corrected.

197.     In particular, each of Defendants had direct and supervisory involvement in the operations of the Scudder funds and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

198.    As set forth above, Defendants each violated Section 10(b) and Rule 10b 5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Scudder funds securities during the Class Period.

## VIOLATIONS OF THE INVESTMENT COMPANY ACT OF 1940

## SIXTH CLAIM FOR RELIEF

## VIOLATION OF SECTION 34(b) OF THE INVESTMENT COMPANY ACT

199.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

200.    This claim is brought pursuant to Sections 34(b) of the Investment Company Act, 15 U.S.C. § 80a 33(b), against the Scudder defendants.

201.    Under Section 34(b) of the Investment Company Act, it is unlawful for any person to make any untrue statement of a material fact in any registration statement application, report, account, record, or other document filed or transmitted pursuant to this title or the keeping of which is required pursuant to section 31(a) [15 U.S.C. § 80a 30(a)].  It is also unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.

202.    Defendants made untrue statements of a material fact in its registration statement, application, report, account, record, and/or other document filed or transmitted pursuant to this title, or the keeping of which is required pursuant to section 31(a) [15 U.S.C. § 80a 30(a)].

203.     Plaintiffs and other Class members have been injured as a result of defendants' statements, conduct, and violations.

## SEVENTH CLAIM FOR RELIEF

## VIOLATION OF SECTION 36(a) OF THE INVESTMENT COMPANY ACT

204.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

205.     This claim is brought pursuant to Section 36(a) of the Investment Company Act, 15 U.S.C. § 80a 35(a), against the Scudder defendants.

206.     Under Section 36(a), the defendants named in this Count are deemed to owe fiduciary duties to Plaintiffs and other Class members and are prohibited from engaging in misconduct with respect to Scudder.

207.     The defendants named in this Count devised and participated in a scheme to obtain substantial fees and other income for themselves and their affiliates by allowing others to engage in market timing of Scudder mutual funds throughout the Class Period, solely for their own benefit and to the detriment of Plaintiffs and the Class, in violation of their fiduciary duties to Plaintiffs and other Class members.   Defendants further failed to reveal material facts concerning their conduct, such that Plaintiffs and other Class members could have made informed decisions about the true value and performance of Scudder mutual funds.

208.     Plaintiffs and other Class members have been injured as a result of defendants' statements, conduct, and violations.

## EIGHTH CLAIM FOR RELIEF

## VIOLATION OF SECTION 36(b) OF THE INVESTMENT COMPANY ACT

209.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

210.    This claim is brought pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a 35(b), against the Scudder defendants.

211.    Under Section 36(b) of the Investment Company Act, defendants are deemed to owe a fiduciary duty to Plaintiffs and other Class members with respect to the receipt of fees and compensation that defendants receive for services of a material nature.

212.    Defendants devised and implemented a scheme to obtain substantial and excessive fees and other income for themselves and their affiliates by allowing others to engage in timing of Scudder funds throughout the Class Period and in violation of their fiduciary duties to their customers, i.e., Plaintiffs and other Class members.  Defendants failed to reveal material facts concerning their conduct, such that Plaintiffs and other Class members could have made informed decisions about the true value and performance of the Scudder funds.

213.    Plaintiffs and other Class members have been injured as a result of defendants' statements, conduct, and excessive fees.

## NINTH CLAIM FOR RELIEF

## VIOLATION OF SECTION 48(a) OF THE INVESTMENT COMPANY ACT

214.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

215.    This claim is brought pursuant to Section 48(a) of the Investment Company Act, 15 U.S.C. §80a 47, against the Scudder defendants.

216.     Under Section 48(a) of the Investment Company Act, it is unlawful for any defendant to do indirectly that which, under the Act, it could not do directly.

217.     Defendants devised and implemented a scheme to obtain substantial fees and other income for themselves and their affiliates by allowing others to engage in timing of Scudder funds throughout the Class Period and in violation of their fiduciary duties to their customers, i.e., Plaintiffs and other Class members.  Defendants failed to reveal material facts concerning their conduct, such that Plaintiffs and other Class members could have made informed decisions about the true value and performance of the Scudder funds.

218.     Plaintiffs and other Class members have been injured as a result of defendants' statements, conduct, and excessive fees.

219.     Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

220.     By virtue of Plaintiff's and the Class members' ownership of the Scudder funds, the representations that defendants made in the Prospectus about timing, and the obligations imposed by law as set forth in further detail in the SEC letters, defendants owed Plaintiffs and the Class members fiduciary duties of the highest good faith, integrity and fair dealing.

221.     Defendants and each of them breached their fiduciary duties by engaging in the acts and omissions detailed more fully above, including but not limited to, treating certain mutual fund investors differently than other mutual fund investors; failing to follow their disclosed policy and procedures of preventing market timing, affirmatively allowing certain investors to engage in timing in exchange for investing in defendants' funds; and  failing to disclose their true practices and procedures to Plaintiff and the Class.

222.     Each of the Defendants knew that the other Defendants were breaching their fiduciary duties to Plaintiff and the Class.  Notwithstanding their knowledge, Defendants and each of them, engaged in conduct, herein before described, which rendered substantial assistance to, encouraged, and/or aided and abetted the breaches of duty.

223.     As a result of the wrongful conduct of defendants, Plaintiffs and the Class have suffered and will continue to suffer economic losses and other general and specific damages, all in an amount to be determined according to proof.

224.     The aforementioned acts of Defendants, and each of them, were done maliciously, oppressively, and with intent to defraud, and Plaintiffs and the Class are entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

## VIOLATIONS OF STATE AND COMMON LAW

## TENTH CLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTY/CONSTRUCTIVE FRAUD

225.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

226.     This claim is brought against the Scudder defendants.

227.     Defendants owed fiduciary duties to Plaintiffs to use reasonable care and skill in operating, administering, issuing, underwriting, distributing and managing the Scudder family of funds.  As a part of their fiduciary duties to Plaintiffs, defendants also owed a duty to make a full and truthful disclosure of all material facts, to ensure that their representations regarding market timing were complete and accurate, and to ensure that actions were taken to protect long term holders of mutual fund shares in the Scudder family of funds from damage caused to their investments from market timing.

228.    Defendants intentionally or recklessly breached their fiduciary duties by allowing favored investors to conduct timed trading in the Scudder family of funds, by misrepresenting and concealing the existence of such market timing, and by placing their own financial interests above those of Plaintiffs.

229.    Defendants breaches of their fiduciary duties to Plaintiffs tended to deceive, to violate public and private confidence and to injure public interests.

230.    Plaintiffs suffered injury as a result of defendants conduct in the form of, *inter alia*, the following:  increased transaction costs; requiring the family of funds to keep excessive cash on hand to pay out timers' redemptions; lower NAV; and management fees.

231.    Defendants breaches of their fiduciary duties proximately caused the damages suffered by Plaintiffs.

**ELEVENTH CLAIM FOR RELIEF**

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

232.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

233.    As alleged above, the Scudder defendants owed a fiduciary duty to Plaintiffs. That duty was breached when those defendants permitted favored investors to market time in the Scudder family of funds.

234.    Defendants Painewebber, UBS Wealth Management USA and John Does 1 - 100 knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted the Scudder defendants  in breaching their fiduciary duties.

235.    As a result of defendant Painewebber and UBS Wealth Management USA's aiding and abetting of the Scudder defendants' breaches of fiduciary duty, Plaintiffs suffered

damages.

## TWELFTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT

236.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

237.    Plaintiffs conferred a benefit on all defendants.  Defendants derived management fees and other benefits and were otherwise unjustly enriched from transactions connected with the Scudder family of funds, to the detriment of Plaintiffs.

238.    Defendants enrichment is directly and causally related to the detriment of Plaintiffs.

239.    The benefit was accepted by defendants under such circumstances that it would be inequitable for it to be retained without payment.  As alleged above, defendants, *inter alia*, breached their fiduciary duties to Plaintiffs and breached contracts with Plaintiffs, and therefore defendants are not justified to retain the benefits conferred upon them.

240.    As a result of all of the defendants' conduct, Plaintiffs suffered damages.

241.    There is no adequate remedy at law to compensate for the injuries of Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.    Declaring this action to be a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure and declaring Plaintiffs to be proper Class Representatives;

2.      Awarding Plaintiffs and the other members of the Class compensatory damages as a result of the wrongs alleged herein, including interest thereon, and further awarding punitive damages, disgorgement and restitution;

3.      Awarding Plaintiffs and the other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

4.      Granting Plaintiffs and the other members of the Class such other and further relief as the Court may deem just and proper.

Plaintiff hereby demands a trial by jury.

Dated:  September 29, 2004               BERGER & MONTAGUE

                                          _____/s/_____
                                          SHERRIE R. SAVETT
                                          ROBERT A. KAUFFMAN
                                          GLEN L. ABRAMSON
                                          1622 Locust Street
                                          Philadelphia, PA 19103
                                          Tel:    (215) 875-3000
                                          Fax:    (215) 875-4604
                                          *Lead Counsel*

Dated:  September 29, 2004               TYDINGS & ROSENBERG LLP

                                          _____/s/_____
                                          WILLIAM C. SAMMONS, Fed Bar No. 02366
                                          JOHN B. ISBISTER, Fed Bar No. 00639
                                          100 East Pratt Street, 26th Floor
                                          Baltimore, MD 21202
                                          Tel:    (410) 752-9700
                                          Fax:    (410) 727-5460
                                          *Liaison Counsel*

## EXHIBIT "A"

## LIST OF PARTIES

### NEW PLAINTIFFS

Linda S. Cape

### NEW DEFENDANTS

Deutsche Asset Management Investment Services Ltd.

Scudder Distributors, Inc.

Investment Company Capital Corporation

Brenda Lyons

William F. Glavin, Jr.

Richard T. Hale

John A. Keffer

James E. Minnick

Charles A. Rizzo

Amy Olmert

Joseph A. Finelli

Tracie Richter

Kenneth Murphy

Salvatore Schiavone

Lucinda Stebbins

Kathleen Sullivan D'Eramo

John Millette

Daniel O. Hirsch

Caroline Pearson

Bruce A. Rosenblum

David W. Baldt

James H. Grifo

Neil P. Jenkins

Patrick W. W. Disney

Ian D. Kelson

Joan A. Binstock

Richard R. Burt

Martin J. Gruber

S. Leland Dill

Philip Saunders, Jr.

Joseph R. Hardiman

Richard J. Herring

Graham E. Jones

Rebecca W. Rimel

William N. Searcy

Robert H. Wadsworth

Charles P. Biggar

Bruce E. Langton

Harry Van Benschoten

Kelvin J. Lancaster

Paul K. Freeman

Hugh G. Lynch

Edward T. Tokar

UBS Painewebber

UBS Wealth Management USA

## **DROPPED PARTIES**

SCUDDER 21ST CENTURY GROWTH FUND, SCUDDER AGGRESSIVE GROWTH FUND, SCUDDER BLUE CHIP FUND, SCUDDER CAPITAL GROWTH FUND, SCUDDER DYNAMIC GROWTH FUND, SCUDDER FLAG INVESTORS COMMUNICATIONS FUND, SCUDDER GLOBAL BIOTECHNOLOGY FUND, SCUDDER GOLD & PRECIOUS METALS FUND, SCUDDER GROWTH FUND, SCUDDER HEALTH CARE FUND, SCUDDER LARGE COMPANY GROWTH FUND, SCUDDER MICRO CAP FUND, SCUDDER MID CAP FUND, SCUDDER SMALL CAP FUND, SCUDDER STRATEGIC GROWTH FUND, SCUDDER TECHNOLOGY FUND, SCUDDER TECHNOLOGY INNOVATION FUND, SCUDDER TOP 50 US FUND, SCUDDER CONTRARIAN FUND, SCUDDER-DREMAN FINANCIAL SERVICES FUND, SCUDDER-DREMAN HIGH RETURN EQUITY FUND, SCUDDER-DREMAN SMALL CAP VALUE FUND, SCUDDER FLAG INVESTORS EQUITY PARTNERS FUND, SCUDDER GROWTH & INCOME FUND, SCUDDER LARGE COMPANY VALUE FUND, SCUDDER-RREEF REAL ESTATE SECURITIES FUND, SCUDDER SMALL COMPANY STOCK FUND, SCUDDER SMALL COMPANY VALUE FUND, SCUDDER TAX ADVANTAGED DIVIDEND FUND, SCUDDER FLAG INVESTORS VALUE BUILDER FUND, SCUDDER FOCUS VALUE AND GROWTH FUND, SCUDDER LIFECYCLE MID RANGE FUND, SCUDDER LIFECYCLE LONG RANGE FUND, SCUDDER LIFECYCLE SHORT RANGE FUND, SCUDDER PATHWAY CONSERVATIVE PORTFOLIO, SCUDDER PATHWAY GROWTH PORTFOLIO, SCUDDER PATHWAY MODERATE PORTFOLIO, SCUDDER RETIREMENT FUND SERIES V, SCUDDER RETIREMENT FUND SERIES VI, SCUDDER RETIREMENT FUND SERIES VII, SCUDDER TARGET 2010 FUND, SCUDDER TARGET 2011 FUND, SCUDDER TARGET 2012 FUND, SCUDDER TARGET 2013 FUND, SCUDDER TOTAL RETURN FUND, SCUDDER EMERGING MARKETS GROWTH FUND, SCUDDER EMERGING MARKETS INCOME FUND, SCUDDER EUROPEAN EQUITY FUND, SCUDDER GLOBAL FUND, SCUDDER GLOBAL BOND FUND, SCUDDER GLOBAL DISCOVERY FUND, SCUDDER GREATER EUROPE GROWTH FUND, SCUDDER INTERNATIONAL FUND, SCUDDER INTERNATIONAL EQUITY FUND, SCUDDER INTERNATIONAL SELECT EQUITY FUND, SCUDDER JAPANESE EQUITY FUND, SCUDDER LATIN AMERICA FUND, SCUDDER NEW EUROPE FUND, SCUDDER PACIFIC OPPORTUNITIES FUND, SCUDDER WORLDWIDE 2004 FUND, SCUDDER FIXED INCOME FUND, SCUDDER HIGH INCOME PLUS FUND, SCUDDER HIGH INCOME FUND, SCUDDER HIGH INCOME OPPORTUNITY FUND, SCUDDER INCOME FUND, SCUDDER PRESERVATIONPLUS FUND, SCUDDER

PRESERVATIONPLUS INCOME FUND, SCUDDER SHORT TERM BOND FUND, SCUDDER SHORT DURATION FUND, SCUDDER STRATEGIC INCOME FUND, SCUDDER US GOVERNMENT SECURITIES FUND, SCUDDER CALIFORNIA TAX-FREE INCOME FUND, SCUDDER FLORIDA TAX-FREE INCOME FUND, SCUDDER HIGH YIELD TAX-FREE FUND, SCUDDER INTERMEDIATE TAX/AMT FREE FUND, SCUDDER MANAGED MUNICIPAL BOND FUND, SCUDDER MASSACHUSETTS TAX-FREE FUND, SCUDDER MUNICIPAL BOND FUND, SCUDDER NEW YORK TAX-FREE INCOME FUND, SCUDDER SHORT TERM MUNICIPAL BOND FUND, SCUDDER EAFE ® EQUITY INDEX FUND, SCUDDER EQUITY 500 INDEX FUND, SCUDDER S&P 500 STOCK FUND, SCUDDER SELECT 500 FUND, SCUDDER US BOND INDEX FUND, SCUDDER CASH RESERVES FUND;  SCUDDER ADVISOR FUNDS II, SCUDDER ADVISOR FUNDS III, SCUDDER AGGRESSIVE GROWTH FUND, SCUDDER BLUE CHIP FUND, SCUDDER CALIFORNIA TAX FREE TRUST, SCUDDER CASH INVESTMENT TRUST, SCUDDER CASH MANAGEMENT PORTFOLIO, SCUDDER SECURITIES TRUST, SCUDDER DYNAMIC GROWTH FUND, SCUDDER EQUITY 500 INDEX PORTFOLIO, VALUE EQUITY TRUST, SCUDDER EQUITY TRUST/IL, SCUDDER FLAG INVESTORS COMMUNICATIONS FUND INC., SCUDDER FLAG EQUITY PARTNERS FUND INC., SCUDDER FLAG INVESTORS VALUE BUILDER FUND, INC., SCUDDER FLOATING RATE FUND /MA/, SCUDDER FOCUS VALUE PLUS GROWTH FUND, SCUDDER MONEY MARKET TRUST, SCUDDER FUNDS TRUST, GLOBAL/INTERNATIONAL FUND INC., SCUDDER GNMA FUND, SCUDDER GROWTH TRUST, SCUDDER HIGH INCOME SERIES, SCUDDER INCOME TRUST, SCUDDER INTERNATIONAL FUNDS INC., SCUDDER INTERNATIONAL RESEARCH FUND INC., SCUDDER INVESTMENT PORTFOLIOS, INVESTMENT TRUST, SCUDDER INVESTMENTS VIT FUNDS, SCUDDER INVESTORS FUNDS INC., SCUDDER INVESTORS PORTFOLIOS TRUST, SCUDDER INVESTORS TRUST, SCUDDER MONEY FUNDS, SCUDDER MUNICIPAL TRUST, SCUDDER MUTUAL FUNDS INC., SCUDDER PATHWAY SERIES /NEW/, SCUDDER PORTFOLIO TRUST, SCUDDER PORTFOLIOS, SCUDDER RREEF SECURITIES TRUST, SCUDDER STATE TAX FREE TRUST, SCUDDER STATE TAX-FREE INCOME SERIES, SCUDDER STRATEGIC INCOME FUND, SCUDDER TARGET FUND, SCUDDER TAX FREE MONEY FUND, SCUDDER TAX FREE TRUST, SCUDDER TECHNOLOGY FUND, SCUDDER TOTAL RETURN FUND, SCUDDER TREASURY MONEY PORTFOLIO, SCUDDER U.S. GOVERNMENT SECURITIES FUND, SCUDDER U.S. TREASURY MONEY FUND, SCUDDER VALUE SERIES INC., SCUDDER YIELDWISE FUNDS;  SCUDDER INVESTMENTS; DEUTSCHE INVESTMENT MANAGEMENT AMERICAS INC.